UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2002 SEP 30  P 12: 57

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| The Estate of Debra Davis<br><br>by<br><br>Olga Davis, in her capacity as<br>administratrix of the Estate of<br>Debra Davis,<br><br>     Plaintiff<br><br>v.<br><br>United States of America,<br>H. Paul Rico,<br>John Morris,<br>John Connolly,<br>Roderick Kennedy,<br>Robert Fitzpatrick,<br>James Ring,<br>James Greenleaf,<br>James Ahearn,<br>John Does, Nos. 1-50,<br><br>     Defendants | Civil Action No.<br><br>**02-11911 RCL**<br><br>RECEIPT # _____<br>AMOUNT $ 150<br>SUMMONS ISSUED _____<br>LOCAL RULE 4.1 _____<br>WAIVER FORM _____<br>MCF ISSUED _____<br>BY DPTY. CLK. _____<br>DATE  09-30-02 |

## COMPLAINT

### I.     INTRODUCTION

1.    The Estate of Debra Davis files this complaint, pursuant to the Federal Tort Claims Act,

28 U.S.C. §§ 2671, et seq, Chapter 229 of the Massachusetts General Laws and *Bivens v.*

*Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971),

against the United States of America, and at least eight former agents of the Boston

Office of the FBI.

2.    Plaintiff seeks redress for the kidnap, torture and murder of Debra Davis ( "Davis").

James J. Bulger and Stephen Flemmi have been indicted for the murder of Debra Davis.



*United States v. Bulger,* 99-CR-10371-RGS, Superseding Indictment. Plaintiff has filed

suit against Bulger and Flemmi in state court for the wrongful death of Debra Davis. See

*Olga Davis, et al v. Stephen J. Flemmi, et al,* Norfolk Superior Court C.A. No. 01 00282.

3.     As a proximate cause of the federal defendants' acts and/or omissions, Davis was

wrongfully killed and her rights as guaranteed by the Fourth and Fifth Amendments to

the United States Constitution and Massachusetts law were violated, as were the Estate's

rights to redress its grievances in the courts of the United States as guaranteed by the

First and Fifth Amendments to the United States Constitution.

4.     Plaintiff alleges that beginning in or about 1969 and continuing up to July 6, 2000, the

federal defendants conspired to protect and shield from prosecution James J. Bulger,

Stephen Flemmi, Kevin Weeks and other members of the so-called "Winter Hill

Organized Crime Group" in exchange for Bulger's and Flemmi's agreements to provide

information to aid the FBI in its prosecution of La Costra Nostra ("LCN") - Bulger's and

Flemmi's competitors in the Boston, Massachusetts Organized Crime Market. It was the

object of the conspiracy for the federal defendants to protect Bulger and Flemmi from

arrest and prosecution in order to maintain their roles as high echelon informants,

providing information to the FBI. Plaintiff alleges that the defendant United States and

federal defendants knew or should have known that Bulger and Flemmi were involved in

violent criminal activity, including murder, extortion and assault, but despite this

knowledge failed or refused to investigate Bulger and Flemmi's criminal activity for

purposes of prosecution because, if prosecuted, the federal defendants would lose Bulger

and Flemmi's services as informants.

5.     The Complaint alleges that the defendant United States continued to utilize Bulger and

2

Flemmi as top echelon informants, even though they had been involved in approximately 23 murders, including at least two persons who were directly cooperating with the FBI at the time of their execution.  Furthermore, the complaint alleges that the federal defendants failed to control the criminal activities of Bulger and Flemmi; failed to enforce the Attorney General Guidelines concerning high echelon informants; violated the Attorney General's Regulations and Policies by failing to inform appropriate law enforcement authorities of the criminal activities of Bulger and Flemmi; failed to properly supervise federal agents, including Connolly and Morris in their handling of Bulger and Flemmi as top echelon informants; and failed to investigate for purposes of prosecution the circumstances of Davis' disappearance and death.

6.     For 21 years, the family of Debra Davis was ignored by the FBI, except for occasional meetings between members of the FBI and Davis' mother Olga, which appeared to be fishing expeditions regarding the family's knowledge of Flemmi's involvement with the FBI rather than any serious attempt at investigating Davis' disappearance.  Davis' remains were finally uncovered in or around October 2000, in a shallow make-shift grave in Dorchester, Massachusetts.

7.     This complaint closely follows the findings and rulings of the United States District Court for the District of Massachusetts.  See *United States v. Salemme*, 91 F.Supp. 2d 141 (D. Mass. 1999).  The Complaint incorporates by reference and includes herein the findings and rulings contained in that order, as well as the facts and circumstances set forth in *United States v. Kevin J. Weeks*, 00-10245-RGS, and *United States v. James J. Bulger, et al*, 99-10371-RGS, charging Bulger and Flemmi with the murder of Debra Davis.

3

## II. PARTIES

8.    Olga Davis in her capacity as administratrix of the Estate of Debra Davis brings this
      action on behalf of the Estate.  The Estate is being probated in Norfolk County Probate
      Court, Commonwealth of Massachusetts.  Olga Davis is duly qualified and authorized to
      maintain this action.

9.    The United States of America ("United States") is a defendant in this action pursuant to
      the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. arising from the acts and/or
      omissions of employees and agents of the Federal Bureau of Investigation ("FBI"), an
      agency of the defendant, and a party defendant for claims arising from Chapter 229 of the
      Massachusetts General Laws in which individual agents of the FBI are named as
      defendants for negligent or wrongful acts or omissions while acting in the scope of their
      office or employment by the FBI, a federal agency pursuant to 28 U.S.C. § 2671 et seq.

10.   Defendant H. Paul Rico ("Rico") is a resident of Florida.  During all times alleged in this
      complaint, Rico was acting within the scope of his office or employment as a Special
      Agent of the FBI.  Rico is sued individually and in his official capacity.

11.   Defendant John Morris ("Morris") resides in a location presently unknown.  During all
      times alleged in this complaint, Morris was acting within the scope of his office or
      employment as a Special Agent of the FBI.  Morris is sued individually and in his official
      capacity.  From 1970 until in or about December 1995, Morris was an FBI Special Agent.
      From approximately March 1972 until approximately November 1991, Morris was
      assigned to the FBI's Boston field office.  For much of that time, Morris was a
      supervisory special agent, and, between December 1977 and January 1983 was the direct
      supervisor of John J. Connolly, Jr. on the FBI's organized crime squad.

4

12.   Defendant, John J. Connolly, Jr. ("Connolly") is a resident of Lynnfield, Massachusetts. During all times alleged in this complaint, Connolly was acting in the scope of his office or employment as a Special Agent of the FBI.  Connolly is sued individually and in his official capacity.  From November 1968 to December 1990, Connolly was a Special Agent of the FBI.  From February 1973 until his retirement in December 1990, Connolly was assigned to the Boston Office of the FBI.

13.   Defendant Roderick Kennedy ("Kennedy") is a resident of Quincy, Massachusetts. During all times alleged in this complaint, Kennedy was acting within the scope of his office or employment as a Special Agent of the FBI.  Kennedy is sued individually and in his official capacity.

14.   Defendant Robert Fitzpatrick ("Fitzpatrick") resides in a location presently unknown. During all times alleged in this complaint, Fitzpatrick was acting within the scope of his office or employment as a Special Agent of the FBI.  Fitzpatrick is sued individually and in his official capacity.

15.   Defendant James Ring ("Ring") is a resident of Boston, Massachusetts.  During all times alleged in this complaint, Ring was acting within the scope of his office or employment as a special agent of the FBI.  Ring is sued individually and in his official capacity.  In or about January 1983, Ring became the supervisory Special Agent of the Organized Crime Squad for the Boston Office of the FBI.  Ring retired from the FBI in or about 1990. During the time of his tenure, Debra Davis was murdered.

16.   Defendant James Greenleaf ("Greenleaf") is a resident of Scarborough, Maine.  During all times alleged in this Complaint, Greenleaf was acting within the scope of his office or employment as a Special Agent of the FBI.  Greenleaf is sued individually and in his

5

official capacity.  During pertinent times alleged in the Complaint, Greenleaf was the FBI

Special Agent in charge of the Boston Office commencing in November 1982 and served

in that capacity until December 1986.  During the time of his tenure, Debra Davis was

murdered.

17.    Defendant James Ahearn ("Ahearn") resides in a location presently unknown.  During all

times alleged in this complaint, Ahearn was acting within the scope of his office or

employment as a Special Agent of the FBI.  Ahearn is sued individually and in his

official capacity.  During pertinent times alleged in the Complaint, Ahearn was Special

Agent in charge of the Boston FBI Office.

18.    John Does Nos. 1 through 50 are persons presently unknown to the plaintiff who violated

the plaintiff's rights as guaranteed by the United States Constitution and Massachusetts

law and/or conspired with others to do so.  The John Does may be private individuals,

state officials or agents of the United States Government who acted in concert with the

federal officials named in this Complaint to deny plaintiff its rights guaranteed by the

United States Constitution and Massachusetts law.  Based on information and belief, the

John Does and other persons, both known and unknown, actively participated in, ratified,

or otherwise implemented the conspiracy alleged herein.  Plaintiff believes that the

conduct and statements of these individuals in furtherance of the conspiracy alleged

herein are admissible against the named defendants but further states that it may request

leave to amend the Complaint as appropriate.

### III.    JURISDICTION AND VENUE

19.    This case is brought to recover damages from certain federal defendants caused to the

plaintiff, while those defendants were acting under color of law of the United States of

6

America, by depriving the plaintiff of its rights guaranteed by the United States Constitution. These causes of action are provided for by *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

20.   The jurisdiction of this Court is founded upon 28 U.S.C. § 1331, because this case arises under the Constitution of the United States.

21.   This case is also brought to recover damages under the Federal Tort Claims Act, 28 U.S.C. 2671, et seq., alleging that Davis' death was caused by the negligent or wrongful acts or omissions of certain employees of the United States Government while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to plaintiff in accordance with the laws of the Commonwealth of Massachusetts.

22.   The jurisdiction of this Court is founded upon 28 U.S.C. § 1346, because the Complaint states causes of action under the Federal Tort Claim Act, 28 U.S.C. § 1346, because the Complaint states causes of action under the Federal Tort Claim Act, 28 U.S.C. § 2671, et seq.

23.   The jurisdiction of this Court is founded upon 28 U.S.C. § 1367, because the Complaint states causes of action so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

24.   On September 14, 2001, the plaintiff duly presented a Notice of Tort Claim, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., 28 U.S.C. § 2401, and 28 C.F.R. § 14.1, et.seq. giving notice of Davis' injuries and wrongful death caused by the negligent or wrongful acts or omissions of certain employees of the United States

7

Government while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to the plaintiffs in accordance with the laws of the Commonwealth of Massachusetts. **See Exhibit A, appended hereto.**

25.    Although the claims referenced in the previous paragraph have not been denied, the United States Government has failed to act on the claims within six months from the date the claims were presented. Therefore, the plaintiff elects to treat these claims as having been denied.

26.    Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims of the plaintiff occurred in the District of Massachusetts.

IV.    THE ESTATE OF DEBRA DAVIS

27.    Debra Davis was a resident of Randolph, Massachusetts. At the time of her death, Davis was twenty-six (26) years old.

28.    In or around 1981, Davis disappeared. For nineteen years after her disappearance, Davis was not found.

29.    In or around October 2000, Davis' remains were unearthed from a make-shift grave in Dorchester, Massachusetts.

30.    Debra Davis is survived by her mother, Olga Davis, and numerous brothers and sisters.

31.    On or about March 22, 2001, the Probate and Family Court Department of the County of Norfolk, Commonwealth of Massachusetts appointed Olga Davis as administratrix of her daughter's estate.

32.    Debra Davis was a citizen of the United States of America and as such she and her Estate

are entitled to the protection of the Constitution and the laws of the United States of America.

33.     At all times relevant to the events herein, defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf, and Ahearn were acting under color of the laws of the United States of America, and/or were conspiring with or acting in concert with, persons who were acting under color of laws of the United States of America.

34.     Other than through the relief sought in this Complaint, the Estate has no effective means to seek redress for the violations of Davis' rights and the Estate's rights under the United States Constitution which are alleged herein.

35.     In the facts which give rise to the present lawsuit there are no "special factors counseling hesitation", Bivens, 403 U.S. at 397, in formulating a remedy for Davis and her Estate.


V. FACTS RELATIVE TO THE DISAPPEARANCE OF DEBRA DAVIS

36.     Sometime, in or around 1972, Debra Davis became acquainted with the defendants Flemmi and Bulger. Debra Davis at the time was seventeen (17) years old, Flemmi was thirty-eight (38).

37.     Flemmi lavished Davis with expensive gifts. Shortly thereafter, Debra Davis became intimate with the defendant Stephen J. Flemmi and for a period of time, resided with him in Brookline and then Randolph, Massachusetts.

38.     At all pertinent times, Stephen J. Flemmi was engaged in racketeering, as that term is defined at 18 U.S.C. s. 1961. Flemmi's racketeering was his primary source of income.

39.     At all pertinent times, Bulger and Flemmi were co-leaders of one or more racketeering enterprises. Racketeering (as that term is defined at 18 U.S.C. s. 1961) was Bulger's

9

primary source of income.

40. Debra Davis became unhappy in her relationship with Flemmi. Sometime in 1981, Debra Davis was desirous of concluding her relationship with Flemmi and she communicated this desire to Flemmi, directly.

41. Shortly thereafter, Debra Davis disappeared. Her last words to her mother, the plaintiff Olga Davis herein, was that she intended to meet Flemmi at an undisclosed location.

42. Flemmi and Bulger jointly murdered Debra Davis in 1981.

43. From 1981 until October 2000, Flemmi and Bulger fraudulently concealed their wrongful conduct from Debra Davis' family and friends. They did so by secreting her body to a hidden burial site, and burying her without proper rites.

44. Flemmi and Bulger were indicted for the murder of Debra Davis in October, 2000. See Indictment Crim. No. 99-10371-RGS , pp.11-27.

45. Until the indictment of Flemmi and Bulger, the plaintiff herein was aware of no admissible evidence to support an allegation that Flemmi and Bulger murdered Debra Davis.

46. Plaintiff alleges that beginning in or about 1965, the defendants H. Paul Rico, John Morris, John Connolly, Roderick Kennedy, Robert Fitzpatrick, James Ring, James Greenleaf, James Ahearn, and other members of the FBI conspired to shield from prosecution Stephen Flemmi, James Bulger and others, in exchange for Bulger and Flemmi's agreement to provide information to the FBI that could and would be used by that agency in its prosecution of Bulger and Flemmi's competitors in the Boston Organized Crime market.

47. The Boston Office of the FBI and its agents did not want Flemmi and Bulger to be

charged with crimes because, if they were, the Boston office would lose their services as informants. Prosecution of Bulger and Flemmi would also have eventually resulted in the disclosure that the FBI was engaging in conduct in violation of its rules and regulations, as well as the laws of the United States of America. In fact, once the protection afforded to Bulger and Flemmi dissolved, the disclosures associated to their relationship with the FBI led to the indictment of Bulger and Flemmi's "handler". See U.S. v. Connolly, Criminal Number 99-10428-JLT.

48.   It is alleged that certain of the defendants, acting in their official capacities and within the scope of their employment, allowed Flemmi and Bulger to continue to conduct their criminal activities with impunity, including murdering Debra Davis, when they knew or should have known that Debra and others were in danger.

49.   As a proximate cause of this gross negligence, Debra Davis' rights, as guaranteed by the Fourth and Fifth Amendments to the United States Constitution were violated.


VI.   RELATIONSHIP BETWEEN DEFENDANTS RICO AND FLEMMI

50.   In November 1965, FBI Special Agent H. Paul Rico targeted Flemmi for development as a top echelon informant – the highest status a source can achieve in the FBI. At that time, a top echelon informant was defined as an individual who "could provide a continuous flow of quality criminal intelligence information regarding the leaders of organized crime."

51.   Since the mid-1960s, the development of top echelon informants has been a very high priority for the FBI. The successful development of informants generally, and therefore top echelon informants particularly, has also been regarded as an important achievement

11

for an FBI agent, with the potential to effect significantly the progress of that agent's career. Thus, it is to the agent's benefit to develop top echelon informants.

52. Rico knew that all information received from informants is recorded on an FBI Form 209. During all times alleged herein, Rico failed to conform to what the FBI policies and procedures required concerning the handling of top echelon informants.

53. Rico sought to realize Flemmi's potential as a source of information by not treating him like a criminal who should be used with caution to obtain valuable information. Rather, Rico suggested that he and Flemmi were allies in a common cause, primarily a war against the LCN.

54. Rico promised Flemmi protection from the FBI if Rico would become an FBI informant.

55. Flemmi was receptive to the alliance with the FBI that Rico proposed. The arrangement offered him an opportunity to use the FBI to disable his enemies, enhance his safety and, with the competition diminished and the protection of the FBI, make his own criminal activities more profitable.

56. Agents of the FBI, including Connolly and Morris, engaged in a pattern of false statements being placed in Flemmi's informant file in order to divert attention from his crimes and/or FBI misconduct.

57. On February 8, 1967, Flemmi was designated as a top echelon informant.

58. When designating Flemmi as a top echelon informant, Rico wrote, with regard to Flemmi's past activities that he had "been engaged in bookmaking, shylocking, robberies, and a suspect of possibly being involved in gangland slayings."

59. Rico had an incentive not to document accurately or completely information about Flemmi's possible involvement in serious crimes because he might lose the authority to

12

utilize Flemmi as an informant, if Rico's superiors decided that Flemmi deserved to be targeted for continued criminal prosecution, rather than used as a source.

60. Rico's suspicions that Flemmi was a murderer did not deter him and the FBI from making Flemmi a top echelon informant and an ally in pursing their investigation of the LCN.

61. In addition to promising "protection" Rico said, in various ways, that Flemmi would not be prosecuted for crimes he was committing while serving as an informant.

62. Rico caused Flemmi to understand that the FBI would overlook Flemmi's criminal activity as long as he was providing information on the LCN.

63. Flemmi has since been indicted and charges are pending, in which it is alleged that in addition to other crimes in 1967, Flemmi participated in the murders of Wimpy Bennett, his brothers Walter and William Bennett, and Richard Grasso. *United States v. Flemmi*, 94-10287-MLW, Fourth Superseding Indictment. Flemmi has also been indicted and charges are pending in which it is alleged that in addition to other crimes, Flemmi participated in the murders of Debra Davis, Thomas King, John McIntyre, Arthur Barrett, Deborah Hussey, Richard Castucci, Roger Wheeler, John Callahan, James Sousa and Edward Connors. *United States v. O'Neil*, 99-CR-10371, Superseding Indictment.

64. Although Rico and his FBI colleagues often worked closely with State investigators and prosecutors in organized crime matters, they did not contribute to any investigation of Flemmi regarding the murders of the Bennetts or Grasso.

65. On or about January 30, 1968, an Attorney John Fitzgerald was crippled, but not killed, by a bomb that exploded as he started his car. Attorney Fitzgerald was representing a witness who was providing information about organized crime activities. The Middlesex

13

County District Attorney took primary responsibility for investigating the Fitzgerald bombing. Neither Rico nor agents of the FBI played any role in that investigation.

66. In September 1969, Rico telephoned Flemmi and informed him that "indictments were coming down" in the Fitzgerald case and suggested that Flemmi and "his friend", Salemme "leave town" promptly. Flemmi followed Rico's advice and he and Salemme fled together.

67. A few days later, on September 11, 1969, Flemmi and Salemme were indicted in Middlesex County for the Fitzgerald bombing and in Suffolk County for the William Bennett murder.

68. On September 15, 1969, Flemmi was closed administratively as an informant of the FBI and a federal fugitive warrant was issued for his arrest for his unlawful flight to avoid prosecution for murder.

VII.   FLEMMI AS A FUGITIVE

69. While Flemmi was a fugitive from justice, allegedly being pursued by the FBI, Flemmi stayed in contact with Rico.

70. FBI policy required that all contacts with informants be recorded. Rico made no effort to record his September 1969 conversation with Flemmi, nor any other conversation he had with Flemmi while Flemmi was a fugitive. Rico also failed to tell the agents responsible for Flemmi's apprehension that Rico had spoken to him.

71. Unlike Flemmi, Salemme was arrested and prosecuted for the Fitzgerald bombing. Salemme was convicted and, as a result, spent the next 15 years in prison.

72. Following the trial and conviction of Salemme, Flemmi called Rico at the Miami office of the FBI, where Rico was then working. Rico told Flemmi that he should return to

Boston and his legal problems would be favorably resolved.

73. Rico assured Flemmi that when he returned to Boston, he would be released on bail and all charges against him would be dismissed.

74. As arranged by Rico, on May 6, 1974, Flemmi returned to Boston and met in Park Square with two Boston detectives. Despite the fact that for five years he had been a fugitive from charges of murder and attempted murder, Flemmi was promptly released on bail by the Middlesex and Suffolk Superior Courts. The federal flight charges were dismissed on the same day.

75. The Fitzgerald bombing charges against Flemmi were subsequently dismissed and on November 13, 1974 the Bennett murder charges concerning Flemmi were also dismissed. Flemmi was a free man.

## VIII. THE DEVELOPMENT OF BULGER AS AN INFORMANT

76. In 1972, defendant Morris was transferred to the Boston Office of the FBI and assigned to the organized crime squad.

77. In or about 1974, defendant Connolly was transferred to the Boston Office of the FBI and also assigned to the organized crime squad.

78. Connolly had known Bulger since they were both children growing up in South Boston.

79. Bulger became a source for Connolly and was administratively designated an FBI informant on September 30, 1975.

80. Bulger explained to the FBI that he became an informant in part because he had "a close feeling towards S.A. John Connolly because they both grew up in the same neighborhood in Boston and had mutual childhood problems, as well as a deep hatred for La Cosa Nostra."

15

81.   When Connolly sought Bulger's cooperation as an informant, the FBI knew that Bulger

was deeply involved in violent gang war, was extorting money from bookmakers, and

was widely regarded and known as being brutally violent.

82.   On February 4, 1976, several months after being officially designated an informant,

Bulger was upgraded to top echelon status.

IX.   AN UNHOLY ALLIANCE: THE BOSTON OFFICE OF THE FBI
AND BULGER AND FLEMMI

A.   The Federal Bureau of Investigation

83.   The Federal Bureau of Investigation is a federal law enforcement agency statutorily

empowered by the United States Congress to enforce and investigate certain alleged

violations of the United States Criminal Code.  The FBI is part of the Department of

Justice and formally subject to oversight and direction by the Attorney General.

84.   The FBI is broken down into field offices.  One of the field offices is the Boston field

office.

85.   Among the offenses that the FBI is empowered to investigate are crimes involving

racketeering, 18 U.S.C. § 1962, et seq.; bribery, 18 U.S.C. § 201; loan sharking, 18

U.S.C. § 891; gambling, 18 U.S.C. § 1955; obstruction of justice, 18 U.S.C. § 1501 et

seq.; interference with commerce by threat, 18 U.S.C. § 1951; tampering with a witness,

victim or an informant, 18 U.S.C. § 1512; and retaliating against a witness, victim or

informant, 18 U.S.C. § 1513.

86.   The FBI has established certain core values that it claims "need to preserved and

defended by the FBI in performing its statutory missions.  Those values are: rigorous

obedience to the Constitution of the United States; respect for the dignity of all those we

protect; compassion; fairness; and uncompromising personal and institutional integrity."

87.   The FBI mission further states: "[r]espect for the dignity of all whom we protect reminds

us to wield law enforcement powers with restraint and to recognize the natural human

tendency to be corrupted by power and to become callous in its exercise. Fairness and

compassion insure that we treat everyone with the highest regard for the constitution,

civil and human rights. Personal and institutional integrity reinforce each other and are

owed to the Nation in exchange for the sacred trust and great authority conferred upon

us."

88.   The FBI was statutorily empowered to protect persons like Debra Davis from being

victimized by clandestine criminal organizations, and to investigate those responsible for

her death.

89.   The FBI is an agency within the meaning of 28 U.S.C. § 2671 et seq.

B.   Bulger and Flemmi

90.   At all times material to this complaint, the "Winter Hill Gang" or the "Bulger Group"

was a clandestine criminal organization that engaged in multiple crimes, including

murder, bribery, extortion, loan sharking, and illegal gambling in greater Boston,

Massachusetts. All of these crimes were subject to the jurisdictional authority of the FBI.

91.   As previously set forth in this complaint, at all times material to this complaint, Bulger

and Flemmi were members of the Winter Hill Gang, and were vicious hardened

criminals.

92.   During the time period alleged in this complaint, the Boston office of the FBI was

investigating the LCN, commonly referred to as the "Mafia". The Mafia was a

nationwide clandestine criminal organization, whose crimes were subject to the

17

jurisdictional authority of the FBI. The LCN was in direct criminal competition with the Winter Hill Gang. In order to investigate the LCN, the Boston office of the FBI enlisted the use of informants who were to provide to the FBI information about the LCN's criminal activities.

93.     Bulger and Flemmi were informants and agreed to cooperate with the FBI and to provide to its agents certain information concerning the criminal activities of the LCN. The FBI intended to prosecute and convict members of the LCN using the information provided to it by Bulger and Flemmi.

94.     In or about September 1980, Connolly officially re-registered Stephen Flemmi as a confidential informant for the FBI. At all times material to this complaint, Connolly was the FBI agent contact assigned to receive information from Bulger and Flemmi, otherwise known as their handler.

95.     The Special Agents of the FBI working out of the Boston office, including Greenleaf, Ring, Morris, Connolly, Kennedy, Fitzpatrick and Ahearn, knew that despite their cooperation with the FBI, Bulger and Flemmi were still engaged in serious criminal wrongdoing during all times pertinent to this complaint.

96.     Agents of the FBI, including Morris and Connolly, made Bulger and Flemmi, who were previously acquainted, but not close, a perfect match. In Boston, Flemmi and Bulger uniquely shared an antipathy for the LCN, a desire to profit criminally from its destruction and the promised protection of the FBI. In order to protect Bulger and Flemmi as sources of information, agents of the FBI, including Connolly, tipped Bulger and Flemmi to various law enforcement initiatives in order to protect their ongoing criminal activities. At all times relevant to this case, agents of the FBI, in order to protect

Bulger and Flemmi from prosecution, and to further their criminal activities, knowingly falsified official FBI documents regarding Bulger's and Flemmi's participation in criminal activities.

97.   During all times relevant to this case, in order to protect Bulger and Flemmi from prosecution and to further their criminal activities, agents of the FBI, failed to report Bulger and Flemmi's ongoing criminal activities, including extortion, loan sharking and illegal gambling.

98.   During all times relevant to this complaint, agents of the FBI, in order to protect Bulger and Flemmi, failed to properly index information concerning the criminal activities of Bulger and Flemmi and place that information in the investigative files referencing their names.

99.   At all times material to this complaint, agents of the FBI, including Connolly and Morris tipped off Bulger and Flemmi to as the identity of individuals who were providing criminal information against Bulger and Flemmi.

100.   As a consequence of the disclosures, these individuals were murdered.

101.   Agents of the FBI made insidious efforts to cultivate in Bulger and Flemmi the sense that Bulger and Flemmi were their friends, consultants, and allies, rather than criminals who were also informants of criminal activity.

102.   As the alliance between the FBI and Flemmi and Bulger developed, Flemmi and Bulger were invited to dine periodically with agents of the FBI engaged in investigating the LCN, including Connolly, Morris, and Ring. These dinners were arranged to celebrate milestones in the FBI's relationship with Bulger and Flemmi, including the successful wiretapping of the LCN's Boston headquarters, as well as the frustration of an

19

investigation of Bulger and Flemmi that had been lead by the Drug Enforcement Agency (the "DEA") in 1984-85. At these dinners, the agents, and Bulger and Flemmi exchanged gifts.

103. Following his retirement from the FBI in December 1990, Connolly maintained associations at the Boston field office of the FBI in order, in part, to obtain law enforcement information related to the criminal activities of Bulger, Flemmi and others.

104. After leaving the FBI, Connolly used the information he gained from the FBI to alert and apprise Bulger and Flemmi of law enforcement investigations into their criminal activities.

105. During hearings held in the matter of _United States of America v. Francis P. Salemme, et al_ in the United States District Court for the District of Massachusetts, the FBI failed to produce to the defendants or the court, as required by court orders, documents potentially damaging to the FBI and the United States.

## X.   THE FBI FORGES THE FLEMMI/BULGER PARTNERSHIP

106. In early 1975, Bulger asked Flemmi whether he would be willing to meet with Connolly. Soon after, Flemmi met with Connolly and Special Agent Condon at a coffee shop in Newton, Massachusetts.

107. Following the Newton meeting with Connolly and Condon, Flemmi began passing information about the LCN to Connolly, through Bulger.

108. Connolly understood that Bulger and Flemmi were dangerous, as he has explained: "we knew what these guys were. They did not have a paper route when we first met them. All of them, top echelon informants, are murderers. The government put me in business with murderers."

20

109.    Beginning in 1984, defendant Kennedy, on several occasions, discussed with Connolly
        what would happen if Bulger and Flemmi were ever arrested.  Kennedy repeatedly told
        Connolly that he believed that if Bulger or Flemmi were arrested, they would divulge
        their relationship with Connolly and the FBI.  Connolly regularly responded that he did
        not have to worry, because they were too smart to get caught.

110.    Connolly protected Flemmi and Bulger, himself, and the reputation of the FBI and others
        by furnishing Bulger and Flemmi information that might help them avoid arrest and
        prosecution.

111.    From approximately 1976 through 1994, Connolly, and Morris received gifts from both
        Flemmi and Bulger.

112.    From approximately 1976 through 1994, Connolly provided Bulger and Flemmi sensitive
        and confidential law enforcement information designed to protect the criminal activities
        of Bulger, Flemmi, and at times, their criminal associates.

113.    From at least 1976 through December 1990, Connolly, while he served as a special agent
        of the FBI, using confidential information that he had received from Morris and from
        other FBI and law enforcement sources, tipped Bulger and Flemmi to various law
        enforcement initiatives in order to protect their ongoing criminal activities.

114.    From at least 1976 through December 1990, Connolly, while he served as a special agent
        of the FBI, using confidential information that he received from FBI and other law
        enforcement sources, alerted Bulger and Flemmi to the identity of confidential law
        enforcement informants in order to protect Bulger's and Flemmi's ongoing criminal
        activities.

21

XI.   THE DEFENDANT FBI AGENTS VIOLATION OF THE ATTORNEY GENERAL'S GUIDELINES AND FBI RULES AND REGULATIONS PERTAINING TO FBI INFORMANTS.

115.   Prior to Davis' murder as set forth in this complaint, defendants Bulger and Flemmi, while providing information to the FBI during a period from 1965 to 1983, both separately and jointly, were engaged in approximately 23 murders and other violent criminal acts.

116.   In 1976, former Attorney General of the United States Edward H. Levi established guidelines relating to the FBI's handling of its informants.  Those guidelines were part of a larger effort by the Attorney General and others to establish standards and procedures aimed at ending a series of serious abuses by the FBI, which had long been masked by the secrecy in which the FBI historically operated.

117.   During the time periods alleged in this Complaint, in other jurisdictions, former FBI officials were indicted and convicted for obstruction of justice and other crimes.

118.   During the times alleged in this Complaint, the Director of the FBI, Clarence Kelley, admitted that some FBI activities had been "clearly wrong and quite indefensible." He declared that the Bureau should never again occupy the "unique position that permitted improper activity without accountability."

119.   On December 15, 1976, about a month before leaving office, Attorney General Levi issued a memorandum to the Director of the FBI that described basic standards and procedures for the FBI's use of informants in Domestic Security, Organized Crime, and other criminal investigations (the "Levi Memorandum").  The Levi Memorandum was incorporated in the FBI's Manual of Instructions, on January 12, 1977.

22

120.    Prior to the issuance of the Levi Memorandum, the FBI had the Manual of
        Instructions regarding the handling of informants.  Under both FBI's Manual of
        Instructions, as well as the Guidelines, it was mandatory that agents of the FBI
        exercise constant care "to avoid any disclosure to anyone which might permit
        identification of a criminal informant or even cast suspicion on a criminal informant."

121.    The Levi Memorandum made it mandatory that  "special care be taken not only to
        minimize [informants] use but also to ensure that individual rights are not infringed
        and that the government itself does not become a violator of the law.  Informants as
        such are not employees of the FBI, but the special relationship of an informant to the
        FBI imposes a special responsibility upon the FBI when the informant engages in
        activity where he has received, or reasonably thinks he has received encouragement
        or direction for that activity from the FBI."

122.    The Levi Memorandum provided that "[t]he FBI may not use informants ... for acts
        ... which the FBI could not authorize for its undercover agents."

123.    The Manual provided that "[u]nder no circumstances shall the FBI take any action to
        conceal a crime by one of its informants."  As set forth in this Complaint, this
        mandatory directive was regularly disregarded concerning Bulger and Flemmi.

124.    Pursuant to the Manual, if the FBI learned that  one of its informants had violated the
        law in furtherance of his assistance to the FBI, it was expected that "ordinarily" the
        FBI would promptly inform the appropriate law enforcement or prosecutive
        authorities, and the FBI would decide whether the continued use of the informant was
        justified.

125.    If there were exceptional circumstances that caused the FBI to believe that such

23

notification was "inadvisable", the FBI had a mandatory duty to inform the Department of Justice. The Department of Justice would then decide whether law enforcement or prosecutive authorities should be notified and whether the FBI should continue to use the informant. As set forth in this Complaint, this mandatory directive was regularly disregarded concerning Flemmi and Bulger.

126.   The Levi Memorandum also established the same procedures where the FBI had "knowledge" that one of its informants had committed a "serious" crime "unconnected with his FBI assignment." As set forth in this Complaint, this mandatory directive was regularly disregarded concerning Flemmi and Bulger.

127.   In 1981, the Guidelines were revised to clarify the need of FBI informants to engage in criminal activities in order to obtain important information  Under these Guidelines, "ordinary criminal activity" is to be authorized by an FBI field office supervisor or higher FBI official.  "Extraordinary criminal activity" which include conduct involving a "significant risk of violence" is to be authorized by the special agent in charge with the approval of the United States Attorney. As set forth in this Complaint, these mandatory directives were regularly disregarded concerning Bulger and Flemmi.

128.   Defendant Greenleaf and others failed to provide special seminars or major training concerning the Guidelines that were received by FBI agents in the Boston office. Morris did not read the new informant Guidelines when they were issued. The informant Guidelines were discussed occasionally in more general training sessions, but the organized crime supervisors in Boston did not get answers to any questions that they had, and the agents were not properly trained in the Guidelines application.

129.   In violation of the Guidelines, Morris and Ring viewed the Guidelines as inconsistent with the top echelon informant program. Thus, in violation of the mandatory duties of the Guidelines, defendants Morris and Ring made a decision that the Guidelines did not apply to organized crime matters despite their knowledge of a history of violence committed by Bulger and Flemmi who they knew to be confidential informants.

130.   Defendants Morris and Ring ignored and violated the provisions of the Attorney General Guidelines that required authorization of criminal activity and reporting of unauthorized crime committed by informants.

131.   Defendant Greenleaf failed to enforce or apply the Guidelines to the Organized Crime Squad despite an apparent history of violence committed by Bulger and Flemmi whom he knew to be confidential informants.

132.   The FBI headquarters in Washington, D.C. failed to effectively supervise the implementation of the Guidelines. While FBI headquarters periodically audited the Boston office's informant files, no deficiencies with regard to the handling of Bulger or Flemmi were noted, despite the fact that those files were replete with information indicating that Bulger and Flemmi were involved in serious criminal activity that had not been authorized in writing, investigated by the FBI, reported to other law enforcement agencies, or reported to the Assistant Attorney General for the Criminal Division as required by the Guidelines. While FBI headquarters engaged in this audit, they found no information or deficiencies that suggested that Bulger or Flemmi were involved with the murders of Castucci, Halloran, Callahan or McIntyre.

133.   With regard to Bulger and Flemmi, defendants Greenleaf, Ring, Morris, Connolly, Kennedy, Fitzpatrick and Ahearn disregarded the carefully calibrated standards and

25

procedures that were developed by Attorney General Levi and his successors for continuing to use informants after the FBI had decided to employ them.

134. While the SAC, Greenleaf delegated the responsibility for recommending the opening and closing of informants to the agent who was the informant's handler. The handler, acting in concert with his supervisor, was also given responsibility for any review of the informant's status that became necessary.

135. While SAC, Greenleaf knew that Bulger was an FBI informant. Greenleaf also knew that although Flemmi may have been technically closed as an informant, he was regularly providing information to the FBI.

136. Greenleaf was aware that Connolly was the handler for both Bulger and Flemmi. Greenleaf generally relied on Connolly and his supervisor, James Ring, to deal with Bulger and Flemmi, and with any matters relating to them.

137. As set forth above, in this period, the Attorney General's Guidelines, which had been incorporated in the FBI's Manual, required that the SAC himself make certain decisions, after consultation with the United States Attorney, whether to authorize extraordinary criminal activity involving a "serious risk of violence," and review all such criminal activity, at least every 90 days. Greenleaf violated this duty and improperly delegated these responsibilities to Connolly and Morris.

138. The Attorney General's Guidelines, which were incorporated in the FBI Manual, required a special review process if an FBI field office wanted to keep an informant open after it learned that he had participated in a serious act of violence or any other serious crime.

139. When Ring became head of the Organized Crime Squad, Morris suggested that Ring

26

terminate Bulger and Flemmi as sources because they "had outlived their usefulness."

140. Ring did not seek to have Bulger closed as an informant. Rather, on February 23, 1983, he approved a memorandum captioned as coming from Greenleaf, prepared by Connolly, to FBI Headquarters recommending that Bulger be elevated to Top Echelon informant status. The memorandum characterized Bulger as "one of the most highly placed and valuable informants in the Boston Division."

141. On May 26, 1983, Connolly wrote a memorandum to Ring requesting a determination of whether Flemmi would imminently be indicted as a result of the Wheeler-Callahan murder investigations or in the case arising from electronic surveillance at 98 Prince Street. Connolly based his request on the fact that Flemmi "continues to voluntarily furnish sensitive information of an extremely high quality."

142. During Ring and Connolly's tenure at the FBI, Flemmi was never indicted for his role in the Wheeler-Callahan murders or for the case arising from electronic surveillance at 98 Prince Street.

143. By the fall of 1983, Ring had met Bulger and Flemmi twice. The first time Ring went with Connolly to Bulger's apartment. The second meeting involved a dinner that Connolly arranged at Flemmi's parents' home

144. Ring used these occasions, in part, to observe and evaluate Connolly's interaction with Bulger and Flemmi, and did not like what he saw. Ring believed that Connolly was treating Bulger and Flemmi like "friends" or "consultants" rather than as informants.

145. Ring was aware Connolly was giving Bulger and Flemmi information.

146. Despite his concerns, Ring did not discipline Connolly or alter Connolly's

27

responsibilities concerning Bulger and Flemmi. Furthermore, contravening Ring's usual practice and in violation of the FBI Manual, no 209 exists relating to the meeting Ring attended at Flemmi's parents' home.

147.    In 1983 and 1984, Ring knew that Bulger and Flemmi were engaged in "a whole host of criminal activities." After rejecting Morris' recommendation to close Bulger and Flemmi as informants, Bulger and Flemmi continued their history of violent criminal activity including, but not limited to, the murders of Arthur "Bucky" Barrett and John McIntyre.

148.    Ring did not provide FBI Headquarters updated information on Bulger's and Flemmi's criminal activities.

149.    Ring believed that the Attorney General Guidelines' process for providing authorization to an informant to commit crimes was not feasible for Organized Crime informants. Morris told Ring that seeking authorization for criminal activity of Organized Crime informants was not "worth the aggravation." Ring agreed and the Guidelines were ignored by Greenleaf, Ring and their subordinates including defendants Morris and Connolly.

150.    As alleged in this Complaint, when members of the FBI received reliable information about criminal activity in which Bulger and Flemmi were engaged, they regularly consulted Connolly and then did not pursue any investigation. Among those who participated in the process of consulting Connolly and then deferring to the commitment he had made to protect Bulger and Flemmi were defendant Kennedy, and agents Potts, Ellavsky, John Newton, James Blackburn and James Levin.

151.    Despite the FBI's knowledge of Bulger's and Flemmi's participation in serious acts

28

of violence or other serious crimes, the Boston Office of the FBI while Greenleaf was

SAC, and Ring was supervisor of the Organized Crime Squad, violated the dictates of

the Attorney General's Guidelines and the FBI Manual.

152.    Assistant United States Attorney James Hebert and the United States Attorney Donald

Stern admitted the Guidelines were not obeyed, at least with regard to Flemmi.   As

Assistant United States Attorney James Herbert stated:

> We don't dispute … the Court's conclusion that the theory behind the
> Guidelines and the FBI's policies and procedures was to remove from the
> line agent the responsibility and the authority to make difficult decisions
> with respect to criminal informants … that is what they were designed to
> do and I don't think they were followed in connection with Mr. Bulger
> and Mr. Flemmi in the manner they were designed to.

United States Attorney Donald Stern stated:

> The FBI and attorney general informant guidelines, together with FBI
> administrative controls, are intended to provide the necessary checks
> and balances and to ensure that often difficult decisions are made to
> the appropriate level, based on complete and accurate information.
> While admittedly no system is foolproof, clearly those objectives were
> not met here, at least in certain critical respects.

## XII.    THE MURDER OF RICHARD CASTUCCI

153.    On or about July 31, 1975, Joseph McDonald and James Sims, both members of the

Winter Hill Gang, were charged with crimes in a federal indictment in the District of

Massachusetts.  McDonald and Sims became fugitives from that charge.

154.    In 1976, Richard Castucci was a nightclub owner and bookmaker who associated with

the Winter Hill Gang.  At the behest of the Winter Hill Gang, Castucci subsequently

assisted McDonald and Sims in obtaining an apartment in the Greenwich Village section

of New York City while they remained fugitives.

29

155.   During that time, Castucci also was a confidential informant of the FBI. In the later part of 1976, Castucci began to provide the FBI with specific information regarding the whereabouts of McDonald and Sims.

156.   In late 1976, Connolly provided otherwise confidential law enforcement information to Bulger which alerted him to the fact that Castucci was a confidential informant of the FBI.

157.   On or about December 29, 1976, as a result of being informed of Castucci's relationship with the FBI, members of the Winter Hill Gang, including Bulger and Flemmi, murdered Richard Castucci.

### XIII.   NATIONAL MELOTONE: REAL THREATS MADE BUT NO SERIOUS FBI INVESTIGATION

158.   In or about 1977 or 1978, several officials of National Melotone, a vending machine company, doing business in Boston, attempted to prompt an FBI investigation of Flemmi, Bulger and their associates for using threats of violence to have National Melontone's vending machines replaced with machines from Flemmi and Bulger's National Vending Company.

159.   Rather than pursue this information or report it to local law enforcement officials, Connolly and Morris successfully sought to protect Flemmi and Bulger.

160.   Utilizing Bulger's and Flemmi's reputations for extreme brutality, Connolly informed the executives of National Melotone that their families would be in great danger if they pursued the investigation, requiring their participation in the federal witness protection program and relocation. This advice exploited the frightening reputations

for violence that Flemmi and Bulger had acquired.

161.   Connolly's approach dissuaded the representatives of National Melotone from pursuing their charges.  Moreover, Connolly told Bulger and Flemmi about the investigation, and the fact that the executives of National Melotone were seeking an investigation.

162.   In October 1977, FBI Special Agents Thomas Daly and Peter Kennedy, who were then members of the organized crime squad, interviewed Francis Green, who had been threatened by Bulger and Flemmi.

163.   Green told the agents that Bulger stated that if Green did not repay a loan, he would be killed, his ears would be cut off and stuffed in his mouth, and his eyes would be gouged out.

164.   Neither Daly, Kennedy nor other members of the Boston office of the FBI sought to develop Green as a witness against Bulger and Flemmi.

XIV.   THE RACE-FIX CASE: THE FBI PROTECTS FLEMMI AND BULGER

165.   On January 27, 1978, Bulger was closed administratively as an informant because he was a primary subject of an investigation that focused on the payment of bribes to fix horse races.  An informant is closed once he becomes a primary subject of a criminal investigation.

166.   Bulger and Connolly discussed the prospect that Bulger and Flemmi would be indicted in the race-fix case.  Neither the FBI, nor Bulger nor Flemmi wanted them to be charged.  Bulger and Flemmi did not want to be charged because they did not wish to go to jail and lose their liberty.  The FBI did not want Flemmi and Bulger to be charged because it would lose Flemmi and Bulger's services as informants.

31

167.   The United States Attorney's Office for the District of Massachusetts was preparing indictments for the race-fix case.

168.   Morris and Connolly asked the prosecutor not to indict Bulger and Flemmi in the race-fix case. Morris and Connolly were successful, and Bulger and Flemmi were not included in the indictment.

169.   A RICO indictment relating to the race-fix scheme was returned against 13 defendants and after a 46 day trial, all of the defendants who had not pled guilty or fled were convicted.

170.   In May 1979, the FBI in Boston requested and received from the Director of the FBI, approval to reopen Bulger as an informant. When reopening Bulger, the FBI informed the Director that "no prosecutable case developed against [Bulger] in the opinion of the Strike Force Attorney handling the matter." This statement was false. Bulger and Flemmi were not prosecuted in the race-fix case because Connolly and Morris had persuaded federal prosecutors that their value as informants outweighed the importance of prosecuting them.

171.   At the time the FBI officially reopened Bulger as an informant, Connolly and Morris were well aware that Bulger and Flemmi remained involved in a range of criminal activity. Nevertheless, the FBI neither investigated nor disclosed such information to any other law enforcement agency.

172.   In July 1979, Morris received reports from informants that Bulger and Flemmi were "shaking down" independent bookmakers. The FBI made no effort to investigate this matter.

173.   In 1979 and early 1980, the FBI received information from informants that Bulger

and Flemmi were involved in other criminal activity, including illegal gambling and trafficking in cocaine. These allegations were not investigated.

174. In June or July 1979, Connolly, Bulger, Flemmi and Special Agent Gianturco met at Gianturco's home. Meeting informants at an agent's home is highly unusual. This meeting occurred at about the time the race-fix case was being tried and was, in part, a celebration of Connolly's success in keeping Bulger and Flemmi from being indicted.

175. Special Agent Gianturco, at whose home several of these dinners occurred, received from Bulger and Flemmi a toy truck to commemorate an FBI investigation, a glass statue and a leather briefcase. Agent Gianturco gave Bulger an Alcatraz belt buckle, knowing that Bulger had spent some time in the Alcatraz prison.

176. Contrary to FBI rules and policies, there is no record of the gifts being exchanged between the participants.

XV.  THE LANCASTER STREET GARAGE INVESTIGATION: A TIP IS CONFIRMED BY THE FBI

177. In 1980, the FBI, through its agents, as set forth below, contributed to frustrating a Massachusetts State Police investigation of criminal activity of Bulger, Flemmi and others occurring at the Lancaster Street Garage.

178. The Massachusetts State Police had determined that "virtually every organized crime figure in the metropolitan area of Boston, including both LCN and non-LCN (Winter Hill) organized crime figures frequented the premises" at the Lancaster Street Garage. Flemmi and Bulger were among those targeted by the Massachusetts State Police.

33

179.    The Massachusetts State Police were concerned that the FBI not be told about the
        investigation and proposed electronic surveillance because it believed that Flemmi
        and Bulger were informants, working with Morris, who might compromise the
        investigation if he knew about it.

180.    Without the direct participation of the FBI, the Massachusetts State Police installed a
        microphone in the Lancaster Street Garage on or about July 24, 1980.  For
        approximately two weeks, the investigation was "extremely productive."  However, it
        then became apparent to the Massachusetts State Police that the targets of the
        investigation had been tipped off concerning the electronic surveillance.

181.    Flemmi initially received information about the State Police's electronic surveillance
        from a Massachusetts State Police Trooper.  Connolly confirmed for Bulger and
        Flemmi that the Lancaster Street Garage was bugged by law enforcement.  Flemmi
        and Bulger advised some of their associates of the bugging operation.  The discussion
        of criminal activity at the Lancaster Street Garage ceased.

        XVI.    THE 98 PRINCE STREET INVESTIGATION: BULGER AND FLEMMI
                USE THE FBI TO GET RID OF THEIR "COMPETITORS"

182.    In October 1980, Morris and Connolly gave Bulger and Flemmi the assignment to
        provide information that would allow for the bugging of the LCN headquarters.

183.    On January 9, 1981, the government applied for and received a warrant to bug 98
        Prince Street, the headquarters of the LCN.

184.    Bulger and Flemmi, in violation of FBI rules and regulations, were told when the bug
        had been installed in January 1981 and when it was removed in April.

185.    In January 1981, Flemmi, Bulger, Connolly and Morris gathered in Morris' home in

34

Lexington, Massachusetts for a belated Christmas celebration. Bulger and Flemmi brought wine and a champagne bucket for Morris. Morris reciprocated by giving Flemmi a Korean war veteran, a painting from Korea.

186. On November 25, 1980, Special Agent Lawrence Sarhart met with Bulger as part of his efforts to determine whether the FBI had compromised the Massachusetts State Police Lancaster Street Garage investigation and whether Bulger and Flemmi should be continued as informants. At this meeting, Bulger falsely claimed that he had not been given any information about the Lancaster Street Garage investigation by the FBI. In providing this false information, Bulger was protecting Connolly.

187. In or about March 1981, defendant Fitzpatrick met with Bulger to re-evaluate whether he should continue as an informant. Fitzpatrick had concerns that Bulger and Flemmi were engaged in serious criminal conduct, including crimes of violence in collecting "tribute" from drug traffickers. There is no written record indicating that Fitzpatrick ever expressed such concerns to his supervisor.

188. Fitzpatrick reviewed and initialed a memorandum prepared by Connolly and Morris seeking to continue Bulger and Flemmi as informants without dissent.

189. In or about April or May 1981, Morris met with Bulger and Flemmi at the Hotel Colonnade, at which time the three drank wine, with Morris drinking so much that Bulger had to drive him home.

190. In the fall of 1983, Connolly and Morris had dinner with Bulger and Flemmi at Flemmi's parents home in South Boston. This meeting was a celebration of the government's return of indictments against members of the LCN.

## XVII.   THE WHEELER, HALLORAN AND CALLAHAN MURDERS

191.   Roger Wheeler owned World Jai Lai, which had facilities in Florida and Connecticut, where it is legal to gamble on Jail Lai matches. Rico, who had retired from the FBI in 1975, served as World Jai Lai's Director of Security.

192.   Brian Halloran was an associate of Bulger and Flemmi. John Callahan, an accountant and associate of Brian Halloran, was the President of World Jai Lai.

193.   Wheeler suspected that Callahan was skimming money from World Jai Lai for members of the Winter Hill Gang, including Halloran, Bulger and Flemmi. Thus, he fired Callahan, put some of his own people in key positions, and began an audit. Before the audit was concluded, on May 27, 1981 Bulger, Flemmi and others caused Wheeler to be shot and killed as he left his golf club in Tulsa, Oklahoma.

194.   Sketches prepared on the basis of descriptions provided by witnesses, among other things, caused the FBI and others to suspect that Bulger had murdered Wheeler. Flemmi was also a suspect.

195.   The FBI in Oklahoma City needed to explore Callahan's relationship with Halloran, as part of its investigation of Bulger and Flemmi. The FBI's Boston organized crime squad opened an investigation to support Oklahoma City's effort to solve the Wheeler murder.

196.   In 1981, at Morris' request, Connolly interviewed Callahan as part of the investigation. The Boston investigation was then quickly closed.

197.   In January 1982, Halloran, who was facing a state murder charge, began to cooperate with the FBI in Boston. Among other things, Halloran told Special Agents Leo Brunnick and Gerald Montanari, two members of the Boston's FBI's Labor and

Racketeering Squad, that he met Bulger and Flemmi at Callahan's apartment and was asked if he was willing to murder Wheeler. Halloran told Brunnick and Montanari that Bulger and Flemmi along with John Callahan and John Mortorano had caused Wheeler to be murdered. Brunnick consulted Morris, as the supervisor of the organized crime squad to get his assessment of Halloran's reliability as a potential witness. Brunnick told Morris about Halloran's allegations concerning Bulger and Flemmi. Morris realized that Halloran's allegations threatened their future as FBI informants, among other things, because it was FBI policy to close sources that it was investigating.

198.   Morris and Connolly did not want to lose, as informants, Flemmi and Bulger, who were important to their investigations and to their own status and future careers in the FBI. Morris told Brunnick that Halloran was untrustworthy and unstable and would not be a believable witness.

199.   The FBI in Oklahoma City expressed an interest in interviewing Halloran regarding the Wheeler murder. The FBI agents in Boston failed to inform the Oklahoma City agents of Halloran's allegations against Flemmi and Bulger.

200.   Halloran knew that his willingness to cooperate with the FBI, if disclosed, would place his life in danger. He therefore requested to be in the witness protection program.

201.   Morris told Connolly that Halloran was speaking with other agents and providing information about Bulger and Flemmi. Morris told Connolly that Halloran had implicated Bulger and Flemmi in the Wheeler homicide.

202.   In or about April 1982, Connolly told Bulger and Flemmi about Halloran's

37

cooperation.

203.   In early May 1982, the FBI denied Halloran's request to be placed in the witness
protection program and told Halloran that his relationship with the FBI was
terminated.

204.   On May 11, 1982, Bulger, Weeks and others caused Halloran to be murdered as he
emerged from a restaurant in South Boston.  Halloran was murdered in order to
prevent his further cooperation with law enforcement authorities and to prevent his
testimony before a federal grand jury investigating the murder of Wheeler.

205.   Morris believed that Bulger and Flemmi were responsible for Halloran's murder, yet
failed to undertake any steps to investigate Halloran's death.  The next time that
Morris asked Connolly to tip Flemmi off to an investigation, he added that he "did
not want another Halloran" – meaning another murder.

206.   Following Halloran's murder, the FBI met with Halloran's wife, gave her $1,000 and
left.  From that time and date until 2000, Mrs. Halloran heard nothing from the FBI
concerning the investigation of her husband's murder.

207.   Several weeks after Halloran's murder, Morris was sent to Glen Cove, Georgia for
drug training.  At that time, although married, Morris was romantically involved with
his secretary.

208.   Not wanting to spend his money to finance her trip, Morris recalled that Bulger and
Flemmi had stated that they hoped Morris would let them know if he ever needed
anything.

209.   Morris needing both money and his girlfriend, recalled the offer and asked Connolly
if Bulger and Flemmi would provide the funds necessary to buy his secretary a plane

ticket.

210. Connolly subsequently gave Morris' secretary an envelope containing $1,000 cash, which Morris understood had come from Bulger and Flemmi.

211. Morris knew that the fact that Bulger and Flemmi had been told by Connolly of Halloran's effort to cooperate with the FBI would be relevant to any investigation of Halloran's murder, but he never provided this information to anyone in the FBI. Morris also did not tell the Suffolk County District Attorney's Office, which conducted an investigation in this matter.

212. Morris, Connolly and others in the Boston field office failed to comply with the Attorney General guidelines concerning the disclosure of information regarding Bulger and Flemmi's possible involvement with Halloran's murder to local law enforcement authorities in Boston or Oklahoma.

213. The Halloran murder presented a dilemma for the FBI.  It precipitated a May 25, 1982 meeting at FBI Headquarters to grapple with Bulger and Flemmi's dual status as valuable FBI informants and also suspects in the investigations of the Wheeler and Halloran murders.  Representatives of the FBI offices in Boston, Oklahoma City, and Miami met with FBI Headquarters officials, including Sean McWeeney, Chief of the Organized Crime Section, and Jeff Jamar, the Informant Coordinator.

214. As a result of this meeting, a decision was made to keep Bulger and Flemmi open as sources unless and until "substantiated information" implicating them in the murders was received.

215. In or about June 1982, Connolly told Bulger and Flemmi that Callahan was sought as a witness in the Wheeler homicide investigation.

216.    Acting in response to Connolly's information, Bulger and Flemmi caused John

        Callahan to be murdered in Fort Lauderdale, Florida, on or about August 1, 1982, in

        order to prevent his cooperating with law enforcement authorities and to prevent him

        from being able to provide testimony in the Wheeler homicide investigation.

217.    On August 4, 1982, the body of John Callahan was found in the trunk of his car in

        Miami, Florida.

218.    On September 23, 1982, Flemmi was administratively closed as an informant.

        Connolly and Morris told FBI Headquarters that they were closing Flemmi because

        he was being targeted for possible prosecution in other investigations. This statement

        was a lie.

219.    In April 1983, the FBI in Oklahoma City sought authority from the Director of the

        FBI to interview Bulger and Flemmi. Defendant Fitzpatrick strongly and

        successfully opposed this request. In doing so, Fitzpatrick claimed that he had

        interviewed Bulger concerning the Wheeler and Callahan murders, and that Bulger

        had denied being involved. This was a lie. Fitzpatrick never questioned Bulger on

        these subjects.

220.    Fitzpatrick did not trust Connolly fully, but also argued that Oklahoma City should

        not be allowed to interview Bulger and Flemmi in part because Connolly was in

        continual contact with them and was disseminating all relevant information that he

        received regarding the Wheeler and Callahan murders. Fitzpatrick and others in the

        Boston Office of the FBI were determined to control the information, and therefore

        the decisions to be made concerning Bulger and Flemmi.

221.    Fitzpatrick knew or should have known that Connolly was in violation of the

                                           40

Attorney General Guidelines regarding Bulger and Flemmi, and, on information and belief, he made no effort to verify that Connolly was properly disseminating the relevant and necessary information regarding the Callahan-Wheeler murders, after preventing Oklahoma authorities from interviewing Bulger and Flemmi.

222.    Although Fitzpatrick and others were successful in preventing the interview of Bulger and Flemmi by agents outside of Boston, Bulger and Flemmi were interviewed together by Montanari and Agent Brendan Cleary.

223.    It is highly unusual for two subjects of an investigation to be interviewed together. Bulger and Flemmi, not surprisingly, denied any involvement in the Wheeler and Callahan murders. Bulger and Flemmi refused to take a polygraph examination and objected to being photographed. No photographs of Bulger and Flemmi from this interview were produced in discovery or introduced as evidence in the *Salemme* matter.

224.    In early 1988, Joseph Murray, who was then in federal prison, alleged, among other things, that Bulger and Pat Nee had murdered Halloran and Bucky Barrett. Murray stated that there was an eyewitness to the Halloran shooting who might come forward, and elaborated that: "there is a person named John, who claims he talked to Whitey and Nee as they sat in the car waiting for Halloran on Northern Avenue. He sits in a bar and talks about it. He saw the whole operation." Murray added that the person providing the information to him "will be willing to talk to you (authorities) soon."

225.    Murray also alleged that Connolly and Special Agent John Newton were selling information to Bulger and Flemmi concerning electronic surveillance.

41

226.    Murray's information was provided to William Weld, who was then Assistant
        Attorney General for the Department of Justice in Washington, D.C.  On February 3,
        1988, Weld directed that the information be forwarded to the United States Attorney
        in Boston and to its strike force chief.

227.    The FBI assumed responsibility for investigating Murray's charges.

228.    In June 1989, ASAC Dennis O'Callahan assigned FBI Agent Edward Clark, the
        Supervisor of the Bank Robbery Squad, to interview Murray.  Also assigned was
        Edward Quinn, a member of the organized crime squad who had then worked with
        Connolly for 13 years and characterized Connolly as a "close friend."

229.    Clark and Quinn spoke to Murray at the strike force's office in the Federal
        Courthouse in Boston on June 14, 1989 – more than a year and a half after the initial
        call to Weld.

230.    The Clark interview notes make no reference that Murray was asked questions
        concerning Connolly and Newton's sale of information to Bulger and Flemmi.  Either
        Murray was not asked about his allegations concerning Connolly and Newton or the
        information that he provided concerning them was not recorded.  Similarly, although
        Murray reiterated that Bulger and Nee had murdered Halloran, neither Clark nor
        Quinn asked him about the individual named "John" who Murray had previously
        asserted witnessed the killing.

231.    Although Murray provided information linking Bulger and Flemmi to the Halloran
        and Barrett murders, Clark was not asked to engage in any further investigation and
        two months later ASAC O'Callahan prepared a memorandum that was forwarded to
        the Director of the FBI reporting that Murray had been interviewed and that "[t]he

42

allegations that SSA Connolly and SA Newton are disclosing information regarding investigations being conducted by this division to criminal elements are unsubstantiated by specific facts...." The administrative inquiry was then terminated in Boston and, evidently, the matter was not pursued by FBI headquarters, the United States Attorneys Office, the Strike Force or the Department of Justice.

232.   Furthermore, the information that Murray provided implicating Bulger and Flemmi in the Halloran and Barrett matters was not provided to any agents responsible for investigating those matters or indexed so that it could be accessed by such agents, all in violation of FBI guidelines and rules.

233.   Similarly, although Clark felt Murray would make a "terrific" informant, there is no evidence that any effort was made by the FBI agents in Boston to utilize him as a source despite his demonstrated willingness to provide information. Murray was effectively eliminated as a threat to the relationship between the FBI and Bulger and Flemmi.

XVIII.   IMPROPER INDEXING OF INFORMATION REGARDING THE MURDERS OF WHEELER, HALLORAN AND CALLAHAN

234.   The FBI in Boston violated Bureau rules and regulations by rendering the information it had received from Halloran regarding Bulger and Flemmi virtually inaccessible to others who might wish to review or evaluate it.

235.   More specifically, in 1982 and 1983, FBI reports containing allegations against an individual were to be indexed by that individual's name and placed in the investigative file. With one exception, the many reports containing Halloran's charges against Bulger and Flemmi were not properly indexed with the reference to

43

their names. Thus, during a Department of Justice investigation in July of 1997, these documents were not found or considered.

236.    When a federal judge ordered that the documents be looked for, they were found by the Boston office of the FBI. Nevertheless, these documents were not promptly produced to the court, thus preventing the examination of Rico and Morris concerning their contents.

237.    As a result of the delayed disclosure of the Halloran documents and of the failure of the adversary system to operate fully and effectively on this issue, the FBI obstructed the efforts of the Federal District Court to determine what role, if any, were played by Flemmi and Bulger in the Wheeler, Halloran, and Callahan murders, and the full degree to which the FBI in Boston, from 1981 until at least September 15, 1999, attempted to keep any such role from being discerned and demonstrated.

238.    In July 2000, the United States finally brought charges against individuals involved in Halloran's murder. In July 2000, defendant Weeks pleaded guilty, in part, to aiding and abetting in Halloran's murder. In September 2000, Bulger and Flemmi were indicted by a federal grand jury, in part, for Bulger's involvement in the murders of Wheeler, Halloran and Callahan and Flemmi's involvement in the murders of Wheeler and Halloran. In October 2000, a Superseding Indictment was brought against Connolly, in part, for providing confidential law enforcement information to Bulger and Flemmi which alerted them to the fact that Halloran had provided information about the murder of Wheeler and that Callahan was sought as a witness in the Wheeler investigation in order to prevent Halloran's and Callahan's further cooperation and testimony.

44

XIX.   THE SOUTH BOSTON LIQUOR MART: CRIME CONTINUES

239.   In or about January 1984, Connolly received reliable information concerning an ongoing extortion by Bulger and Flemmi of Stephen and Julie Rakes.

240.   Bulger and Flemmi decided that the South Boston Liquor Mart, which the Rakes had recently purchased would be an excellent site for their criminal activities. They, and Kevin Weeks, visited the Rakes and said they wanted to buy the liquor store. The Rakes told them it was not for sale. Flemmi responded by pulling out a gun, commenting on how lovely the Rakes' young child was and reiterating that they were going to buy the liquor store.

241.   Joseph Lundbohm was a Boston police detective and uncle of Julie Rakes. The Rakes sought Lundbohm's assistance, telling him what occurred. Lundbohm knew that Bulger and Flemmi were reputed to be dangerous members of the organized crime and sought the assistance of the FBI. Lundbohm contacted Connolly. Connolly falsely told Lundbohm that unless Rakes agreed to wear a recording device in conversations with Bulger and Flemmi, the FBI was unlikely to take action on the Rakes' complaint.

242.   In violation of FBI regulations, Connolly made no record of the information that Lundbohm had provided to him, nor did he disclose it to defendant Ring, who had become the acting supervisor of the Organized Crime Squad in 1983.

243.   Connolly did, however, tell Bulger of his conversation with Lundbohm. As a consequence, Bulger urged the Rakes "to back off."

244.   The agents in the Boston office failed to investigate the extortion of the Rakes,

Connolly failed to attempt to obtain the testimony of Mr. and Mrs. Rakes.

245.   The extortion scheme succeeded.  The Rakes reluctantly sold their liquor store to Flemmi.

      XX.      THE 1984-1985 ELECTRONIC SURVEILLANCE: ANOTHER TIP TO BULGER AND FLEMMI

246.   In 1984 and 1985, the DEA and the FBI were authorized by a series of court orders to engage jointly in electronic surveillance targeting Bulger and Flemmi.

247.   Armed with information provided by his colleagues, Connolly contributed to assuring that DEA's efforts would not succeed by alerting Bulger and Flemmi to the investigation generally and to the electronic surveillance particularly.

248.   The FBI, determined not to confirm for the United States Attorney or the DEA the accuracy of their understanding that Bulger and Flemmi were FBI informants, disregarded the government's legal obligation of candor to the court when applying for authority to conduct electronic surveillance.

249.   McWeeney, the Chief for the Organized Crime Section at FBI headquarters in Boston, told Connolly that the DEA was trying to obtain a wire tape targeting Bulger and Flemmi.

250.   Morris also told Connolly about the investigation targeting Bulger and Flemmi.

251.   Connolly told Bulger and Flemmi that the DEA investigation had been initiated and advised them of the information he had obtained concerning its progress.  As a result, Bulger found the electronic bug in his car.

252.   In the Spring of 1984, Morris received from Bulger and Flemmi a second $1,000 payment and a case of wine.  These payments were the expression of Bulger's and

Flemmi's appreciation for Morris's assistance in informing them of the DEA investigation against them.

253. When applying for court ordered wire taps, the FBI made material omissions caused by its reckless disregard for the truth and for the obligations imposed by Title III and the United States Constitution, in order to protect Bulger and Flemmi.

254. Connolly provided to Flemmi the tip that the wire tap was placed on the telephone of George Kaufman. In late 1984 or early 1985, Connolly began meeting with Bulger and Flemmi at Newton's apartment, rather than at Bulger's home or his own, because Connolly needed a new, secure location.

XXI. THE MURDER OF JOHN L MCINTYRE: THE 24TH KNOWN MURDER CAUSED BY BULGER OR FLEMMI SINCE BECOMING FBI INFORMANTS

255. Halloran was not the only informant that the FBI identified for Bulger and Flemmi. Rico disclosed the identity of several informants to Flemmi, and Connolly identified for Bulger and Flemmi at least a dozen individuals who were either FBI informants or sources for other law enforcement agencies.

256. In mid-October 1984, John L. McIntyre, age 32, began cooperating with Richard Bergeron of the Quincy Police Department. McIntyre reported that he was engaged in certain criminal activity and revealed that he was the engineer on a ship named the Valhalla, which had been used in an attempt to deliver guns and ammunition from Massachusetts to the Irish Republican Army in Ireland.

257. McIntyre stated to Bergeron that Joseph Murray was closely connected to Bulger and that Bulger, through his associates Kevin Weeks and Patrick Nee, was also involved in the Valhalla arms shipment. Flemmi was also mentioned during the interview.

47

258.    McIntyre was willing to cooperate with law enforcement, but was "petrified" of the people that he was discussing. McIntyre was fearful that his identity would be disclosed.

259.    McIntyre knew that if Bulger or Flemmi learned of his willingness to cooperate with law enforcement officials, his life would be in danger.

260.    Bergeron realized that the information McIntyre was providing would be significant to several law enforcement agencies and he immediately arranged for agents of the DEA and the United States Customs Service to participate in the debriefing of McIntyre.

261.    In addition, Bergeron told defendant FBI Special Agent Roderick Kennedy that McIntyre was cooperating and, among other things, of McIntyre's charges against Bulger and his associates. At the time Bergeron contacted Kennedy, Kennedy knew that Bulger and Flemmi were Connolly's informants.

262.    At the time of Bergeron's contact, Kennedy was aware of the Bulger/Murray relationship because in 1983 Connolly told Kennedy that Bulger had disclosed that he had extorted $60,000 to $90,000 from Murray, because Murray was storing marijuana in a warehouse in South Boston, which was part of Bulger's territory. Although Kennedy was the FBI's operational liaison with other agencies concerning narcotics matters and had participated with the DEA in a raid of the specific warehouse that Murray owned, Kennedy did not share this information with the DEA or with any prosecutors working on the case in violation of the Attorney General Guidelines.

263.    Kennedy subordinated the interest of investigations in which he was involved to the interest that Connolly and the FBI had in maintaining Bulger and Flemmi as sources.

264.    Kennedy, with a customs agent, interviewed McIntyre on or about October 17, 1984. With regard to drugs, McIntyre told Kennedy that "an individual named Whitey, who operates a liquor store in South Boston [had become] partners with Joe Murray." Kennedy recognized this as a reference to Bulger. McIntyre agreed to fully cooperate with the FBI and Customs Service. Kennedy reported the information that he had received from McIntyre to his supervisor, defendant Greenleaf.

265.    Connolly was present when FBI Agents discussed McIntyre's cooperation with law enforcement.

266.    In or about October and November 1984, members and associates of the Bulger Group learned that John McIntyre was cooperating with law enforcement officials including agents of the Federal Bureau of Investigation and the United States Customs Service concerning illegal activities of the Bulger Group. These illegal activities included the illegal shipment of arms and ammunition aboard the fishing trawler Valhalla to elements of the Irish Republican Army in Ireland in September of 1984 and the illegal distribution of drugs by members and associates of the Bulger Group, including the importation of approximately thirty-six tons of marihuana into Boston Harbor on board the vessel Ramsland, which had been seized by federal authorities on or about November 14, 1984.

267.    On or about November 30, 1984, because he was cooperating with the FBI, McIntyre was kidnapped, tortured and murdered by Bulger, Flemmi, Weeks and others.

        XXII.  IGNORING A PATTERN OF 24 MURDERS, INCLUDING THREE COOPERATING WITNESSES, THE FBI FAILS TO INVESTIGATE

268.    On December 6, 1984, the Quincy Police realized that McIntyre had disappeared. Only Kennedy and the customs agent were informed immediately. The FBI undertook no

investigation of his disappearance and possible death.

269.   During this time defendant Greenleaf was the SAC in Boston and defendant Ring was the supervisor of the Organized Crime Squad. Defendant Ring believed that Bulger and Flemmi were engaged in gambling, loan sharking and perhaps murder.  Ring and Greenleaf, however, did not take any action to investigate or cause an investigation regarding McIntyre's murder.

270.   By the time of McIntyre's cooperation with law enforcement in October 1984 and McIntyre's murder on or about November 30, 1984 agents of the FBI, including defendants Greenleaf, Ring, Morris, Connolly, Kennedy and Fitzpatrick were aware that Bulger and Flemmi had a history of violence including attempted murder and murder.

271.   As alleged elsewhere in this Complaint, in November 1965, defendant Rico targeted Flemmi for development as a top echelon informant.  After Flemmi became an FBI informant Flemmi engaged in the threatened and actual use of violence, including assault, attempted murder and murder.

272.   In or about January 1967 in the Commonwealth of Massachusetts, Flemmi and others murdered Edward "Wimpy" Bennett.

273.   As alleged elsewhere in this Complaint on February 8, 1967, Flemmi was designated as a top echelon informant. After Flemmi became a top echelon informant Flemmi engaged in the threatened and actual use of violence, including assault, attempted murder and murder.

274.   In or about April 1967, in the Commonwealth of Massachusetts, Flemmi and others murdered Walter Bennett.

275.   On or about December 23, 1967, in the Commonwealth of Massachusetts, Flemmi and

others murdered William Bennett.

276. On or about December 23, 1967, in the Commonwealth of Massachusetts, Flemmi and others murdered Richard Grasso.

277. As alleged elsewhere in this Compliant, from September 1969 to May 1974, Flemmi was a fugitive for charges of murder and attempted murder. Despite these charges, defendant Rico arranged for Flemmi to return to Boston on May 6, 1974. Shortly after Flemmi's return the pending charges against him were dismissed. Flemmi then resumed his role as informant providing information to the Boston office of the FBI.

278. As alleged elsewhere in this Complaint, on or about September 30, 1975, Bulger became a source for Connolly and was administratively designated an FBI informant.

279. On or about March 8, 1973 in the Commonwealth of Massachusetts defendant Bulger and others murdered Michael Milano.

280. On or about March 8, 1973 members and associates of the Bulger Group including Bulger and others shot Dianne Sussman.

281. On or about March 8, 1973 members and associates of the Bulger Group including Bulger and others shot Louis Lapiana.

282. On or about March 19, 1973 in the Commonwealth of Massachusetts defendant Bulger and others murdered Al Plummer.

283. On or about March 19, 1973 members and associates of the Bulger Group including Bulger and others shot Hugh Shields.

284. On or about March 19, 1973 members and associates of the Bulger Group including Bulger and others shot Frank Capizzi.

285. On or about March 24, 1973 in the Commonwealth of Massachusetts defendant Bulger

51

and others murdered William O'Brien.

286. On or about March 24, 1973 members and associates of the Bulger Group including Bulger and others shot Ralph DiMasi.

287. On or about April 3, 1973 members and associates of the Bulger Group including Bulger and others murdered James Leary.

288. On or about April 18, 1973 members and associates of the Bulger Group including Bulger and others murdered Joseph Notorangeli.

289. On or about December 1, 1973, in the vicinity of Dorchester, Massachusetts, Bulger and others murdered James O'Toole.

290. On or about February 21, 1974 members and associates of the Bulger Group including Bulger and others murdered Al Notorangeli..

291. In or about October 1974, in the vicinity of Sommerville, Massachusetts, defendants Bulger, Flemmi and others murdered James Sousa, a criminal associate who was involved in a botched robbery with other members and associates of the Bulger Group, after he was arrested and charged in connection with that robbery because he was believed to be a potential witness against and liability to members of the Bulger Group.

292. In or about November 1974, in the vicinity of South Boston, Massachusetts, defendant Bulger and others murdered Paul McGonagle.

293. On or about June 12, 1975, in the vicinity of Dorchester, Massachusetts, the defendants Bulger, Flemmi and others murdered Edward Connors.

294. On or about November 5, 1975, in the vicinity of South Boston, Massachusetts, defendants Bulger and Flemmi and others murdered Thomas King.

295. On or about November 6, 1975, in the vicinity of South Boston, Massachusetts,

defendant Bulger and others murdered Francis "Buddy" Leonard.

296.   In or about December 1976, members and associates of the Bulger Group learned from defendant Connolly that Richard Castucci was providing information to agents of the Federal Bureau of Investigation regarding the whereabouts of fugitives Joseph M. McDonald and James L. Sims.  On or about December 30, 1976, in the vicinity of Somerville, Massachusetts, defendants Bulger and Flemmi and others murdered Richard Castucci

297.   On or about May 27, 1981, defendants Bulger, Flemmi and others caused the murder of Roger Wheeler, the owner of a business known as World Jai Alai.

298.   In or about late 1981, in the vicinity of South Boston, Massachusetts, defendants Bulger and Flemmi murdered Debra Davis.

299.   In or about May 1982, members and associates of the Bulger Group learned from defendant Connolly that Brian Halloran was providing information to agents of the Federal Bureau of Investigation regarding, among other things, the involvement of defendants Bulger, Flemmi and Martorano in the murder of Roger Wheeler.  Members and associates also learned that Brian Halloran was providing information to agents of the Federal Bureau of Investigation regarding the involvement of Bulger and others in the murder of Louis Litif.  On or about May 11, 1982, in the vicinity of Northern Avenue, South Boston, Massachusetts. Defendants Bulger, Weeks and others murdered Brian Halloran and Michael Donahue, who was riding in an automobile with Halloran at the time Halloran was murdered.

300.   In or about July 1982, defendants Bulger and Flemmi learned from defendant Connolly that investigative efforts relating to the murder of Roger Wheeler were being directed

towards John B. Callahan, former president of World Jai Alai. Concerned that Callahan might implicate Bulger and Flemmi in the murder of Wheeler, defendants Bulger and Flemmi agreed with John V. Martorano to murder Callahan. On or about August 1, 1982, Callahan was murdered.

301. In or about July 1983, in the vicinity of South Boston, Massachusetts, defendants Bulger, Flemmi, Weeks and others kidnapped, extorted and murdered Arthur "Bucky" Barrett.

302. Despite Bulger and Flemmi's threatened and actual use of violence, including assault, attempted murder and murder before and after becoming FBI informants and despite Bulger and Flemmi's threatened use of violence, including murder, against actual and potential witnesses providing information of criminal activities of the Bulger Group to the FBI and other law enforcement agencies, agents of the Boston Office of the FBI, including defendants Greenleaf, Ring, Morris, Connolly, Kennedy, Fitzpatrick and Ahearn failed to undertake any effort to investigate Davis' disappearance.

303. In order to evade detection for the murder of Davis, Bulger, Flemmi and Weeks and other members and associates of the Bulger Group buried the remains in Dorchester, Massachusetts.

304. In October 2000, 19 years after her disappearance, but only months after the Court Order in *United States v. Salemme*, disclosing much of the facts contained in this Complaint, the remains of Debra Davis were unearthed from a shallow make-shift grave in Dorchester, Massachusetts.

XXIII.   THE COVER UP:  AFTER THE MURDERS OF DAVIS AND OTHERS, THE FBI
         AGENTS,  IN  BREACH  OF  THEIR  DUTIES  AND  IN  VIOLATION  OF
         MANDATORY GUIDELINES AND RULES OF LAW CONTINUED TO PROTECT
         FLEMMI AND BULGER, FAILED TO INVESTIGATE THE CIRCUMSTANCES OF
         DAVIS'  MURDER  ALL  TO  THE  DETRIMENT  OF  THE  ESTATE  AND  THE
         PLAINTIFF

305.     Despite Debra's sudden disappearance, and the coincidence that other individuals
         associated with Flemmi and Bulger had been murdered, Debra's disappearance was met
         with studied indifference.

306.     In addition to failing to protect Debra Davis from the murderous criminals they were
         harboring, the defendant employees of the FBI intentionally avoided investigating
         Debra's disappearance and apparent murder after wresting the case away from the state
         and local police.

307.     Debra's mother, Olga Davis, reported her missing to the Randolph Police Department
         within twenty-four hours of her daughter's disappearance.  Ms. Davis believes she
         initially spoke with an Officer Carvel at the Randolph Police Department.

308.     Two days later, Ms. Davis received a call from a representative of the Federal Bureau
         of Investigation informing her that the FBI would be "taking over the investigation."

309.     Shortly thereafter, Ms. Davis met with approximately four agents from the Bureau at
         their direction.  The agents requested that Ms. Davis meet with them in a car at a
         secluded area.  Their purported reason for doing so was "in case Flemmi was around."

310.     The agents asked some preliminary questions about Debra, such as description of her
         appearance.  The agents then switched gears and quickly began prodding Ms. Davis for
         whatever information she knew about Stephen Flemmi, ostensibly to learn whether Ms.
         Davis knew anything about Flemmi's involvement with the FBI.  They no longer

appeared to be concerned specifically about Debra's disappearance.

311.    Ms. Davis met with agents from the FBI, at their behest, approximately once a month over the next year. The agents insisted they meet in motel rooms and parking lots. Ms. Davis recalls being asked questions regarding her knowledge of what Mr. Flemmi did for a living and whether or not she had ever overheard any of his telephone conversations. The agents continued to fish for information Ms. Davis might know about Flemmi but made no apparent progress regarding Debra's disappearance and, in fact, seemingly lost interest in the investigation.

312.    Ms. Davis felt extremely intimidated by these meetings in which she was always asked to meet with several agents by herself, with the exception of one time when Michelle Davis, Debra's sister was present. Ms. Davis was never asked to meet with the agents at FBI headquarters, nor did they ever meet with her at her home. Instead, they insisted on meeting her at out of the way places, such as the parking lot of St. Bernadette's Church in Randolph.

313.    The agents made statements to Ms. Davis to the effect that if James Bulger and Steven Flemmi murdered somebody, they would know how to make a body disappear because they knew people who worked at funeral parlors. These statements were highly inappropriate and upset Ms. Davis. Moreover, she felt they were intended to be veiled threats not to pursue any help from local authorities outside of the FBI.

314.    Michelle Davis also recalls being asked questions about Mr. Flemmi, which she believed were designed to discover exactly how much she knew about Flemmi's involvement with the FBI. Michelle Davis resided for a time with Mr. Flemmi and Debra in Brookline. Michelle Davis was repeatedly asked by the agents what she knew of

56

Flemmi's business and what, if anything, she may have heard him discussing in telephone conversations.

315.     Olga Davis recalls being instructed by the agents not to talk to anyone else and being advised that she "has eight other kids to worry about". Again, Ms. Davis felt this was a highly inappropriate comment and interpreted this as a warning not to pursue any investigation into her daughter's disappearance. Instead of feeling reassured by the FBI's involvement, Ms. Davis recalls feeling nervous and scared by the agents' behavior. The very people who should have been helping Ms. Davis find her daughter frightened her and did nothing to locate Debra.

316.     On at least one occasion, Ms. Davis recalled that the conversation between herself and the FBI was recorded on a reel to reel recorder but, despite numerous requests, Ms. Davis has not been able to recover such recordings.

317.     As time went on, it became apparent to Ms. Davis that the FBI had no intention of investigating Debra's disappearance, and in fact, prevented local authorities from pursuing any investigation as well. Ms. Davis recalls providing local authorities with pictures of Debra, to aid the search. After the FBI became involved in the matter, Ms. Davis approached the local authorities to have the pictures returned to her, only to be told they were "missing". Ms. Davis believes that the federal authorities took custody of these pictures, but did not in fact use them to locate her.

318.     Because of these actions by the federal agents, Ms. Davis and her family did not learn what happened to their daughter and sister, Debra, until nearly nineteen years after her disappearance.

319.     The FBI's flagrant disregard for the guidelines for handling informants allowed Mr.

Flemmi and Bulger to remain on the streets, engaging in criminal activity, while "working" as informants.

320.  Even after the FBI became aware that Debra Davis had disappeared in 1981, they did nothing to investigate Flemmi's involvement in that crime. In fact, Ms. Davis asserts that they did the exact opposite - they turned a blind eye and squelched any attempts to investigate the matter. Flemmi and Bulger were allowed to roam free and continue on with their criminal activities for nearly thirteen more years.

321.  In the meantime, Ms. Davis and her family have lived in fear, both from Mr. Flemmi and also from the very body of law enforcement supposed to protect her. Ms. Davis has had to live with the knowledge that not only was her beloved daughter murdered, she was murdered by a man the federal government nurtured and protected.

322.  The Boston office of the FBI, through the defendants named herein and others, failed to investigate Davis' death because they did not want to disrupt their relationship with Bulger and Flemmi and the benefits that the FBI, the United States and the individual agents were receiving as a result of that relationship. Moreover, the agents of the FBI were fulfilling their part of their bargain with Flemmi and Bulger to protect them, and to avoid embarrassment to the FBI.

323.  The FBI did not investigate Flemmi or Bulger because to do so would have been to disclose them as informants or, in the alternative, would have required that they be closed as informants.

324.  Since Davis' remains were discovered, the United States has brought charges against Weeks, Bulger and Flemmi for their involvement in Davis' murder.

XXIV.    BULGER/FLEMMI CELEBRATION FOR BEING TIPPED OFF OF
         THE DEA INVESTIGATION

325.    In April 1985, FBI Agents Connolly, and Morris had dinner at Morris's home with
        Bulger and Flemmi.  The dinner was held several weeks after Bulger found a law
        enforcement electronic bug that had been placed in his car and it had become obvious
        that the investigation lead by the DEA would not succeed.  Bulger and Flemmi brought
        a bottle of wine and a bottle of champagne.  The dinner was planned to celebrate among
        other things the DEA's failure.

326.    At the dinner, Morris stated that Bulger and Flemmi could "do anything you want as
        long as you don't 'clip' anyone."

327.    At the time Morris made this statement, he was aware of the murders of Halloran and
        McIntyre and the failure of the FBI to undertake any investigative activity of their
        murders.

328.    Shortly before they left Morris's home, Bulger and Flemmi gave to Morris $5,000 in
        cash.  Morris never returned or repaid the $5,000, nor was he ever asked to do so by
        Flemmi or Bulger.

XXV.    WITH THE CONVICTION OF MEMBERS OF THE LCN, AND THE
        MURDER OF SEVERAL INFORMANTS, FLEMMI AND BULGER
        EXPAND THEIR OWN CRIMINAL ACTIVITIES.

329.    The arrest and prosecution of the members of LCN allowed Bulger and Flemmi to
        expand their criminal activities.

330.    One of Morris' informants reported that Flemmi was "taking over, the LCN bookmakers
        and numbers agents, and that the LCN was not able to do anything to stop him."  The
        FBI made no effort to investigate these allegations.

331.    Despite knowledge of Flemmi's increased criminal activity, the FBI Bureau in Boston requested authority from FBI headquarters to reopen Flemmi as an informant in July 1986.

332.    In November 1986, defendant James Ahearn became Special Agent in charge of the Boston Office of FBI. Ahearn asked his assistant Special Agent Lawrence Potts to conduct a "suitability review" of Bulger and Flemmi.

333.    At that time, the FBI manual established criteria that were to be taken into consideration in conducting a suitability review. In conducting his review, Potts did not consider the range of factors prescribed by the FBI manual and failed to weigh their productivity against the seriousness of the threat posed by the crimes Bulger and Flemmi were understood to be committing, and had committed.

334.    In violation of the rules and regulations, Potts failed to review the administrative portion of Bulger's and Flemmi's files or information provided by other sources concerning their criminal activity.

335.    In violation of the FBI manual that required FBI headquarters review at least annually the determination by a field office that an individual was suitable to serve as an informant, the information was never provided to the FBI headquarters and the review never took place.

XXVI.    THE EXTORTION OF RAYMOND SLINGER: THE CRIMINAL RAMPAGE CONTINUES

336.    In 1986, Raymond Slinger, a real estate broker in South Boston, was introduced to Bulger and Flemmi. Slinger knew that Bulger and Flemmi were reputed to be violent criminals.

337.    In early 1987, Slinger was asked to come to a bar where, in a private room, Slinger was re-introduced to Bulger.  Bulger told Slinger that he had been hired to kill him, but Slinger could avoid that fate if he paid Bulger instead.  Slinger offered to pay $2,000. Bulger rejected this offer and demanded $50,000.

338.    Slinger sought the assistance of his friend, Boston City Councilor James Kelley, who indicated that he would speak to Bulger.  A week or two later, in March 1987, Slinger was again requested to come to the bar.  This time, Slinger took with him his assistant, Arlene Lehane, and a hidden handgun.  There, Bulger, Kevin O'Neil, and Kevin Weeks found the handgun, beat Slinger badly and berated him for talking about the shakedown. Bulger then put Slinger's loaded gun to the top of Slinger's head, said that if he shot him from that angle there would be no blood shed and ordered Weeks to get a body bag. Bulger subsequently said, however, that he would give Slinger another chance to get the $50,000 quickly.  Slinger agreed to do so.

339.    In March 1987, Slinger borrowed money from his sister and wife and made an initial $10,000 payment to O'Neill.  He then made weekly payments to O'Neill of about $2,000 each, amounting to a total of $25,000 by May 1987.

340.    In or about May 1987, Slinger called the FBI.  The squad responsible for non-traditional organized crime matters, whose supervisor was Bruce Ellavsky, was informed of the ongoing Slinger extortion.  Rod Kennedy was assigned to interview Slinger.

341.    Kennedy and Newton interviewed Slinger at his office in South Boston.  Slinger told Kennedy and Newton what had occurred and about the continuing payments he was making.  Although Slinger expressed concern for himself and his family, he said that he was willing to testify and would "wear a wire to record incriminating conversations as

61

well."

342.   Ellavsky understood that Slinger was willing to wear a wire and testify and also knew that Bulger was an FBI informant. Ellavsky consulted with his supervisor, Potts.

343.   Under the Attorney General Guidelines, Ellavsky and Potts had the option of reporting the allegations of Slinger to a state or local law enforcement agency responsible for investigating those allegations, or reporting to FBI headquarters and the Assistant Attorney General the decision not to make any disclosure to state or local law enforcement. In violation of these guidelines, Potts and Ellavsky decided that no further investigation would be conducted and no report would be made to FBI headquarters.

344.   In violation of the Attorney General's Manual Guidelines and the FBI Manual in Standard Practice and Procedure, no FBI Form 302 or other written record was made of the interview of Slinger. This dereliction of duty minimized the risks that Slinger's information would ever be used against Bulger and those in the FBI who were protecting him.

345.   Following the FBI's interview with Slinger, Connolly told Bulger to cease his extortion of Slinger.

346.   The day after the FBI interview of Slinger, O'Neil told Slinger that he would not have to pay the remaining $25,000 that "he owed." Bulger was never asked to return the $25,000 that Slinger had previously paid.

XXVII.   THE FBI TIPS INFORMATION ABOUT THE ELECTRONIC SURVEILLANCE OF JOHN BAHORIAN TO BULGER AND FLEMMI IN ORDER TO PROTECT THEM BUT WARNS THEM THAT IT DOES "NOT WANT ANOTHER HALLORAN."

347.   During Ring's tenure as supervisor of the Boston office, the FBI was involved in the

investigation of payoffs to members of the Boston Police Department. In the course of that investigation, FBI agents obtained the cooperation of a Boston Police Lieutenant, James Cox. It was decided to have Cox attempt to record conversations with Flemmi and Bulger.

348. In or about August or September 1988, Connolly told Bulger and Flemmi that Cox was cooperating with the FBI.

349. Connolly inserted false information into Flemmi's file in order to disguise his improper conduct in leaking information to Bulger and Flemmi of Cox's willingness to cooperate.

350. As the pay-off investigation evolved, on John Bahorian, a bookmaker believed to be making payments to Flemmi. Special agents were preparing an application for electronic surveillance of Bahorian, which targeted Flemmi as well.

351. Morris was afraid that the electronic surveillance would lead to Flemmi's arrest and indictment. Morris was concerned that if that occurred, the nature of his relationship with Bulger and Flemmi would be revealed. Thus, Morris asked Connolly to tell Flemmi and Bulger to stay away from Bahorian. Morris also asked Connolly to tell Bulger and Flemmi not to do anything to Bahorian because Morris "did not want another Halloran."

352. Connolly delivered Morris's message to Bulger and Flemmi. He later reported to Morris that Bulger and Flemmi wanted to meet with him to discuss the Bahorian matter.

353. In the spring of 1988, prior to the inception of electronic surveillance of Bahorian, Bulger, Flemmi and Connolly met with Morris at his home. Morris told Bulger and Flemmi about the electronic surveillance plan and warned them to stay away from Bahorian.

354. Bahorian's telephone was wiretapped from June 22 to September 5, 1988. The wiretap

63

produced evidence that lead to the indictment of Bahorian and others.  Flemmi was neither intercepted, nor charged.

XXVIII.   RING, CONNOLLY AND OTHERS CONTINUE TO ACT IN VIOLATION OF THE ATTORNEY GENERAL GUIDELINES

355.   On June 13, 1989, the Boston Herald published an article by Shelly Murphy headlined "Ex-Con Seen as Hub Mob's Heir Apparent."   The article contained accurate information that had been provided to Connolly by informants that Salemme was taking over the Boston LCN's loan sharking and gambling activities when other members of the Boston LCN were indicted.  The Boston Herald article cited "law enforcement sources" and accurately reported that certain "local mob leaders" were to be indicted and that Salemme had been "made" a member of the Patriarca Family.

356.   Connolly was the source of information for this article.

357.   On June 16, 1989, three days after it was published, Salemme was shot, but not killed and another member of the LCN, Grasso, was murdered in Connecticut.

358.   Bulger and Flemmi had an interest in the murder of Salemme – an enhanced opportunity to profit from the vacuum created by the decimation of the LCN in Boston.

359.   John Mercurio became an informant for Connolly and was a source of some of the information in the Boston Herald article.

360.   On August 2, 1989, another informant, who Ring regarded as highly reliable, advised that Mercurio played a central role in the Salemme shooting.  The informant stated, among other things, that Mercurio had fled after the shooting because he had lured Salemme to the meeting at which the attempt on Salemme's life was made.

361.   Ring believed that this information was true and that Mercurio had previously failed to

64

inform the FBI of plans for imminent violent activity in which he was involved. Ring also recognized that there were enduring threats of additional violence about which Mercurio would be knowledgeable because of his involvement.

362. The Attorney General Guidelines, which were incorporated in the FBI Manual, required a special review process if an FBI field office wanted to keep an informant open after it learned that he had participated in a serious act of violence or any other serious crime. FBI headquarters and the Assistant Attorney General should have been advised that the Boston office had credible information concerning Mercurio's involvement in the Grasso murder and the Salemme shooting. The Boston FBI, including defendants Ahearn, however, did not provide the required notification to Headquarters or the Department of Justice as required by the Guidelines.

363. Instead, the Boston office of the FBI arrogated to itself the decision to continue to utilize Mercurio as an informant, despite the fact that it was believed that he had, while as an informant, been involved in murder and attempted murder.

364. When a federal prosecutor learned of the reliable report of Mercurio's involvement in the Salemme shooting, she asked Ring whether it presented a problem under the Attorney General's Guidelines. Ring lied to her and told her that it did not.

365. Contrary to the FBI Rules and Guidelines, Ring and Connolly informed Mercurio of an electronic surveillance and permitted him to flee prior to him being indicted.

366. On or about October 30, 1989, Mercurio became a fugitive.

367. In allowing Mercurio to flee prior to indictment, Ring and Connolly avoided the risk that the prosecution of LCN members would be jeopardized by the issues that would have been presented by Mercurio's dual status as a defendant and an FBI source concerning

65

criminal activity. Mercurio's flight also masked the violation of the Attorney General's Guidelines committed by Ring and Ahearn when they decided to continue Mercurio as an informant despite his perceived involvement in the Salemme shooting, without consulting FBI headquarters and the Assistant Attorney General.

368.   This failure to comply with the Guidelines also precluded any investigation of defendants Greenleaf, Rico, Morris, Kennedy and Fitzpatrick as well as any investigation of defendants Ring and Connolly relating to the abrogation of their mandatory duties surrounding the murder of informants.

### XXIX.   CONNOLLY RETIRES: BUT THE CONSPIRACY CONTINUES

369.   In or about December 1990, Connolly retired on short notice. By this time, Connolly had enjoyed a very successful career as an FBI agent, based largely on his handling of top echelon informants. As a result of Connolly's retirement, Flemmi and Bulger were administratively closed as informants on December 3, 1990.

370.   By 1992, however, the United States Attorney's Office had begun a grand jury investigation targeting Bulger and Flemmi, among others.

371.   Despite repeated attempts by the United States, the FBI kept secret from the U.S. Attorney information concerning Bulger's relationship with the FBI, until January 9, 1995, four days after Flemmi's arrest, and the day before he and Bulger were indicted.

372.   Connolly, who was no longer employed by the Bureau, was able to monitor the progress of the grand jury investigation and keep Bulger and Flemmi advised concerning it. Connolly knew that Bulger and Flemmi were targets of the grand jury investigation and often discussed it with each of them, particularly Bulger.

373.   Connolly's enduring relationship with members of the Organized Crime Squad gave him

access to some information concerning the ongoing investigation of Bulger and Flemmi.

374.    In early January 1995, Connolly alerted Flemmi and Bulger that a federal grand jury in the District of Massachusetts would be asked to issue an indictment on January 10, 1995 in the case subsequently captioned *United States v. Francis P. Salemme*.

375.    On or about January 4, 1995, in connection with the case subsequently captioned *United States v. Salemme, et al*, Criminal Number 94-10287-MLW (D.Mass), arrest warrants were issued for Flemmi, Bulger and others.

376.    On or about January 5, 1995, Salemme fled the District of Massachusetts.  He was apprehended on or about August 12, 1995 in West Palm Beach, Florida.

377.    On or before January 5, 1995, Bulger fled the District of Massachusetts.  He remains a fugitive.

378.    On or about January 23, 1995, Bulger returned briefly to the Boston area to drop off Theresa Stanley, with whom he had been romantically involved for 30 years.  It was widely known that Stanley had been traveling with Bulger and was back in Boston.  Yet, the FBI did not contact her until April 1996, about 15 months after she had returned.  By the time she was interviewed by the FBI, the information that she could provide was dated and of diminished value.  Nevertheless, the FBI paid Stanley $1,000 in November 1996 – an amount also paid to Halloran's widow after Halloran's murder in 1982.

379.    Connolly was not interviewed in the Bulger fugitive investigation until March 21, 1997, more than two years after Bulger fled.

380.    Connolly and Morris were upset that Bulger and Flemmi had been indicted.  Connolly stated that he had known Bulger since they were both boys and Bulger had bought him an ice cream cone.  Connolly stated that he "hoped that Bulger was never caught." "At

least he kept his end of the bargain."  With regard to the government, Connolly wondered, "what ever happened to keeping your word."

381.    According to Connolly, the "FBI knew what [Flemmi and Bulger] were.  They didn't have a paper route when [the FBI] first met them.  All ... Top Echelon informants are murderers.  The government put me in business with murderers."  .  Connolly further stated that "charging Bulger and Flemmi with gambling and loan sharking was a betrayal of the promises made to [them]."  However, the minute [Connolly] told [the government] that [he] would testify to the fact that these people were authorized to run a gambling and loansharking business, the [government] did not want to hear from [him]."

382.    On December 22, 1999, in the United States District Court for the District of Massachusetts, John J. Connolly, James Bulger, and Stephen Flemmi were indicted. *United States v. Connolly*, Criminal Number 99-10428-JLT.  On or about October 11, 2000, a Superseding Indictment was filed against Connolly and Flemmi in the United States District Court for the District of Massachusetts, 99-10428-JLT.

383.    According to reports published in The Boston Globe on June 27, 2000, Connolly, through his attorneys, maintains he was authorized by his superiors at the FBI to undertake conduct alleged in the indictment alleged in the previous paragraph: "It is clear that Mr. Connolly was authorized to commit all of the acts he committed with respect to informants.  He was authorized to tell them to commit crimes.  He was authorized to look the other way.  He was authorized not to press them for information about their criminal conduct."

**Count I – MGL Ch. 229 § 2 --- Civil Conspiracy – Defendants United States, Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn**

384.　　The plaintiff incorporates the facts alleged in paragraphs 1-383 and repeats and recite all previous allegations as if fully set forth herein.

385.　　From in or about 1969 and continuing thereafter up to July 6, 2000 in the District of Massachusetts and elsewhere, defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn, while acting within the course or scope of their office or employment with the FBI, an agency of the defendant United States, together with defendants Bulger and Flemmi combined, conspired and agreed to protect Bulger, Flemmi, and their associates from arrest and prosecution for their criminal activities including, but not limited to, murder, loan sharking, illegal gambling, extortion and bribery in exchange for defendants Bulger and Flemmi's agreement to provide information pertaining to the criminal activities of others to agents of the FBI.

386.　　It was the object of the conspiracy to protect defendants Bulger and Flemmi from arrest and prosecution in order to maintain their roles as high echelon informants, providing information to the FBI.  In furtherance thereof, defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn, among other things: (a) provided Bulger and Flemmi with confidential law enforcement information regarding grand jury investigations, court authorized wire taps and other investigative efforts, including the identities of confidential informants who were providing information about Bulger and Flemmi; (b) deflected and squelched prosecutions and criminal investigations about Bulger's and Flemmi's crimes; (c) improperly preserved Bulger's and Flemmi's status as FBI informants through the filing of misleading official reports and failed to report

69

and record allegations of their crimes in official FBI documents; (d) improperly failed to supervise and review Bulger's and Flemmi's criminal activities; (e) improperly lied to others concerning the criminal activities of Bulger and Flemmi; and (f) failed to follow the Attorney General Guidelines governing high echelon informants.

387. In part, the defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn benefited from the conspiracy alleged herein by, among other ways: (a) increased prestige and promotions for the individual agents and the Boston field office of the FBI, in general, arising from the successful prosecution of the LCN; (b) receiving gifts of money and other things of value from Bulger and Flemmi; (c) concealing from the public and courts that the Attorney General Guidelines regulating the handling of high echelon informants had been systematically ignored; (d) concealing from the public and courts that agents of the FBI had violated the laws of the United States of America, thus saving the defendant United States from the adverse publicity and harm to reputation associated with the indictment of one or more of its agents or the public revelation of the conduct alleged within this Complaint; (e) concealing from the public, courts, and litigants the conduct alleged in this complaint in order to prevent persons from challenging the legality of their convictions; and (f) concealing from the public, courts and litigants the conduct alleged in this complaint, thus precluding persons who had been unlawfully imprisoned or harmed, including your plaintiff, from making claims against the defendant United States.

388. On or about 1981, Davis was kidnapped, tortured and murdered by Bulger, Flemmi, Weeks and others.

389. The defendant United States by and through defendants Morris, Connolly, Kennedy,

Fitzpatrick, Ring, Greenleaf, Ahearn and others failed to undertake any serious investigation of Davis' disappearance.

390.   At the time of Davis' disappearance, Bulger and Flemmi had been involved in approximately 23 murders, including at least 2 persons who were directly cooperating with the FBI at the time of their executions.

391.   The defendant United States and its agency, the Federal Bureau of Investigation negligently continued to utilize Bulger and Flemmi as top echelon informants; negligently failed to control the criminal activities of Bulger and Flemmi, negligently failed to enforce the Attorney General Guidelines governing high echelon informants, including Bulger and Flemmi; negligently and in violation of the regulations and policies of the defendant United States failed to inform the appropriate law enforcement or prosecutive authorities of the criminal activities of Bulger and Flemmi; negligently failed to properly supervise federal agents, including Connolly and Morris, in their handling of Bulger and Flemmi; negligently continued to allow Connolly to remain Bulger and Flemmi's "handler" when it was known or should have been known that he should have been removed from that position;; negligently failed to warn and protect Davis; and negligently failed to investigate for the purpose of prosecution the circumstances of Davis' disappearance and death.

392.   As a result of these wrongful acts by agents and employees of the defendant United States, events occurred that a reasonable, prudent person would have foreseen in light of the circumstances set forth herein, including the kidnapping, torture and wrongful death of Debra Davis.  The tortious conduct of such employees was a material element and proximate cause in bringing about Davis' kidnapping, torture and death.

71

393.   By reason of the negligence of defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf, Ahearn and United States, the next of kin has been deprived of compensation for the loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice and reasonable funeral and burial expenses as well as other damages pursuant to MGL Ch. 229, § 2.

### Count II -- MGL Ch. 229 § 6 -- Conscious Suffering -- Defendants United States, Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn

394.   The plaintiff incorporates the facts alleged in paragraph 1-393 and repeats and recites all previous allegations as if fully set forth herein.

395.   As a direct and proximate result of the negligence of defendant United States, by and through defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn, while acting within the scope or office of their employment by the FBI, alleged in the previous Count of this Compliant, Davis suffered great pain of body and anguish of mind in that she was kidnapped, tortured and wrongfully killed.

396.   This Count of the Compliant is for conscious suffering and is being brought for the benefit of the Estate of Debra Davis pursuant to MGL Ch 229 § 6.

### Count III -- MGL Ch. 229 § 2 and Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., 28 U.S.C. § 2401, and C.F.R. § 14.1, et seq. -- Negligence -- Defendants United States, Morris, Connolly, Kennedy Fitzpatrick, Ring and Greenleaf

397.   The plaintiff incorporate the facts alleged in Paragraphs 1-417 and repeats and recites all previous allegations as if fully set forth herein.

398.   The defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring and Greenleaf, while acting within the course and scope of their office or employment by the FBI, an agency

of the defendant United States: (a) knew or should have known that Bulger and Flemmi had engaged in a history of criminal activity including assault, attempted murder and murder; (b) knew or should have known they had a duty to investigate the prior 23 murders caused by Bulger and Flemmi, (c) knew or should have known they had a duty to disclose Flemmi and Bulger's violent criminal activities to law enforcement agencies with jurisdiction over their crimes and/or report these activities to the Department of Justice and/or terminate Bulger and Flemmi's status as confidential informants; (d) knew or should have known that they had a duty to follow and enforce the Attorney General Guidelines regarding the handling of high echelon informants and (e) knew or should have known that their failure to comply with their duties alleged herein would place the life of Debra Davis in grave danger.

399.    The United States and its agency, the Federal Bureau of Investigation, negligently continued to utilize Bulger and Flemmi as top echelon informants; negligently failed to control the criminal activities of Bulger and Flemmi, negligently failed to enforce the Attorney General Guidelines governing high echelon informants, including Bulger and Flemmi; negligently and in violation of the regulations and policies of the defendant United States failed to inform the appropriate law enforcement or prospective authorities of the criminal activities of Bulger and Flemmi; negligently failed to properly supervise federal agents, including Connolly and Morris, in their handling of Bulger and Flemmi; negligently continued to allow Connolly to remain Bulger and Flemmi's "handler" when it was known or should have been known that he should have been removed from that position.

400.    As a result of these wrongful acts by agents and employees of the defendant United

States, events occurred that a reasonable, prudent person would have foreseen in light of the circumstances set forth herein, including the kidnapping, torture and wrongful death of Debra Davis. The tortious conduct of such employees was a material element and proximate cause in bringing about Davis' kidnapping, torture and death.

401.     By reason of the negligence of defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and United States, the next of kin has been deprived of compensation for the loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice and reasonable funeral and burial expenses, as well as other damages pursuant to MGL Ch. 229 § 2.

402.     The plaintiff has additionally duly presented a Notice of Tort Claim, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., 28 U.S.C. § 2401, and 28 C.F.R. § 14.1, et.seq. giving notice of Davis' injuries and wrongful death caused by the negligent or wrongful acts or omissions of certain employees of the United States Government while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to the plaintiffs in accordance with the laws of the Commonwealth of Massachusetts. **See Exhibit A, appended hereto.**

## Count IV – MGL Ch. 229 § 6 -- Conscious Suffering – Defendants United States, Morris, Connolly, Kennedy Fitzpatrick, Ring and Greenleaf

403.     The plaintiff incorporates the facts alleged in paragraphs 1-402 and repeats and recites all previous allegations as if fully set forth herein.

404.     As a direct and proximate result of the negligence of defendant United States, by and through defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring and Greenleaf, while acting within the scope or office of their employment by the FBI, alleged in the previous

74

Count of this Compliant, Davis suffered great pain of body and anguish of mind in that he was kidnapped, tortured and wrongfully killed.

405.     This Count of the Complaint is for conscious suffering and is being brought for the benefit of the Estate of Debra Davis pursuant to MGL Ch. 229 § 6.

### Count V – MGL Ch. 229 § 2 -- Supervisory Liability – Defendants United States, Ring and Greenleaf

406.     The plaintiff incorporates the facts alleged in paragraphs 1-405 and repeats and recites all previous allegations as if fully set forth herein.

407.     At the time of Davis' murder, defendants Ring and Greenleaf were the supervisors of John J. Connolly.

408.     Defendants Ring and Greenleaf while acting in the course and scope of their office or employment by the FBI, an agency of the defendant United States, had a duty to ensure that their subordinate Connolly followed the laws of the United States, acted in conformity therewith, that both Connolly and the Boston Field Office of the FBI were in compliance with the Attorney General Guidelines concerning the handling of high echelon informants, including Bulger and Flemmi.

409.     By the time of Davis' sudden disappearance in 1981, defendants Ring, Greenleaf: (a) knew or should have known that Bulger and Flemmi had engaged in a history of violent criminal activity, including assault, attempted murder and murder; and (b) knew or should have known they had a responsibility to inform appropriate law enforcement or prosecutive authorities of the criminal activity of Bulger and Flemmi.

410.     During the tenure of defendants Ring and/or Greenleaf, Connolly, while he served as a Special Agent of the FBI, both received things of value from Flemmi and Bulger

and with Flemmi and Bulger paid a series of things of value to former Supervisory Special Agent Morris.

411.    During the tenure of defendants Ring and/or Greenleaf, Connolly, while he served as a Special Agent of the FBI, provided Bulger and Flemmi sensitive and confidential law enforcement information designed to protect the criminal activities of Bulger, Flemmi, and, at times, their criminal associates.

412.    During the tenure of defendants Ring and/or Greenleaf, Connolly, while he served as a Special Agent of the FBI, using confidential information that he received from Supervisory Special Agent Morris and from other FBI and law enforcement sources, tipped Bulger and Flemmi to various law enforcement initiatives in order to protect their ongoing criminal activities.

413.    During the tenure of defendants Ring and/or Greenleaf, Connolly, while he served as a Special Agent of the FBI, using confidential information that he received from FBI and other law enforcement sources, alerted Bulger and Flemmi to the identity of confidential law enforcement informants in order to protect Bulger's and Flemmi's ongoing criminal activities.

414.    During the tenure of defendants Ring and/or Greenleaf, Connolly, while he served as a Special Agent of the FBI, knowingly omitted material information from official FBI documents regarding Bulger and Flemmi.

415.    During the tenure of defendants Ring or Greenleaf, Connolly, while he served as a Special Agent of the FBI, in order to protect Bulger and Flemmi from prosecution and to further their criminal activities, in knowing and willful violation of his responsibilities as an FBI agent, endeavored to preserve Bulger's and Flemmi's status

76

as confidential informants by failing to report information relating to Bulger and Flemmi which was material to the investigation of criminal activity in the Boston area.

416.  During the tenure of Ring and Greenleaf, the FBI failed to undertake any good faith investigation of the role of Bulger, Flemmi and others in the murders of Halloran and Callahan.  Bulger, Flemmi and Connolly have subsequently been indicted for their roles in the murders of Halloran and Callahan.

417.  During the tenure of Ring and Greenleaf, in 1984 Connolly, failed to report or to otherwise memorialize on any official FBI document the information he had received from Joseph Lundbohm regarding Bulger, Flemmi and Weeks' extortion of Stephen and Julie Rakes and falsely told Lundbohm that unless Rakes agreed to wear a recording device in conversations with Bulger and Flemmi, the FBI was unlikely to take action on the Rakes' compliant.

418.  During the tenure of Ring, in or about June 1988, Connolly and Morris provided confidential law enforcement information to Bulger and Flemmi which altered them to a federal wiretap authorization and investigation.

419.  Defendants Ring and Greenleaf, while acting within the course and scope of their office or employment by the FBI, an agency of the defendant United States, breached their duties by failing to properly supervise Connolly and others and failing to ensure that Connolly and others followed Attorney General Guidelines concerning the handling of high echelon informants thereby placing the lives of others at great risk.

420.  As a result of these wrongful acts by agents and employees of the defendant United States, events occurred that a reasonable, prudent person would have foreseen in light

of the circumstances set forth herein, including the kidnapping, torture and wrongful death of Debra Davis. The tortious conduct of such employees was a material element and proximate cause in bringing about Davis' kidnapping, torture and death.

421.    By reason of the negligence of defendants Ring, Greenleaf and United States, the next of kin has been deprived of compensation for the loss of reasonably expected net income, services, protection, care assistance, society, companionship, comfort, guidance, counsel and advice and reasonable funeral and burial expenses as well as other damages pursuant to MGL Ch. 229 § 2.

### Count VI -- MGL Ch. 229 § 6 – Conscious Suffering – Defendants United States, Ring and Greenleaf

422.    The plaintiff incorporates the facts alleged in paragraphs 1-421 of this Complaint and repeats and recites all previous allegations as if fully set forth herein.

423.    As a direct and proximate result of the negligence of defendant United States, by and through defendants Ring and Greenleaf, while acting within the scope or office of their employment by the FBI, alleged in the previous Count of this Compliant, Davis suffered great pain of body and anguish of mind in that she was kidnapped, tortured and wrongfully killed.

424.    This Count of the Compliant is for conscious suffering and is being brought for the benefit of the Estate of Debra Davis pursuant to MGL Ch. 229 § 6.

### Count VII – MGL Ch. 229 § 2- Wrongful Death – Willful – Defendants Bulger, Flemmi and Weeks

425.    The plaintiff incorporates the facts alleged in paragraph 1-424 and repeats and recites all previous allegations as if fully set forth herein.

426. On or about 1981, defendants Bulger, Flemmi, Weeks and others willfully, wantonly, maliciously, intentionally and unlawfully killed Debra Davis.

427. Bulger, Flemmi, Weeks and others willfully, wantonly, maliciously, intentionally and unlawfully killed Debra Davis by aiding and abetting one another in kidnapping, torturing and causing the wrongful death Davis.

428. By reason of Bulger's, Flemmi's and Week's willful, malicious and wrongful acts, the next of kin have been deprived of compensation for the loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice and reasonable funeral and burial expenses as well as other damages pursuant to MGL Ch. 229 § 2.

429. By reason of Connolly's, Bulger's and Week's malicious, willful wanton and reckless conduct, the plaintiff is entitled to an award of punitive damages pursuant to MGL Ch. 229 § 2.

### Count VIII – MGL Ch. 229 § 6 – Conscious Suffering – Defendants Bulger, Flemmi and Weeks

430. The plaintiff incorporates the facts alleged in paragraph 1-429 and repeats and recites all previous allegations as if fully set forth herein.

431. As a direct and proximate result of the willful, malicious and wrongful acts of defendants Bulger, Flemmi and Weeks alleged in the previous Count of this Compliant, Davis suffered great pain of body and anguish of mind in that he was kidnapped, assaulted and beaten with the intent to kill him and by such assault and beating was wrongfully killed.

432. This Count of the Compliant is for conscious suffering and is being brought for the

benefit of the Estate of Debra Davis pursuant to MGL Ch 229 § 6.

### COUNT IX -- Bivens – Fourth Amendment – Defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring and Greenleaf

433.    The plaintiff incorporates the facts alleged in paragraph 1 - 432 and repeats and recites all previous allegations as if fully set forth herein.

434.    Defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring and Greenleaf, while acting under color of law of the United States of America, knowingly, intentionally, and with actual malice, denied Debra Davis her clearly established right to be secure in her person against unreasonable seizures as guaranteed by the Fourth Amendment to the United States Constitution.

435.    These denials were accomplished in that defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring and Greenleaf continued to utilize Bulger and Flemmi as top echelon informants; failed to control the criminal activities of Bulger and Flemmi; failed to enforce the Attorney General Guidelines governing high echelon informants, including Bulger and Flemmi; in violation of the regulations and policy of the United States failed to inform the appropriate law enforcement or prosecutive authorities of the criminal activities of Bulger and Flemmi; continued to allow Connolly to remain Bulger and Flemmi's "handler" when it was known or should have been known that he should have been removed from that position; failed to warn and protect Debra Davis from individuals known to be murderers.

436.    These actions violated Davis' clearly established right to be secure in her person from unreasonable seizures, guaranteed by the Fourth Amendment to the United States

Constitution, that is, force which was, considering all the facts and circumstances of the case, unreasonable in that it was not intended to achieve any lawful purpose.

437.     As a direct, proximate, and foreseeable result of the actions of defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring and Greenleaf, Davis was actually denied her constitutional rights pursuant to the Fourth Amendment as alleged above to the United States Constitution, and suffered extreme and severe fright, shock, fear, horror, emotional distress and wrongful death.

438.     The actions of defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring and Greenleaf, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken intentionally, with actual malice, and/or reckless disregard for their likely consequences. As a result, the plaintiff is entitled to an award of punitive damages.

## COUNT X - Bivens – Substantive Fifth Amendment – Defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring and Greenleaf

439.     The plaintiff incorporates the facts alleged in paragraph 1-438 and repeats and recites all previous allegations as if fully set forth herein.

440.     Defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring and Greenleaf, while acting under color of law of the United States, knowingly, intentionally, and with actual malice, denied Debra Davis her clearly established substantive due process right not to be deprived of life and liberty without due process of law, guaranteed by the Fifth Amendment to the United States Constitution.

441.     These denials were accomplished in that defendants Greenleaf, Ring, Morris, Connolly, Kennedy and Fitzpatrick continued to utilize Bulger and Flemmi as top echelon

informants; failed to control the criminal activities of Bulger and Flemmi; failed to enforce the Attorney General Guidelines governing high echelon informants, including Bulger and Flemmi; in violation of the regulations and policy of the United States failed to inform the appropriate law enforcement or prosecutive authorities of the criminal activities of Bulger and Flemmi; continued to allow Connolly to remain Bulger and Flemmi's "handler" when it was known or should have been known that he should have been removed from that position.

442. These actions violated Davis' clearly established substantive due process rights not to be deprived of life or liberty without due process of law, guaranteed by the Fifth Amendment to the United States Constitution because the force used was arbitrary and/or reckless and highly likely to cause harm, and shocks the conscience.

443. As a direct, proximate, and foreseeable result of the actions of defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring and Greenleaf, Davis was actually denied her constitutional rights pursuant to the Fifth Amendment as alleged above to the United States Constitution, and suffered extreme and severe fright, shock, fear, horror, emotional distress and wrongful death.

444. The actions of defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring and Greenleaf, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken intentionally, with actual malice, and/or reckless disregard for their likely consequences. As a result, the plaintiff is entitled to an award of punitive damages.

## COUNT XI – Bivens – Fourth and Fifth Amendments - Failure To Supervise – Defendants Ring and Greenleaf

445. The plaintiff incorporates the facts alleged in paragraphs 1-444 repeats and recites all

previous allegations as if fully set forth herein.

446.  Defendants Ring and Greenleaf, while acting under color of law of the United States of America knowingly, intentionally, and with actual malice, denied Debra Davis her clearly established right to be secure in her person from unreasonable seizures as guaranteed by the Fourth Amendment to the United States Constitution, and/or her substantive due process rights not to deprived of liberty and life without due process of law, guaranteed by the Fifth Amendment to the United States Constitution, by breaching their duty to supervise John J. Connolly through their own acts or omissions causing Davis to be kidnapped, tortured and wrongfully killed by Bulger, Flemmi, Weeks and others.

447.  At the time of Davis' murder, defendants Ring and Greenleaf were the supervisors of John J. Connolly.

448.  Defendants Ring and Greenleaf had a duty to ensure that Connolly and other agents followed the law, acted in conformity therewith and that both Connolly and the Boston Field Office of the FBI were in Compliance with the Attorney General Guidelines concerning the handling of high echelon informants, including Bulger and Flemmi.

449.  By the time of Davis' sudden disappearance in 1981, defendants Ring and Greenleaf (a) knew or should have known that Bulger and Flemmi had engaged in a history of violent criminal activity, including assault, attempted murder and murder; (b) knew or should have known that Connolly was the FBI "handler" for Bulger and Flemmi and that others within the FBI receiving reliable information about criminal activity in which Bulger and Flemmi were engaged, would consult Connolly and then not pursue any investigation of Bulger and Flemmi; (c) knew or should have known that Connolly was giving

information to Bulger and Flemmi and that Bulger and Flemmi were engaged in criminal activities while serving as FBI informants; and (d) knew or should have known they had a responsibility to inform appropriate law enforcement or prosecutive authorities of the criminal activity of Bulger and Flemmi.

450.    During the tenure of defendants Ring or Greenleaf, Connolly, while he served as a Special Agent of the FBI, both received things of value from Flemmi and Bulger and with Flemmi and Bulger paid a series of things of value to former Supervisory Special Agent Morris.

451.    During the tenure of defendants Ring or Greenleaf, Connolly, while he served as a Special Agent of the FBI, provided Bulger and Flemmi sensitive and confidential law enforcement information designed to protect the criminal activities of Bulger, Flemmi, and, at times, their criminal associates.

452.    During the tenure of defendants Ring or Greenleaf, Connolly, while he served as a Special Agent of the FBI, using confidential information that he received from Supervisory Special Agent Morris and from other FBI and law enforcement sources, tipped Bulger and Flemmi to various law enforcement initiatives in order to protect their ongoing criminal activities.

453.    During the tenure of defendants Ring or Greenleaf, Connolly, while he served as a Special Agent of the FBI, using confidential information that he received from FBI and other law enforcement sources, alerted Bulger and Flemmi to the identity of confidential law enforcement informants in order to protect Bulger's and Flemmi's ongoing criminal activities.

454.    During the tenure of defendants Ring or Greenleaf, Connolly, while he served as a

Special Agent of the FBI, knowingly omitted material information from official FBI documents regarding Bulger and Flemmi.

455.    During the tenure of defendants Ring or Greenleaf, Connolly, while he served as a Special Agent of the FBI, in order to protect Bulger and Flemmi from prosecution and to further their criminal activities, in knowing and willful violation of his responsibilities as an FBI agent, endeavored to preserve Bulger's and Flemmi's status as confidential informants by failing to report information relating to Bulger and Flemmi which was material to the investigation of criminal activity in the Boston area.

456.    During the tenure of Ring and Greenleaf, the FBI failed to undertake any good faith investigation of the role of Bulger, Flemmi and others in the murders of Halloran and Callahan.  Bulger, Flemmi and Connolly have subsequently been indicted for their roles in the murders of Halloran and Callahan.

457.    During the tenure of Ring and Greenleaf, in 1984, Connolly, failed to report or to otherwise memorialize on any official FBI document the information he had received from Joseph Lundbohm regarding Bulger, Flemmi and Weeks' extortion of Stephen and Julie Rakes and falsely told Lundbohm that unless Rakes agreed to wear a recording device in conversations with Bulger and Flemmi, the FBI was unlikely to take action on the Rakes' complaint.

458.    During the tenure of Ring, in or about June 1988, Connolly and Morris provided confidential law enforcement information to Bulger and Flemmi which alerted them to a federal wiretap authorization and investigation.

459.    Defendants Ring and Greenleaf through their own acts or omissions encouraged, condoned, acquiesced and/or acted with gross negligence or deliberate indifference to

Connolly and Kennedy's actions in that they ignored: that Bulger and Flemmi had engaged in a history of violent criminal activity, including assault, attempted murder and murder; that informants willing to cooperate against Bulger and Flemmi had been intimidated, tampered with or murdered in violation of 18 U.S.C. §§ 1512, 1513 and other provisions of state and federal law; the clear statutory authority to investigate those cases where witnesses and informants were tampered with or retaliated against, arising from their cooperation with law enforcement; their duty to properly supervise Connolly's personal relationship with Bulger and Flemmi; and their mandatory duty to ensure that Connolly and other agents within the Boston Field office of the FBI were in compliance with the Attorney General Guidelines concerning the handling of high echelon informants.

460.    As a direct, proximate, and foreseeable result of defendants Ring and Greenleaf's actions, Davis was actually denied her clearly established constitutional rights pursuant to the Fourth and Fifth Amendments to the United States Constitution, alleged above, and suffered extreme and severe fright, shock, fear, horror, emotional distress and wrongful death.

461.    The actions of defendants Ring and Greenleaf, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken intentionally, with actual malice, and/or reckless disregard for their likely consequences.  As a result, the plaintiff is entitled to an award of punitive damages.

**Count XII–Bivens Conspiracy - Fourth And Fifth Amendments – Defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn**

462.    The plaintiff incorporates the facts alleged in paragraphs 1-461 and repeats and recites

all previous allegations as if fully set forth herein.

463.    From in or about 1969 and continuing thereafter up to July 6, 2000 in the District Court of Massachusetts and elsewhere, defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn, while acting under color of the law of the United States, together with defendants Bulger, Flemmi and Weeks, combined, conspired and agreed to protect James Bulger, Stephen Flemmi, and their associates from arrest and prosecution for their criminal activities including, but not limited to, murder, loan sharking, illegal gambling, extortion and bribery, in exchange for defendants Bulger and Flemmi's agreement to provide information pertaining to the criminal activities of others to agents of the FBI.

464.    It was the object of the conspiracy to protect Bulger and Flemmi from arrest and prosecution in order to maintain their roles as high echelon informants, providing information to the FBI.  In furtherance thereof, defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn among other things, (a) provided Bulger and Flemmi with confidential law enforcement information regarding grand jury investigations, court authorized wire taps and other investigative efforts, including the identities of confidential informants who were providing information about Bulger and Flemmi; (b) deflected and squelched prosecutions and criminal investigations about Bulger's and Flemmi's crimes; (c) improperly preserved Bulger's and Flemmi's status as FBI informants through the filing of misleading official reports and failed to report and record allegations of their crimes in official FBI documents; (d) improperly failed to supervise and review Bulger's and Flemmi's criminal activities; (e) improperly lied to others concerning the criminal activities of Bulger and Flemmi; and (f) failed to

87

follow the Attorney General Guidelines governing high echelon informants.

465.  In part, the defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn benefitted from the conspiracy alleged herein for, among other ways: (a) increased prestige and promotions for the individual agents and the Boston field office of the FBI, in general, arising from the successful prosecution of the LCN; (b) receiving gifts of money and other things of value from Bulger and Flemmi; (c) concealing from the public and courts that the Attorney General Guidelines regulating the handling of high echelon informants had been systematically ignored; (d) concealing from the public and courts that agents of the FBI had violated the laws of the United States of America, thus saving the United States from adverse publicity and harm to reputation associated with the indictment of one or more of its agents or the public revelation of the conduct alleged within this Complaint; (e) concealing from the public, courts, and litigants the conduct alleged in this complaint in order to prevent persons from challenging the legality of their convictions; and (f) concealing from the public, courts and litigants the conduct alleged in this complaint, thus precluding persons who had been unlawfully imprisoned or harmed, including your plaintiff, from making claims against the defendant United States.

466.  On or about 1981, Davis was kidnapped, tortured and murdered by Bulger, Flemmi, Weeks and others.

467.  The defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf, Ahearn and others failed to undertake any serious investigation of Davis' disappearance.

468.  At the time of Davis' disappearance, Bulger and Flemmi had been involved in approximately 23 murders, including 2 persons who were directly cooperating with the

88

FBI at the time of their executions.

469.    As part of the conspiracy and in furtherance thereof the defendants acting under color of law of the United States of America, knowingly, intentionally, and with actual malice, denied Debra Davis her clearly established right to be secure in her persons against unreasonable seizures as guaranteed by the Fourth Amendment to the United States Constitution, and/or his substantive due process rights not to be deprived of liberty and life without due process of law, guaranteed by the Fifth Amendment to the United States Constitution.

470.    These denials were accomplished in that defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn continued to utilize Bulger and Flemmi as top echelon informants; failed to control the criminal activities of Bulger and Flemmi; failed to enforce the Attorney General Guidelines governing high echelon informants, including Bulger and Flemmi; in violation of the regulations and policy of the United States, failed to inform the appropriate law enforcement or prosecutive authorities of the criminal activities of Bulger and Flemmi; continued to allow Connolly to remain Bulger and Flemmi's "handler" when it was known or should have been known that he should have been removed from that position; failed to warn and protect Debra Davis.

471.    These actions undertaken in furtherance of the conspiracy alleged herein violated Davis' clearly established right to be secure in her person from unreasonable seizures, guaranteed by the Fourth Amendment to the United States Constitution, that is, force which was, considering all the circumstances, unreasonable in that it was not intended to achieve any lawful purpose.

472.    These actions undertaken in furtherance of the conspiracy alleged herein also violated

Davis' clearly established substantive due process right not be deprived of life or liberty without due process of law, guaranteed by the Fifth Amendment to the United States Constitution because the force used was arbitrary and/or reckless and highly likely to cause harm, and shocks the conscience.

473.    As a direct, proximate, and foreseeable result of the conspiracy alleged herein and defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn's actions to further the conspiracy, Davis was actually denied her constitutional rights pursuant to the Fourth and Fifth Amendments to the United States Constitution, and suffered extreme and severe fright, shock, fear, horror, emotional distress and wrongful death.

474.    The actions of defendants Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken intentionally, with actual malice, and/or reckless disregard for their likely consequences.  As a result, the plaintiff is entitled to an award of punitive damages.

**Count XIII – Bivens Conspiracy to Deprive Estate of Rights Guaranteed by the First and Fifth Amendments – Defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn**

475.    The plaintiff incorporates the facts alleged in paragraphs 1-474 and repeats and recites all previous allegations as if fully set forth herein.

476.    From on or about November 1984 to July 6, 2000 in the District of Massachusetts and elsewhere, defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf, Ahearn and others both known and unknown, acting under color of law of the United States combined, conspired and confederated together to deny the Estate of Debra Davis its

clearly established right to seek redress of grievances as guaranteed by the First Amendment to the United States Constitution and/or its right not to be deprived of property without due process of law as secured by the Fifth Amendment to the United States Constitution.

477.   Pursuant to 18 U.S.C. §§ 1512, 1513, the Boston Field Office of the FBI was congressionally authorized to investigate those cases where witnesses and informants were tampered with or retaliated against, arising from their cooperation with law enforcement.

478.   By the time of Davis' sudden disappearance in 1981, the defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn knew or should have known that there was a haunting pattern of FBI informants against Bulger and Flemmi disappearing and/or being murdered.

479.   Despite their statutory mandate and knowledge of the fate of other informants who had provided information against Bulger and Flemmi, the defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn acted to thwart, restrict and obstruct the investigation of Davis' disappearance and murder.

480.   In part, defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn benefitted from the conspiracy alleged herein for, among other ways: (a) increased prestige and promotions for the individual agents named in this Complaint and the Boston field office of the FBI, in general, arising from the successful prosecution of the LCN; (b) receiving gifts of money and other things of value from Bulger and Flemmi; (c) concealing from the public and courts that the Attorney General Guidelines regulating the handling of high echelon informants had been systematically ignored by

91

the Boston Field Office of the FBI, thus saving the Boston Field Office from extreme embarrassment associated with its handling of Bulger and Flemmi; (d) concealing from the public and courts that agents of the FBI had violated the laws of the United States of America, thus saving the FBI and the United States from the adverse publicity associated with the indictment of one or more of its agents or the public revelation of the conduct alleged within this complaint; or (e) concealing from the public, courts, and litigants the conduct alleged in this complaint in order to prevent persons from challenging the legality of their convictions; and (f) concealing from the public, courts and litigants the conduct alleged in this complaint, thus precluding persons who had been unlawfully imprisoned or harmed, including your plaintiff, from making claims against the defendant United States.

481.    In furtherance of the conspiracy, defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn: (a) failed to undertake a good faith effort to learn the identity of the murderers of Debra Davis and the circumstances of her death; (b) failed to interview potential witnesses who had information concerning Davis' disappearance; (c) failed to interview Bulger and Flemmi or members of the Bulger Group regarding Davis' disappearance; (d) otherwise failed to follow up on leads provided to them regarding the death and disappearance of Debra Davis.

482.    The defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn also acted to further the conspiracy by providing Bulger and Flemmi with (a) confidential law enforcement information regarding grand jury investigations, court authorized wiretaps and other investigative efforts; (b) disclosure of identities of other confidential informants; (c) deflected and squelched prosecutions and criminal

92

investigations of Bulger and Flemmi's crimes; and (d) improperly preserved Bulger and Flemmi's status as FBI informants through the filing of misleading official reports and failing to report and record allegations of Bulger and Flemmi's crimes in official FBI documents.

483.   As a direct, proximate, foreseeable and intended result of the conspiracy alleged in this Complaint, the defendants prevented the plaintiff from learning the identities of those involved in Davis' death, precluding it from seeking civil judgment against those responsible for Davis' death, denying the plaintiff its clearly established constitutional rights to seek redress of grievances as guaranteed by the First Amendment to the United States Constitution and/or its right not to be deprived of property without due process of law as secured by the Fifth Amendment to the United States Constitution in that the Estate was deprived its right to seek a civil remedy from 1981 to the date of this Complaint for the kidnapping, torture and murder of Debra Davis resulting in lost damages.

484.   The actions of the defendants Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken intentionally with actual malice, and/or with a reckless disregard for their likely consequences.  As a result, the plaintiff is entitled to an award of punitive damages.

**Count XIV - Violation of 42 U.S.C. § 1983 v. All Individual Defendants**

485.   Plaintiff repeats and realleges each and every allegation above stated as though such allegations were set forth herein.

93

486.     By engaging in the conduct described above, the individual defendants deprived Debra Davis of clearly established and well settled constitutional rights while acting under color of law.  Specifically, the defendants deprived Ms. Davis of rights secured and guaranteed to her by the United States Constitution including, but not limited to, his Fourth Amendment right to be free from unlawful seizure of his person and his Fifth and Fourteenth Amendment rights to due process of law.

487.     Further, the wrongful acts were undertaken with grossly reckless disregard of Plaintiff's constitutional rights.

488.     Each of the defendants together with the Federal Bureau of Investigation and the individual defendants in civil action, engaged in a conspiracy to deprive Ms.Davis and others of their rights, privileges and immunities as guaranteed and protected by the Constitution of the United States in violation of the provisions of 42 U.S.C. § 1983.

489.     The conspiracy, included but was not limited to the use and protection of James J. Bulger and Stephen Flemmi in their capacity as high echelon informants, concealment of their activities and failure to investigate their role in the disappearance and death of Debra Davis.

490.     As a result of the defendants' violations of Ms. Davis' civil rights, she suffered a loss of freedom, loss of enjoyment of life, loss of ability to earn income, extreme  emotional distress and was otherwise damaged.

491.     The above constitutes violations of 42 U.S.C. § 1983 et seq.

## Count XV - Conspiracy in Violation of 42 U.S.C. § 1983 (All Defendants)

492.     Debra Davis repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

493.     By having engaged in the conduct described above, the Defendants conspired to deprive Ms. Davis of the equal protection of the law or of the equal privileges and immunities under the law, and they acted in furtherance of the conspiracy, which resulted in the injury to Ms. Davis described above, in violation of 42 U.S.C. § 1983.

## Count XVI– Reasonable Attorney's Fees and Cost of Suit – Defendants United States, Rico, Morris, Connolly, Kennedy, Fitzpatrick, Ring, Greenleaf and Ahearn

494.     The plaintiff incorporates the facts alleged in paragraphs 1-497 of this Complaint and repeats and recites all previous allegations as if fully set forth herein.

495.     The plaintiff has been required to retain the services of counsel to prosecute the present lawsuit.

496.     The actions of the Defendants alleged above were in no instance substantially justified under the circumstances.  The Estate is therefore entitled to an award of reasonable attorneys' fees and costs of suit in prosecuting the present action, under the provisions of the Equal Access to Justice Act, 28 U.S.C. § 2412; F.R.Civ.P. 54; and pursuant to other provisions of law.

WHEREFORE, the plaintiff demands judgment against defendants as follows:

A.       Damages in the amount of $30,000,000.00;

B.       Plaintiff's costs and reasonable attorneys' fees in this action; and

C.       Such other and further relief as the Court deems just and proper.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

RESPECTFULLY SUBMITTED

PLAINTIFF

by their attorneys:

Robert S. Sinsheimer, Esq., BBO # 464940
Susan E. Sivacek, Esq., BBO # 644771
Sinsheimer and Associates
4 Longfellow Place, Suite 3501
Boston, MA 02114
(617) 722-9954

Dated:       September 30, 2002

96

# SINSHEIMER AND ASSOCIATES
## COUNSELLORS AT LAW
### 4 LONGFELLOW PLACE
### SUITE 3501-06
### BOSTON, MASSACHUSETTS 02114

Telephone
617-722-9954
617-227-2800
Facsimile
617-973-1562

Robert S. Sinsheimer, Esq.
robsins@aol.com

Susan E. Sivacek, Esq.
ssivacek@aol.com

September 14, 2001

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Louis J. Freeh, Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, D.C. 20535-0001

Charles Prouty
Special Agent in Charge
Federal Bureau of Investigation
One Center Plaza, Suite 600
Boston, MA 02108

Dear Gentlemen,

This office represents the Estate of Debra Davis ("Estate"). Pursuant to the provisions set forth in the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, and 28 C.F.R. 14.2(c), this letter serves as notice of the Estate's claims against the Federal Bureau of Investigation ("FBI"), its agents, servants, and/or representatives of the Federal Bureau of Investigation, including but not limited to: United States of America, H. Paul Rico, John Morris, John J. Connolly, Roderick Kennedy, Robert Fitzpatrick, Larry Potts, Bruce Ellavsky, James Ring, James Greenleaf, Edward Clarke and Edward Quinn (collectively "the defendants") for the wrongful death of Debra Davis. Pendant to the federal claims, the Estate has also brought state claims including a wrongful death action pursuant to M.G.L. c. 229.

Olga Davis (hereinafter also referred to as "Ms. Davis") has been appointed as administratrix of the Estate of Debra Davis. See Exhibit A. Ms. Davis is the mother of Debra Davis. Pursuant to U.S.C. 28 § 2675, the Estate claims money damages in the amount of $30,000,000.00 for the wrongful death and conscious suffering of Debra Davis as well as other allowable damages for which the FBI and its agents, servants, and/or representatives are liable under the laws of the United States and Commonwealth of Massachusetts.

Louis J. Freeh, Director
Federal Bureau of Investigation
September 14, 2001

This claim arises out of the kidnaping, torture and execution of Debra Davis and the conspiracy of the defendants to cover up the circumstances of her death. The Estate alleges that beginning in or about 1965 and continuing up to the filing of this notice of claim, the defendants conspired to protect and shield from prosecution Stephen Flemmi, James Bulger and others, in exchange for Bulger's and Flemmi's agreement to provide information to the FBI that could and would be used by that agency in its prosecution of Bulger's and Flemmi's competitors in the Boston Organized Crime market. The Boston Office of the FBI and its agents did not want Flemmi and Bulger to be charged with crimes because, if they were, the Boston office would lose their services as informants. Prosecution of Bulger and Flemmi would also have eventually resulted in the disclosure that the FBI was engaging in conduct in violation of its rules and regulations, as well as the laws of the United States of America. In fact, once the protection afforded to Bulger and Flemmi dissolved, the disclosures associated to their relationship with the FBI led to the indictment of Bulger and Flemmi's "handler". See U.S. v. Connolly, Criminal Number 99-10428-JLT.

It is alleged that certain of the defendants, acting in their official capacities and within the scope of their employment, allowed Flemmi and Bulger to continue to conduct their criminal activities with impunity, including murdering Debra Davis, when they knew or should have known that Debra and others were in danger. Allowing Flemmi and Bulger to continuously commit serious crimes, under the protection of the federal government amounts to nothing less than gross negligence. As a proximate cause of this gross negligence, Debra Davis' rights, as guaranteed by the Fourth and Fifth Amendments to the United States Constitution were violated. Despite Debra's sudden disappearance, and the coincidence that other individuals associated with Flemmi and Bulger had been murdered, Debra's disappearance was met with studied indifference.

In addition to failing to protect Debra Davis from the murderous criminals they were harboring, the defendant employees of the FBI intentionally avoided investigating Debra's disappearance and apparent murder after wresting the case away from the state and local police. Debra's mother, Olga Davis, reported her missing to the Randolph Police Department within twenty-four hours of her daughter's disappearance. Ms. Davis believes she initially spoke with an Officer Carvel at the Randolph Police Department. Two days later, Ms. Davis received a call from a representative of the Federal Bureau of Investigation informing her that the FBI would be "taking over the investigation."

2

Louis J. Freeh, Director
Federal Bureau of Investigation
September 14, 2001

Shortly thereafter, Ms. Davis met with approximately four agents from the Bureau at their direction.  The agents requested that Ms. Davis meet with them in a car at a secluded area.  Their purported reason for doing so was "in case Flemmi was around."  The agents asked some preliminary questions about Debra, such as description of her appearance.  The agents then switched gears and quickly began prodding Ms. Davis for whatever information she knew about Stephen Flemmi, ostensibly to learn whether Ms. Davis knew anything about Flemmi's involvement with the FBI.  They no longer appeared to be concerned specifically about Debra's disappearance.

Ms. Davis met with agents from the FBI, at their behest, approximately once a month over the next year.  The agents insisted they meet in motel rooms and parking lots.  Ms. Davis recalls being asked questions regarding her knowledge of what Mr. Flemmi did for a living and whether or not she had ever overheard any of his telephone conversations.  The agents continued to fish for information Ms. Davis might know about Flemmi but made no apparent progress regarding Debra's disappearance and, in fact, seemingly lost interest in the investigation.

Ms. Davis felt extremely intimidated by these meetings in which she was always asked to meet with several agents by herself, with the exception of one time when Michelle Davis, Debra's sister was present.  Ms. Davis was never asked to meet with the agents at FBI headquarters, nor did they ever meet with her at her home.  Instead, they insisted on meeting her at out of the way places, such as the parking lot of St. Bernadette's Church in Randolph.

The agents made statements to Ms. Davis to the effect that if James Bulger and Steven Flemmi murdered somebody, they would know how to make a body disappear because they knew people who worked at funeral parlors.  These statements were highly inappropriate and upset Ms. Davis.  Moreover, she felt they were intended to be veiled threats not to pursue any help from local authorities outside of the FBI.

Michelle Davis also recalls being asked questions about Mr. Flemmi, which she believed were designed to discover exactly how much she knew about Flemmi's involvement with the FBI.  Michelle Davis resided for a time with Mr. Flemmi and Debra in Brookline.  Michelle Davis was repeatedly asked by the agents what she knew of Flemmi's business and what, if anything, she may have heard him discussing in telephone conversations.

3

Louis J. Freeh, Director
Federal Bureau of Investigation
September 14, 2001

Olga Davis recalls being instructed by the agents not to talk to anyone else and being advised that she "has eight other kids to worry about". Again, Ms. Davis felt this was a highly inappropriate comment and interpreted this as a warning not to pursue any investigation into her daughter's disappearance. Instead of feeling reassured by the FBI's involvement, Ms. Davis recalls feeling nervous and scared by the agents' behavior. The very people who should have been helping Ms. Davis find her daughter frightened her and did nothing to locate Debra.

On at least one occasion, Ms. Davis recalled that the conversation between herself and the FBI was recorded on a reel to reel recorder but, despite numerous requests, Ms. Davis has not been able to recover such recordings.

As time went on, it became apparent to Ms. Davis that the FBI had no intention of investigating Debra's disappearance, and in fact, prevented local authorities from pursuing any investigation as well. Ms. Davis recalls providing local authorities with pictures of Debra, to aid the search. After the FBI became involved in the matter, Ms. Davis approached the local authorities to have the pictures returned to her, only to be told they were "missing". Ms. Davis believes that the federal authorities took custody of these pictures, but did not in fact use them to locate her.

Ms. Davis now knows, and has long suspected, that Debra was murdered by Stephen J. Flemmi and James J. Bulger. She now also knows that at the time of Debra's disappearance, these two men were working as informants for the FBI and operating a criminal organization under the protection of the agency.

The allegations made herein are buttressed by the fact that a federal jurist, The Honorable Mark Wolf, has, in essence, made similar allegations. At Mr. Flemmi's sentencing hearing on August 21, 2001, Judge Wolf stated, "If Mr. Flemmi has committed any of the crimes with which he remains charged, he was able to do so largely because of the protection of the Federal Bureau of Investigation." See Exhibit B, Transcript p. 8. See also DICK LEHR & GERARD O'NEILL, BLACK MASS: THE IRISH MOB, THE FBI AND A DEVIL'S DEAL (PublicAffairs Pub.) (2000) and RALPH RANALLI, DEADLY ALLIANCE (HarperCollins Pub.) (2001). One of these crimes was the murder of Debra Davis. Clearly, not only did the FBI provide the protection with which Flemmi was able to conduct criminal activities, they actively worked to prevent any local authorities from investigating these crimes and continued to protect their informants from any

4

Louis J. Freeh, Director
Federal Bureau of Investigation
September 14, 2001

investigatory scrutiny.  Because of these actions by the federal agents, Ms. Davis and her family
did not learn what happened to their daughter and sister, Debra, until nearly <u>nineteen</u> years after
her disappearance.

Had it not been for the FBI's recruitment and protection of Mr. Flemmi as an informant,
Ms. Davis believes that her daughter would be alive today.  As Judge Wolf further noted, "All of
the murders with which Mr. Flemmi is charged in the pending cases against him occurred after
he was told by [Paul] Rico in 1974 to return to Boston and, as promised, the charges against him
were dismissed." Ex. B, Tr. p. 8.

The FBI's flagrant disregard for the guidelines for handling informants allowed Mr.
Flemmi to remain on the streets, engaging in criminal activity, while "working" as an informant.
Had the FBI not offered Mr. Flemmi such protection, he doubtless would have been unable to
continue these activities and "would have been killed or in prison" as long ago as 1969 when he
was tipped off and encouraged to flee by federal agent, Paul Rico.  Ex. B, Tr. p. 8.

Even after the FBI became aware that Debra Davis had disappeared in 1981, they did
nothing to investigate Flemmi's involvement in that crime.  In fact, Ms. Davis asserts that they
did the exact opposite - they turned a blind eye and squelched any attempts to investigate the
matter.  Mr. Flemmi was allowed to roam free and continue on with his criminal activities for
nearly thirteen more years.

In the meantime, Ms. Davis and her family have lived in fear, both from Mr. Flemmi and
also from the very body of law enforcement supposed to protect her.  Ms. Davis has had to live
with the knowledge that not only was her beloved daughter murdered, she was murdered by a
man the federal government nurtured and protected.

Ms. Davis, on behalf of the Estate of Debra Davis, hereby provides notice of her intent to
bring claims against the Federal Bureau of Investigation and its agents and/or representatives,
including but not limited to: United States of America, H. Paul Rico, John Morris, John J.
Connolly, Roderick Kennedy, Robert Fitzpatrick, Larry Potts, Bruce Ellavsky, James Ring,
James Greenleaf, Edward Clarke and Edward Quinn for (a) conspiracy to protect James Bulger,
Stephen Flemmi and their associates from arrest and prosecution, and that as a proximate cause
thereof, Debra Davis' rights as guaranteed by the Fourth and Fifth Amendments to the United

5

Louis J. Freeh, Director
Federal Bureau of Investigation
September 14, 2001

States Constitution were violated by her kidnaping, torture and execution and the Estate's rights as guaranteed by the Fourth and Fifth Amendments to the United States Constitution to petition the government and not be deprived of property without due process of law were violated by the defendants' interference with the Estate's right to seek a civil remedy for the kidnaping, torture and murder of Debra Davis; (b) substantive Bivens actions against the defendants for the violations of Debra Davis' constitutional rights as protected by the Fourth and Fifth Amendments to the United States Constitution; (c) civil conspiracy to protect James Bulger, Stephen Flemmi and their associates from arrest and prosecution, and that as a proximate cause thereof, Debra Davis was kidnaped, tortured and executed resulting in damages pursuant to M.G.L.A. c. 229 §§ 2, 6; and (d) substantive claims against the defendants for the wrongful death of Debra Davis pursuant to M.G.L.A. c. 229 §§ 2, 6. The Estate further intends to seek punitive damages.

As a direct and proximate result of the negligent, willful, malicious and unlawful acts of the Federal Bureau of Investigation, its agents, servants and/or representatives, the Estate sustained damages in the amount of $30,000,000.00. Pursuant to 28 U.S.C. § 2657(b), the Estate reserves the right to amend or supplement its claimed damages if newly discovered evidence not reasonably discoverable at this time comes into existence or intervening facts relating to this claim arise.

Thank you for your prompt attention to this claim.

Sincerely yours,

Robert S. Sinsheimer, Esq.
Susan E. Sivacek, Esq.

Enclosure
cc:   Ms. Olga Davis
      Ms. Michelle Davis
      Mr. Victor Davis

c:\SSF\Davis\Presentment Letter

6

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write *"Return Receipt Requested"* on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

LOUIS J. FREEH, DIRECTOR
FEDERAL BUREAU OF
INVESTIGATION
935 PENNSYLVANIA AVE, N.W.
WASHINGTON, D.C. 20535-0001

4a. Article Number
7000 1670 0000 3666 0883

4b. Service Type
☐ Registered        ☑ Certified
☐ Express Mail       ☐ Insured
☐ Return Receipt for Merchandise   ☐ COD

7. Date of Delivery
9/17/01

5. Received By: *(Print Name)*

6. Signature: *(Addressee or Agent)*
X DN/mes/CBI

8. Addressee's Address *(Only if requested and fee is paid)*

PS Form 3811, December 1994        102595-98-B-0229        Domestic Return Receipt

Is your **RETURN ADDRESS** completed on the reverse side?

Thank you for using Return Receipt Service.

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Estate of Debra Davis by Olga Davis, as administratix of the Estate

## DEFENDANTS

United States of America, H. Paul Rico, John Morris, John Connoly, et al.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF NORFOLK
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Robert S. Sinsheimer, Esq. BBO 464940
Sinsheimer & Associates
4 Longfellow PL., #3501, Boston, MA 02114
(617)722-9954

ATTORNEYS (IF KNOWN)

02-11911 RCL

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury — Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
**HABEAS CORPUS:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS — Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☒ 890 Other Statutory Actions

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Violation of
Federal Tort Claims Act, 28 U.S.C. s. 2671 and violation of 42 U.S.C. 1983    Plaintiff
seeking Redress for Wrongful Death of Debra Davis.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $
$30,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES   ☐ NO

01-CV-11346-NG

## VIII. RELATED CASE(S) (See instructions): IF ANY

JUDGE GERTNER/LINDSEY   DOCKET NUMBER 01-CV-10408-RCL

DATE
9-30-02

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) Estate of Debra Davis

    v. United States of America

2.  CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER
    SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

    ___     I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    X       II.     195, 368, 400, 440, 441-444, 540, 550, 625, 710, 720, 730,
                    740, 790, 791, 820, 830, 840, 850, 890, 892-894, 895, 950.

    ___     III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                    315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                    380, 385, 450, 891.

    ___     IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                    690, 810, 861-865, 870, 871, 875, 900.

    ___     V.      150, 152, 153.

    02 - 11911 RCL

3.  TITLE AND NUMBER, IF ANY, OF RELATED CASES.  (SEE LOCAL RULE 40.1(E)).

    01-CV-11346; 01-CV-10408-RCL

4.  HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?
    NO

5.  DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC
    INTEREST?     no
    IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?  (SEE 28 USC 2403) _____

6.  IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28
    USC 2284?          no

7.  DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF MASSACHUSETTS (WORCESTER
    COUNTY) - (SEE LOCAL RULE 40.1(C)).  YES____ no _____OR IN THE WESTERN SECTION (BERKSHIRE, FRANKLIN,
    HAMPDEN OR HAMPSHIRE COUNTIES)? - (SEE LOCAL RULE 40.1(D)).  YES____

8.  DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN SECTIONS OF THE
    DISTRICT?  YES_____ no _____ (a)   IF YES, IN WHICH SECTION DOES THE PLAINTIFF
    RESIDE?_____

9.  IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE?_NORFOLK COUNTY

10. IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL AGENCY
    OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE CENTRAL SECTION____ no _____ OR
    WESTERN SECTION____ no _____

    (PLEASE TYPE OR PRINT)
    ATTORNEY'S NAME  Robert S. Sinsheimer, Esq.

    ADDRESS  4 Longfellow Pl., #3501, Boston, MA 02114

    TELEPHONE NO. (617) 722-9954

    (Category.frm - 09/92)