UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| The Estate of Debra Davis | ) | |
| | ) | |
| by | ) | |
| | ) | |
| Olga Davis, in her capacity as | ) | |
| administratrix of the Estate of | ) | |
| Debra Davis, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No.     02-11911 RCL |
| v. | ) | |
| | ) | |
| United States of America, | ) | |
| H. Paul Rico, | ) | |
| John Morris, | ) | |
| John Connolly, | ) | |
| Lawrence Sarhatt, | ) | |
| Robert Fitzpatrick, | ) | |
| John Does, Nos. 1-50, | ) | |
| | ) | |
| Defendants | ) | |

## FIRST AMENDED COMPLAINT

### I.     INTRODUCTION

1.     The Estate of Debra Davis files this complaint, pursuant to the Federal Tort Claims Act,

28 U.S.C. §§ 2671, <u>et seq</u>, Chapter 229 of the Massachusetts General Laws and <u>*Bivens v.*</u>

<u>*Six Unknown Named Agents of Federal Bureau of Narcotics,*</u> 403 U.S. 388 (1971),

against the United States of America, and at least five former agents of the Boston Office

of the FBI.

2.     Plaintiff seeks redress for the kidnap, torture and murder of Debra Davis ( "Davis").

James J. Bulger and Stephen Flemmi have been indicted for the murder of Debra Davis.

<u>*United States v. Bulger,*</u>99-CR-10371-RGS, Superseding Indictment.  Plaintiff has filed



suit against Bulger and Flemmi in state court for the wrongful death of Debra Davis. See *Olga Davis, et al v. Stephen J. Flemmi, et al*, Norfolk Superior Court C.A. No. 01 00282.

3.  As a proximate cause of the federal defendants' acts and/or omissions, Davis was wrongfully killed and her rights as guaranteed by the Fourth and Fifth Amendments to the United States Constitution and Massachusetts law were violated, as were the Estate's rights to redress its grievances in the courts of the United States as guaranteed by the First and Fifth Amendments to the United States Constitution.

4.  Plaintiff alleges that beginning in or about 1969 and continuing up to July 6, 2000, the federal defendants conspired to protect and shield from prosecution James J. Bulger, Stephen Flemmi, Kevin Weeks and other members of the so-called "Winter Hill Organized Crime Group" in exchange for Bulger's and Flemmi's agreements to provide information to aid the FBI in its prosecution of La Costra Nostra ("LCN") - Bulger's and Flemmi's competitors in the Boston, Massachusetts Organized Crime Market. It was the object of the conspiracy for the federal defendants to protect Bulger and Flemmi from arrest and prosecution in order to maintain their roles as high echelon informants, providing information to the FBI. Plaintiff alleges that the defendant United States and federal defendants knew or should have known that Bulger and Flemmi were involved in violent criminal activity, including murder, extortion and assault, but despite this knowledge failed or refused to investigate Bulger and Flemmi's criminal activity for purposes of prosecution because, if prosecuted, the federal defendants would lose Bulger and Flemmi's services as informants.

5.  The Complaint alleges that the defendant United States continued to utilize Bulger and Flemmi as top echelon informants, even though they had been involved in approximately

23 murders. Furthermore, the complaint alleges that the federal defendants failed to control the criminal activities of Bulger and Flemmi; failed to enforce the Attorney General Guidelines concerning high echelon informants; violated the Attorney General's Regulations and Policies by failing to inform appropriate law enforcement authorities of the criminal activities of Bulger and Flemmi; failed to properly supervise federal agents, including Connolly and Morris in their handling of Bulger and Flemmi as top echelon informants; and failed to investigate for purposes of prosecution the circumstances of Davis' disappearance and death.

6.      For 21 years, the family of Debra Davis was ignored by the FBI, except for occasional meetings between members of the FBI and Davis' mother Olga, which appeared to be fishing expeditions regarding the family's knowledge of Flemmi's involvement with the FBI rather than any serious attempt at investigating Davis' disappearance. Davis' remains were finally uncovered in or around October 2000, in a shallow make-shift grave in Dorchester, Massachusetts.

7.      This complaint closely follows the findings and rulings of the United States District Court for the District of Massachusetts. See *United States v. Salemme*, 91 F.Supp. 2d 141 (D. Mass. 1999). The Complaint incorporates by reference and includes herein the findings and rulings contained in that order, as well as the facts and circumstances set forth in *United States v. Kevin J. Weeks*, 00-10245-RGS, and *United States v. James J. Bulger, et al*, 99-10371-RGS, charging Bulger and Flemmi with the murder of Debra Davis.

3

## II. PARTIES

8.  Olga Davis in her capacity as administratrix of the Estate of Debra Davis brings this action on behalf of the Estate. The Estate is being probated in Norfolk County Probate Court, Commonwealth of Massachusetts. Olga Davis is duly qualified and authorized to maintain this action.

9.  The United States of America ("United States") is a defendant in this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. arising from the acts and/or omissions of employees and agents of the Federal Bureau of Investigation ("FBI"), an agency of the defendant, and a party defendant for claims arising from Chapter 229 of the Massachusetts General Laws in which individual agents of the FBI are named as defendants for negligent or wrongful acts or omissions while acting in the scope of their office or employment by the FBI, a federal agency pursuant to 28 U.S.C. § 2671 et seq.

10. Defendant H. Paul Rico ("Rico") is a resident of Florida. During all times alleged in this complaint, Rico was acting within the scope of his office or employment as a Special Agent of the FBI. Rico is sued individually and in his official capacity.

11. Defendant John Morris ("Morris") resides in a location presently unknown. During all times alleged in this complaint, Morris was acting within the scope of his office or employment as a Special Agent of the FBI. Morris is sued individually and in his official capacity. From 1970 until in or about December 1995, Morris was an FBI Special Agent. From approximately March 1972 until approximately November 1991, Morris was assigned to the FBI's Boston field office. For much of that time, Morris was a supervisory special agent, and, between December 1977 and January 1983 was the direct supervisor of John J. Connolly, Jr. on the FBI's organized crime squad.

4

12.     Defendant, John J. Connolly, Jr. ("Connolly") is currently incarcerated at the Federal

        Medical Center in Lexington, Kentucky.  During all times alleged in this complaint,

        Connolly was acting in the scope of his office or employment as a Special Agent of the

        FBI.  Connolly is sued individually and in his official capacity.  From November 1968 to

        December 1990, Connolly was a Special Agent of the FBI.  From February 1973 until his

        retirement in December 1990, Connolly was assigned to the Boston Office of the FBI.

13.     Defendant Lawrence Sarhatt ("Sarhatt") resides in a location presently unknown.  During

        all times alleged in this complaint, Sarhatt was acting within the scope of his office or

        employment as a Special Agent of the FBI.  Sarhatt is sued individually and in his

        official capacity.  During pertinent times alleged in the Complaint, Sarhatt was the FBI

        special agent in charge ("SAC") of the Boston Office from 1980 until 1982.  During the

        time of his tenure, Debra Davis was murdered.

14.     Defendant Robert Fitzpatrick ("Fitzpatrick") resides in a location presently unknown.

        During all times alleged in this complaint, Fitzpatrick was acting within the scope of his

        office or employment as a Special Agent of the FBI.  Fitzpatrick is sued individually and

        in his official capacity.

15.     John Does Nos. 1 through 50 are persons presently unknown to the plaintiff who violated

        the plaintiff's rights as guaranteed by the United States Constitution and Massachusetts

        law and/or conspired with others to do so.  The John Does may be private individuals,

        state officials or agents of the United States Government who acted in concert with the

        federal officials named in this Complaint to deny plaintiff its rights guaranteed by the

        United States Constitution and Massachusetts law.  Based on information and belief, the

        John Does and other persons, both known and unknown, actively participated in, ratified,

5

or otherwise implemented the conspiracy alleged herein.  Plaintiff believes that the conduct and statements of these individuals in furtherance of the conspiracy alleged herein are admissible against the named defendants but further states that it may request leave to amend the Complaint as appropriate.

### III.    JURISDICTION AND VENUE

16.    This case is brought to recover damages from certain federal defendants caused to the plaintiff, while those defendants were acting under color of law of the United States of America, by depriving the plaintiff of its rights guaranteed by the United States Constitution.  These causes of action are provided for by *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

17.    The jurisdiction of this Court is founded upon 28 U.S.C. § 1331, because this case arises under the Constitution of the United States.

18.    This case is also brought to recover damages under the Federal Tort Claims Act, 28 U.S.C. 2671, et seq., alleging that Davis' death was caused by the negligent or wrongful acts or omissions of certain employees of the United States Government while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to plaintiff in accordance with the laws of the Commonwealth of Massachusetts.

19.    The jurisdiction of this Court is founded upon 28 U.S.C. § 1346, because the Complaint states causes of action under the Federal Tort Claim Act, 28 U.S.C. § 1346, because the Complaint states causes of action under the Federal Tort Claim Act, 28 U.S.C. § 2671, et seq.

20.    The jurisdiction of this Court is founded upon 28 U.S.C. § 1367, because the Complaint

states causes of action so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

21. On September 14, 2001, the plaintiff duly presented a Notice of Tort Claim, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., 28 U.S.C. § 2401, and 28 C.F.R. § 14.1, et.seq. giving notice of Davis' injuries and wrongful death caused by the negligent or wrongful acts or omissions of certain employees of the United States Government while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to the plaintiffs in accordance with the laws of the Commonwealth of Massachusetts. See Exhibit A, appended hereto.

22. Although the claims referenced in the previous paragraph have not been denied, the United States Government has failed to act on the claims within six months from the date the claims were presented. Therefore, the plaintiff elects to treat these claims as having been denied.

23. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims of the plaintiff occurred in the District of Massachusetts.

IV.   THE ESTATE OF DEBRA DAVIS

24. Debra Davis was a resident of Randolph, Massachusetts. At the time of her death, Davis was twenty-six (26) years old.

25. In or around 1981, Davis disappeared. For nineteen years after her disappearance, Davis was not found.

7

26.     In or around October 2000, Davis' remains were unearthed from a make-shift grave in
        Dorchester, Massachusetts.

27.     Debra Davis is survived by her mother, Olga Davis, and numerous brothers and sisters.

28.     On or about March 22, 2001, the Probate and Family Court Department of the County of
        Norfolk, Commonwealth of Massachusetts appointed Olga Davis as administratrix of her
        daughter's estate.

29.     Debra Davis was a citizen of the United States of America and as such she and her Estate
        are entitled to the protection of the Constitution and the laws of the United States of
        America.

30.     At all times relevant to the events herein, defendants Rico, Morris, Connolly, Sarhatt, and
        Fitzpatrick were acting under color of the laws of the United States of America, and/or
        were conspiring with or acting in concert with, persons who were acting under color of
        laws of the United States of America.

31.     Other than through the relief sought in this Complaint, the Estate has no effective means
        to seek redress for the violations of Davis' rights and the Estate's rights under the United
        States Constitution which are alleged herein.

32.     In the facts which give rise to the present lawsuit there are no "special factors counseling
        hesitation", <u>Bivens</u>, 403 U.S. at 397, in formulating a remedy for Davis and her Estate.


                   V. <u>FACTS RELATIVE TO THE DISAPPEARANCE OF DEBRA DAVIS</u>

33.     Sometime, in or around 1972, Debra Davis became acquainted with the defendants
        Flemmi and Bulger.  Debra Davis at the time was seventeen (17)  years old, Flemmi was
        thirty-eight (38).

                                              8

34.     Flemmi lavished Davis with expensive gifts.  Shortly thereafter, Debra Davis became

        intimate with the defendant Stephen J. Flemmi and for a period of time, resided with him

        in Brookline and then Randolph, Massachusetts.

35.     At all pertinent times, Stephen J. Flemmi was engaged in racketeering, as that term is

        defined at 18 U.S.C. s. 1961.  Flemmi's racketeering was his primary source of income.

36.     At all pertinent times, Bulger and Flemmi were co-leaders of one or more racketeering

        enterprises.  Racketeering (as that term is defined at 18 U.S.C. s. 1961) was Bulger's

        primary source of income.

37.     Debra Davis became unhappy in her relationship with Flemmi.  Sometime in 1981,

        Debra Davis was desirous of concluding her relationship with Flemmi and she

        communicated this desire to Flemmi, directly.

38.     Shortly thereafter, Debra Davis disappeared.  Her last words to her mother, the plaintiff

        Olga Davis herein, was that she intended to meet Flemmi at an undisclosed location.

39.     Flemmi and Bulger jointly murdered Debra Davis in 1981.

40.     From 1981 until October 2000, Flemmi and Bulger fraudulently concealed their wrongful

        conduct from Debra Davis' family and friends.  They did so by secreting her body to a

        hidden burial site, and burying her without proper rites.

41.     Flemmi and Bulger were indicted for the murder of Debra Davis in October, 2000.  See

        Indictment Crim. No. 99-10371-RGS , pp.11-27.

42.     Until the indictment of Flemmi and Bulger, the plaintiff herein was aware of no

        admissible evidence to support an allegation that Flemmi and Bulger murdered Debra

        Davis.

43.     Plaintiff alleges that beginning in or about 1965, the defendants H. Paul Rico, John

9

Morris, John Connolly, Lawrence Sarhatt, Robert Fitzpatrick and other members of the FBI conspired to shield from prosecution Stephen Flemmi, James Bulger and others, in exchange for Bulger and Flemmi's agreement to provide information to the FBI that could and would be used by that agency in its prosecution of Bulger and Flemmi's competitors in the Boston Organized Crime market.

44.     The Boston Office of the FBI and its agents did not want Flemmi and Bulger to be charged with crimes because, if they were, the Boston office would lose their services as informants. Prosecution of Bulger and Flemmi would also have eventually resulted in the disclosure that the FBI was engaging in conduct in violation of its rules and regulations, as well as the laws of the United States of America. In fact, once the protection afforded to Bulger and Flemmi dissolved, the disclosures associated to their relationship with the FBI led to the indictment of Bulger and Flemmi's "handler". See U.S. v. Connolly, Criminal Number 99-10428-JLT.

45.     It is alleged that certain of the defendants, acting in their official capacities and within the scope of their employment, allowed Flemmi and Bulger to continue to conduct their criminal activities with impunity, including murdering Debra Davis, when they knew or should have known that Debra and others were in danger.

46.     As a proximate cause of this gross negligence, Debra Davis' rights, as guaranteed by the Fourth and Fifth Amendments to the United States Constitution were violated.


VI.     RELATIONSHIP BETWEEN DEFENDANTS RICO AND FLEMMI

47.     In November 1965, FBI Special Agent H. Paul Rico targeted Flemmi for development as a top echelon informant – the highest status a source can achieve in the FBI. At that time,

10

a top echelon informant was defined as an individual who "could provide a continuous flow of quality criminal intelligence information regarding the leaders of organized crime."

48.    Since the mid-1960s, the development of top echelon informants has been a very high priority for the FBI. The successful development of informants generally, and therefore top echelon informants particularly, has also been regarded as an important achievement for an FBI agent, with the potential to effect significantly the progress of that agent's career. Thus, it is to the agent's benefit to develop top echelon informants.

49.    Rico knew that all information received from informants is recorded on an FBI Form 209. During all times alleged herein, Rico failed to conform to what the FBI policies and procedures required concerning the handling of top echelon informants.

50.    Rico sought to realize Flemmi's potential as a source of information by not treating him like a criminal who should be used with caution to obtain valuable information. Rather, Rico suggested that he and Flemmi were allies in a common cause, primarily a war against the LCN.

51.    Rico promised Flemmi protection from the FBI if Rico would become an FBI informant.

52.    Flemmi was receptive to the alliance with the FBI that Rico proposed. The arrangement offered him an opportunity to use the FBI to disable his enemies, enhance his safety and, with the competition diminished and the protection of the FBI, make his own criminal activities more profitable.

53.    Agents of the FBI, including Connolly and Morris, engaged in a pattern of false statements being placed in Flemmi's informant file in order to divert attention from his crimes and/or FBI misconduct.

11

54.    On February 8, 1967, Flemmi was designated as a top echelon informant.

55.    When designating Flemmi as a top echelon informant, Rico wrote, with regard to Flemmi's past activities that he had "been engaged in bookmaking, shylocking, robberies, and a suspect of possibly being involved in gangland slayings."

56.    Rico had an incentive not to document accurately or completely information about Flemmi's possible involvement in serious crimes because he might lose the authority to utilize Flemmi as an informant, if Rico's superiors decided that Flemmi deserved to be targeted for continued criminal prosecution, rather than used as a source.

57.    Rico's suspicions that Flemmi was a murderer did not deter him and the FBI from making Flemmi a top echelon informant and an ally in pursing their investigation of the LCN.

58.    In addition to promising "protection" Rico said, in various ways, that Flemmi would not be prosecuted for crimes he was committing while serving as an informant.

59.    Rico caused Flemmi to understand that the FBI would overlook Flemmi's criminal activity as long as he was providing information on the LCN.

60.    Flemmi has since been indicted and charges are pending, in which it is alleged that in addition to other crimes in 1967, Flemmi participated in the murders of Wimpy Bennett, his brothers Walter and William Bennett, and Richard Grasso. _United States v. Flemmi_, 94-10287-MLW, Fourth Superseding Indictment. Flemmi has also been indicted and charges are pending in which it is alleged that in addition to other crimes, Flemmi participated in the murders of Debra Davis, Thomas King, John McIntyre, Arthur Barrett, Deborah Hussey, Richard Castucci, Roger Wheeler, John Callahan, James Sousa and Edward Connors. _United States v. O'Neil_, 99-CR-10371, Superseding Indictment.

12

61.     Although Rico and his FBI colleagues often worked closely with State investigators and

        prosecutors in organized crime matters, they did not contribute to any investigation of

        Flemmi regarding the murders of the Bennetts or Grasso.

62.     On or about January 30, 1968, an Attorney John Fitzgerald was crippled, but not killed,

        by a bomb that exploded as he started his car.  Attorney Fitzgerald was representing a

        witness who was providing information about organized crime activities. The Middlesex

        County District Attorney took primary responsibility for investigating the Fitzgerald

        bombing.  Neither Rico nor agents of the FBI played any role in that investigation.

63.     In September 1969, Rico telephoned Flemmi and informed him that "indictments were

        coming down" in the Fitzgerald case and suggested that Flemmi and "his friend",

        Salemme "leave town" promptly.  Flemmi followed Rico's advice and he and Salemme

        fled together.

64.     A few days later, on September 11, 1969, Flemmi and Salemme were indicted in

        Middlesex County for the Fitzgerald bombing and in Suffolk County for the William

        Bennett murder.

65.     On September 15, 1969, Flemmi was closed administratively as an informant of the FBI

        and a federal fugitive warrant was issued for his arrest for his unlawful flight to avoid

        prosecution for murder.

VII.    FLEMMI AS A FUGITIVE

66.     While Flemmi was a fugitive from justice, allegedly being pursued by the FBI, Flemmi

        stayed in contact with Rico.

67.     FBI policy required that all contacts with informants be recorded.  Rico made no effort to

        record his September 1969 conversation with Flemmi, nor any other conversation he had

13

with Flemmi while Flemmi was a fugitive.  Rico also failed to tell the agents responsible for Flemmi's apprehension that Rico had spoken to him.

68. Unlike Flemmi, Salemme was arrested and prosecuted for the Fitzgerald bombing. Salemme was convicted and, as a result, spent the next 15 years in prison.

69. Following the trial and conviction of Salemme, Flemmi called Rico at the Miami office of the FBI, where Rico was then working.  Rico told Flemmi that he should return to Boston and his legal problems would be favorably resolved.

70. Rico assured Flemmi that when he returned to Boston, he would be released on bail and all charges against him would be dismissed.

71. As arranged by Rico, on May 6, 1974, Flemmi returned to Boston and met in Park Square with two Boston detectives.  Despite the fact that for five years he had been a fugitive from charges of murder and attempted murder, Flemmi was promptly released on bail by the Middlesex and Suffolk Superior Courts.  The federal flight charges were dismissed on the same day.

72. The Fitzgerald bombing charges against Flemmi were subsequently dismissed and on November 13, 1974 the Bennett murder charges concerning Flemmi were also dismissed. Flemmi was a free man.

VIII.   THE DEVELOPMENT OF BULGER AS AN INFORMANT

73. In 1972, defendant Morris was transferred to the Boston Office of the FBI and assigned to the organized crime squad.

74. In or about 1974, defendant Connolly was transferred to the Boston Office of the FBI and also assigned to the organized crime squad.

75. Connolly had known Bulger since they were both children growing up in South Boston.

14

76. Bulger became a source for Connolly and was administratively designated an FBI informant on September 30, 1975.

77. Bulger explained to the FBI that he became an informant in part because he had "a close feeling towards S.A. John Connolly because they both grew up in the same neighborhood in Boston and had mutual childhood problems, as well as a deep hatred for La Cosa Nostra."

78. When Connolly sought Bulger's cooperation as an informant, the FBI knew that Bulger was deeply involved in violent gang war, was extorting money from bookmakers, and was widely regarded and known as being brutally violent.

79. On February 4, 1976, several months after being officially designated an informant, Bulger was upgraded to top echelon status.

IX.   AN UNHOLY ALLIANCE: THE BOSTON OFFICE OF THE FBI
      AND BULGER AND FLEMMI

A.   The Federal Bureau of Investigation

80. The Federal Bureau of Investigation is a federal law enforcement agency statutorily empowered by the United States Congress to enforce and investigate certain alleged violations of the United States Criminal Code.  The FBI is part of the Department of Justice and formally subject to oversight and direction by the Attorney General.

81. The FBI is broken down into field offices.  One of the field offices is the Boston field office.

82. Among the offenses that the FBI is empowered to investigate are crimes involving racketeering, 18 U.S.C. § 1962, et seq.; bribery, 18 U.S.C. § 201; loan sharking, 18 U.S.C. § 891; gambling, 18 U.S.C. § 1955; obstruction of justice, 18 U.S.C. § 1501 et

seq.; interference with commerce by threat, 18 U.S.C. § 1951; tampering with a witness, victim or an informant, 18 U.S.C. § 1512; and retaliating against a witness, victim or informant, 18 U.S.C. § 1513.

83. The FBI has established certain core values that it claims "need to preserved and defended by the FBI in performing its statutory missions. Those values are: rigorous obedience to the Constitution of the United States; respect for the dignity of all those we protect; compassion; fairness; and uncompromising personal and institutional integrity."

84. The FBI mission further states: "[r]espect for the dignity of all whom we protect reminds us to wield law enforcement powers with restraint and to recognize the natural human tendency to be corrupted by power and to become callous in its exercise. Fairness and compassion insure that we treat everyone with the highest regard for the constitution, civil and human rights. Personal and institutional integrity reinforce each other and are owed to the Nation in exchange for the sacred trust and great authority conferred upon us."

85. The FBI was statutorily empowered to protect persons like Debra Davis from being victimized by clandestine criminal organizations, and to investigate those responsible for her death.

86. The FBI is an agency within the meaning of 28 U.S.C. § 2671 et seq.

B. Bulger and Flemmi

87. At all times material to this complaint, the "Winter Hill Gang" or the "Bulger Group" was a clandestine criminal organization that engaged in multiple crimes, including murder, bribery, extortion, loan sharking, and illegal gambling in greater Boston, Massachusetts. All of these crimes were subject to the jurisdictional authority of the FBI.

16

88.   As previously set forth in this complaint, at all times material to this complaint, Bulger and Flemmi were members of the Winter Hill Gang, and were vicious hardened criminals.

89.   During the time period alleged in this complaint, the Boston office of the FBI was investigating the LCN, commonly referred to as the "Mafia". The Mafia was a nationwide clandestine criminal organization, whose crimes were subject to the jurisdictional authority of the FBI. The LCN was in direct criminal competition with the Winter Hill Gang. In order to investigate the LCN, the Boston office of the FBI enlisted the use of informants who were to provide to the FBI information about the LCN's criminal activities.

90.   Bulger and Flemmi were informants and agreed to cooperate with the FBI and to provide to its agents certain information concerning the criminal activities of the LCN. The FBI intended to prosecute and convict members of the LCN using the information provided to it by Bulger and Flemmi.

91.   In or about September 1980, Connolly officially re-registered Stephen Flemmi as a confidential informant for the FBI. At all times material to this complaint, Connolly was the FBI agent contact assigned to receive information from Bulger and Flemmi, otherwise known as their handler.

92.   The Special Agents of the FBI working out of the Boston office, including Sarhatt, Morris, Connolly, and Fitzpatrick knew that despite their cooperation with the FBI, Bulger and Flemmi were still engaged in serious criminal wrongdoing during all times pertinent to this complaint.

93.   Agents of the FBI, including Morris and Connolly, made Bulger and Flemmi, who were

17

previously acquainted, but not close, a perfect match. In Boston, Flemmi and Bulger uniquely shared an antipathy for the LCN, a desire to profit criminally from its destruction and the promised protection of the FBI. In order to protect Bulger and Flemmi as sources of information, agents of the FBI, including Connolly, tipped Bulger and Flemmi to various law enforcement initiatives in order to protect their ongoing criminal activities. At all times relevant to this case, agents of the FBI, in order to protect Bulger and Flemmi from prosecution, and to further their criminal activities, knowingly falsified official FBI documents regarding Bulger's and Flemmi's participation in criminal activities.

94. During all times relevant to this case, in order to protect Bulger and Flemmi from prosecution and to further their criminal activities, agents of the FBI, failed to report Bulger and Flemmi's ongoing criminal activities, including extortion, loan sharking and illegal gambling.

95. During all times relevant to this complaint, agents of the FBI, in order to protect Bulger and Flemmi, failed to properly index information concerning the criminal activities of Bulger and Flemmi and place that information in the investigative files referencing their names.

96. At all times material to this complaint, agents of the FBI, including Connolly and Morris tipped off Bulger and Flemmi to as the identity of individuals who were providing criminal information against Bulger and Flemmi.

97. As a consequence of the disclosures, these individuals were murdered.

98. Agents of the FBI made insidious efforts to cultivate in Bulger and Flemmi the sense that Bulger and Flemmi were their friends, consultants, and allies, rather than criminals who

were also informants of criminal activity.

99.   As the alliance between the FBI and Flemmi and Bulger developed, Flemmi and Bulger were invited to dine periodically with agents of the FBI engaged in investigating the LCN, including Connolly and Morris. These dinners were arranged to celebrate milestones in the FBI's relationship with Bulger and Flemmi, including the successful wiretapping of the LCN's Boston headquarters, as well as the frustration of an investigation of Bulger and Flemmi that had been lead by the Drug Enforcement Agency (the "DEA") in 1984-85.  At these dinners, the agents, and Bulger and Flemmi exchanged gifts.

100.  Following his retirement from the FBI in December 1990, Connolly maintained associations at the Boston field office of the FBI in order, in part, to obtain law enforcement information related to the criminal activities of Bulger, Flemmi and others.

101.  After leaving the FBI, Connolly used the information he gained from the FBI to alert and apprise Bulger and Flemmi of law enforcement investigations into their criminal activities.

102.  During hearings held in the matter of *United States of America v. Francis P. Salemme, et al* in the United States District Court for the District of Massachusetts, the FBI failed to produce to the defendants or the court, as required by court orders, documents potentially damaging to the FBI and the United States.

## X.   THE FBI FORGES THE FLEMMI/BULGER PARTNERSHIP

103.  In early 1975, Bulger asked Flemmi whether he would be willing to meet with Connolly. Soon after, Flemmi met with Connolly and Special Agent Condon at a coffee shop in Newton, Massachusetts.

104. Following the Newton meeting with Connolly and Condon, Flemmi began passing information about the LCN to Connolly, through Bulger.

105. Connolly understood that Bulger and Flemmi were dangerous, as he has explained: "we knew what these guys were. They did not have a paper route when we first met them. All of them, top echelon informants, are murderers. The government put me in business with murderers."

106. Beginning in 1984, Special Agent Roderick Kennedy, on several occasions, discussed with Connolly what would happen if Bulger and Flemmi were ever arrested. Kennedy repeatedly told Connolly that he believed that if Bulger or Flemmi were arrested, they would divulge their relationship with Connolly and the FBI. Connolly regularly responded that he did not have to worry, because they were too smart to get caught.

107. Connolly protected Flemmi and Bulger, himself, and the reputation of the FBI and others by furnishing Bulger and Flemmi information that might help them avoid arrest and prosecution.

108. From approximately 1976 through 1994, Connolly, and Morris received gifts from both Flemmi and Bulger.

109. From approximately 1976 through 1994, Connolly provided Bulger and Flemmi sensitive and confidential law enforcement information designed to protect the criminal activities of Bulger, Flemmi, and at times, their criminal associates.

110. From at least 1976 through December 1990, Connolly, while he served as a special agent of the FBI, using confidential information that he had received from Morris and from other FBI and law enforcement sources, tipped Bulger and Flemmi to various law enforcement initiatives in order to protect their ongoing criminal activities.

20

111.   From at least 1976 through December 1990, Connolly, while he served as a special agent of the FBI, using confidential information that he received from FBI and other law enforcement sources, alerted Bulger and Flemmi to the identity of confidential law enforcement informants in order to protect Bulger's and Flemmi's ongoing criminal activities.

XI.   THE DEFENDANT FBI AGENTS VIOLATION OF THE ATTORNEY GENERAL'S GUIDELINES AND FBI RULES AND REGULATIONS PERTAINING TO FBI INFORMANTS.

112.   Prior to Davis' murder as set forth in this complaint, defendants Bulger and Flemmi, while providing information to the FBI during a period from 1965 to 1981, both separately and jointly, were engaged in approximately 23 murders and other violent criminal acts.

113.   In 1976, former Attorney General of the United States Edward H. Levi established guidelines relating to the FBI's handling of its informants.  Those guidelines were part of a larger effort by the Attorney General and others to establish standards and procedures aimed at ending a series of serious abuses by the FBI, which had long been masked by the secrecy in which the FBI historically operated.

114.   During the time periods alleged in this Complaint, in other jurisdictions, former FBI officials were indicted and convicted for obstruction of justice and other crimes.

115.   During the times alleged in this Complaint, the Director of the FBI, Clarence Kelley, admitted that some FBI activities had been "clearly wrong and quite indefensible." He declared that the Bureau should never again occupy the "unique position that permitted improper activity without accountability."

21

116.  On December 15, 1976, about a month before leaving office, Attorney General Levi

issued a memorandum to the Director of the FBI that described basic standards and

procedures for the FBI's use of informants in Domestic Security, Organized Crime, and

other criminal investigations (the "Levi Memorandum"). The Levi Memorandum was

incorporated in the FBI's Manual of Instructions, on January 12, 1977.

117.  Prior to the issuance of the Levi Memorandum, the FBI had the Manual of Instructions

regarding the handling of informants. Under both FBI's Manual of Instructions, as well

as the Guidelines, it was mandatory that agents of the FBI exercise constant care "to

avoid any disclosure to anyone which might permit identification of a criminal informant

or even cast suspicion on a criminal informant."

118.  The Levi Memorandum made it mandatory that "special care be taken not only to

minimize [informants] use but also to ensure that individual rights are not infringed and

that the government itself does not become a violator of the law. Informants as such are

not employees of the FBI, but the special relationship of an informant to the FBI imposes

a special responsibility upon the FBI when the informant engages in activity where he

has received, or reasonably thinks he has received encouragement or direction for that

activity from the FBI."

119.  The Levi Memorandum provided that "[t]he FBI may not use informants ... for acts ...

which the FBI could not authorize for its undercover agents."

120.  The Manual provided that "[u]nder no circumstances shall the FBI take any action to

conceal a crime by one of its informants." As set forth in this Complaint, this mandatory

directive was regularly disregarded concerning Bulger and Flemmi.

121.  Pursuant to the Manual, if the FBI learned that one of its informants had violated the law

in furtherance of his assistance to the FBI, it was expected that "ordinarily" the FBI would promptly inform the appropriate law enforcement or prosecutive authorities, and the FBI would decide whether the continued use of the informant was justified.

122. If there were exceptional circumstances that caused the FBI to believe that such notification was "inadvisable", the FBI had a mandatory duty to inform the Department of Justice. The Department of Justice would then decide whether law enforcement or prosecutive authorities should be notified and whether the FBI should continue to use the informant. As set forth in this Complaint, this mandatory directive was regularly disregarded concerning Flemmi and Bulger.

123. The Levi Memorandum also established the same procedures where the FBI had "knowledge" that one of its informants had committed a "serious" crime "unconnected with his FBI assignment." As set forth in this Complaint, this mandatory directive was regularly disregarded concerning Flemmi and Bulger.

124. In 1981, the Guidelines were revised to clarify the need of FBI informants to engage in criminal activities in order to obtain important information Under these Guidelines, "ordinary criminal activity" is to be authorized by an FBI field office supervisor or higher FBI official. "Extraordinary criminal activity" which include conduct involving a "significant risk of violence" is to be authorized by the special agent in charge with the approval of the United States Attorney. As set forth in this Complaint, these mandatory directives were regularly disregarded concerning Bulger and Flemmi.

125. Defendant Sarhatt and others failed to provide special seminars or major training concerning the Guidelines that were received by FBI agents in the Boston office. Defendant Morris did not read the new informant Guidelines when they were issued. The

informant Guidelines were discussed occasionally in more general training sessions, but the organized crime supervisors in Boston did not get answers to any questions that they had, and the agents were not properly trained in the Guidelines application.

126.    In violation of the Guidelines, Morris viewed the Guidelines as inconsistent with the top echelon informant program. Thus, in violation of the mandatory duties of the Guidelines, defendant Morris made a decision that the Guidelines did not apply to organized crime matters despite their knowledge of a history of violence committed by Bulger and Flemmi who they knew to be confidential informants.

127.    Defendant Morris ignored and violated the provisions of the Attorney General Guidelines that required authorization of criminal activity and reporting of unauthorized crime committed by informants.

128.    The FBI headquarters in Washington, D.C. failed to effectively supervise the implementation of the Guidelines. While FBI headquarters periodically audited the Boston office's informant files, no deficiencies with regard to the handling of Bulger or Flemmi were noted, despite the fact that those files were replete with information indicating that Bulger and Flemmi were involved in serious criminal activity that had not been authorized in writing, investigated by the FBI, reported to other law enforcement agencies, or reported to the Assistant Attorney General for the Criminal Division as required by the Guidelines. While FBI headquarters engaged in this audit, they found no information or deficiencies that suggested that Bulger or Flemmi were involved with murder.

129.    With regard to Bulger and Flemmi, defendants Sarhatt, Morris, Connolly, and Fitzpatrick disregarded the carefully calibrated standards and procedures that were developed by

24

Attorney General Levi and his successors for continuing to use informants after the FBI had decided to employ them.

130. While the SAC, Sarhatt delegated the responsibility for recommending the opening and closing of informants to the agent who was the informant's handler. The handler, acting in concert with his supervisor, was also given responsibility for any review of the informant's status that became necessary.

131. While SAC, Sarhatt knew that Bulger was an FBI informant. Sarhatt also knew that although Flemmi may have been technically closed as an informant, he was regularly providing information to the FBI.

132. Sarhatt was aware that Connolly was the handler for both Bulger and Flemmi. Sarhatt generally relied on Connolly to deal with Bulger and Flemmi, and with any matters relating to them.

133. As set forth above, in this period, the Attorney General's Guidelines, which had been incorporated in the FBI's Manual, required that the SAC himself make certain decisions, after consultation with the United States Attorney, whether to authorize extraordinary criminal activity involving a "serious risk of violence," and review all such criminal activity, at least every 90 days. Sarhatt violated this duty and improperly delegated these responsibilities to Connolly and Morris.

134. The Attorney General's Guidelines, which were incorporated in the FBI Manual, required a special review process if an FBI field office wanted to keep an informant open after it learned that he had participated in a serious act of violence or any other serious crime.

135. Despite the FBI's knowledge of Bulger's and Flemmi's participation in serious acts of

25

violence or other serious crimes, the Boston Office of the FBI, while Sarhatt was SAC,

violated the dictates of the Attorney General's Guidelines and the FBI Manual.

136.    Assistant United States Attorney James Hebert and the United States Attorney Donald Stern

admitted the Guidelines were not obeyed, at least with regard to Flemmi.   As Assistant

United States Attorney James Herbert stated:

> We don't dispute ... the Court's conclusion that the theory behind the
> Guidelines and the FBI's policies and procedures was to remove from the
> line agent the responsibility and the authority to make difficult decisions
> with respect to criminal informants ... that is what they were designed to
> do and I don't think they were followed in connection with Mr. Bulger
> and Mr. Flemmi in the manner they were designed to.

United States Attorney Donald Stern stated:

> The FBI and attorney general informant guidelines, together with FBI
> administrative controls, are intended to provide the necessary checks
> and balances and to ensure that often difficult decisions are made to
> the appropriate level, based on complete and accurate information.
> While admittedly no system is foolproof, clearly those objectives were
> not met here, at least in certain critical respects.

XII.    THE MURDER OF RICHARD CASTUCCI

137.    On or about July 31, 1975, Joseph McDonald and James Sims, both members of the Winter

Hill Gang, were charged with crimes in a federal indictment in the District of Massachusetts.

McDonald and Sims became fugitives from that charge.

138.    In 1976, Richard Castucci was a nightclub owner and bookmaker who associated with the

Winter Hill Gang.  At the behest of the Winter Hill Gang, Castucci subsequently assisted

McDonald and Sims in obtaining an apartment in the Greenwich Village section of New

York City while they remained fugitives.

139.    During that time, Castucci also was a confidential informant of the FBI.  In the later part of

26

1976, Castucci began to provide the FBI with specific information regarding the whereabouts of McDonald and Sims.

140.    In late 1976, Connolly provided otherwise confidential law enforcement information to Bulger which alerted him to the fact that Castucci was a confidential informant of the FBI.

141.    On or about December 29, 1976, as a result of being informed of Castucci's relationship with the FBI, members of the Winter Hill Gang, including Bulger and Flemmi, murdered Richard Castucci.


### XIII.    NATIONAL MELOTONE: REAL THREATS MADE BUT NO SERIOUS FBI INVESTIGATION

142.    In or about 1977 or 1978, several officials of National Melotone, a vending machine company, doing business in Boston, attempted to prompt an FBI investigation of Flemmi, Bulger and their associates for using threats of violence to have National Melotone's vending machines replaced with machines from Flemmi and Bulger's National Vending Company.

143.    Rather than pursue this information or report it to local law enforcement officials, Connolly and Morris successfully sought to protect Flemmi and Bulger.

144.    Utilizing Bulger's and Flemmi's reputations for extreme brutality, Connolly informed the executives of National Melotone that their families would be in great danger if they pursued the investigation, requiring their participation in the federal witness protection program and relocation. This advice exploited the frightening reputations for violence that Flemmi and Bulger had acquired.

145.    Connolly's approach dissuaded the representatives of National Melotone from pursuing

27

their charges.  Moreover, Connolly told Bulger and Flemmi about the investigation, and

the fact that the executives of National Melotone were seeking an investigation.

146.    In October 1977, FBI Special Agents Thomas Daly and Peter Kennedy, who were then

members of the organized crime squad, interviewed Francis Green, who had been

threatened by Bulger and Flemmi.

147.    Green told the agents that Bulger stated that if Green did not repay a loan, he would be

killed, his ears would be cut off and stuffed in his mouth, and his eyes would be gouged

out.

148.    Neither Daly, Kennedy nor other members of the Boston office of the FBI sought to

develop Green as a witness against Bulger and Flemmi.

XIV.    THE RACE-FIX CASE: THE FBI PROTECTS FLEMMI AND BULGER

149.    On January 27, 1978, Bulger was closed administratively as an informant because he was

a primary subject of an investigation that focused on the payment of bribes to fix horse

races.  An informant is closed once he becomes a primary subject of a criminal

investigation.

150.    Bulger and Connolly discussed the prospect that Bulger and Flemmi would be indicted in

the race-fix case.  Neither the FBI, nor Bulger nor Flemmi wanted them to be charged.

Bulger and Flemmi did not want to be charged because they did not wish to go to jail and

lose their liberty.  The FBI did not want Flemmi and Bulger to be charged because it

would lose Flemmi and Bulger's services as informants.

151.    The United States Attorney's Office for the District of Massachusetts was preparing

indictments for the race-fix case.

152.    Morris and Connolly asked the prosecutor not to indict Bulger and Flemmi  in the race-

28

fix case. Morris and Connolly were successful, and Bulger and Flemmi were not included in the indictment.

153. A RICO indictment relating to the race-fix scheme was returned against 13 defendants and after a 46 day trial, all of the defendants who had not pled guilty or fled were convicted.

154. In May 1979, the FBI in Boston requested and received from the Director of the FBI, approval to reopen Bulger as an informant. When reopening Bulger, the FBI informed the Director that "no prosecutable case developed against [Bulger] in the opinion of the Strike Force Attorney handling the matter." This statement was false. Bulger and Flemmi were not prosecuted in the race-fix case because Connolly and Morris had persuaded federal prosecutors that their value as informants outweighed the importance of prosecuting them.

155. At the time the FBI officially reopened Bulger as an informant, Connolly and Morris were well aware that Bulger and Flemmi remained involved in a range of criminal activity. Nevertheless, the FBI neither investigated nor disclosed such information to any other law enforcement agency.

156. In July 1979, Morris received reports from informants that Bulger and Flemmi were "shaking down" independent bookmakers. The FBI made no effort to investigate this matter.

157. In 1979 and early 1980, the FBI received information from informants that Bulger and Flemmi were involved in other criminal activity, including illegal gambling and trafficking in cocaine. These allegations were not investigated.

158. In June or July 1979, Connolly, Bulger, Flemmi and Special Agent Gianturco met at

Gianturco's home.  Meeting informants at an agent's home is highly unusual.  This meeting occurred at about the time the race-fix case was being tried and was, in part, a celebration of Connolly's success in keeping Bulger and Flemmi from being indicted.

159.    Special Agent Gianturco, at whose home several of these dinners occurred, received from Bulger and Flemmi a toy truck to commemorate an FBI investigation, a glass statue and a leather briefcase.  Agent Gianturco gave Bulger an Alcatraz belt buckle, knowing that Bulger had spent some time in the Alcatraz prison.

160.    Contrary to FBI rules and policies, there is no record of the gifts being exchanged between the participants.

XV.    THE LANCASTER STREET GARAGE INVESTIGATION: A TIP IS CONFIRMED BY THE FBI

161.    In 1980, the FBI, through its agents, as set forth below, contributed to frustrating a Massachusetts State Police investigation of criminal activity of Bulger, Flemmi and others occurring at the Lancaster Street Garage.

162.    The Massachusetts State Police had determined that "virtually every organized crime figure in the metropolitan area of Boston, including both LCN and non-LCN (Winter Hill) organized crime figures frequented the premises" at the Lancaster Street Garage. Flemmi and Bulger were among those targeted by the Massachusetts State Police.

163.    The Massachusetts State Police were concerned that the FBI not be told about the investigation and proposed electronic surveillance because it believed that Flemmi and Bulger were informants, working with Morris, who might compromise the investigation if he knew about it.

164.    Without the direct participation of the FBI, the Massachusetts State Police installed a

microphone in the Lancaster Street Garage on or about July 24, 1980. For approximately two weeks, the investigation was "extremely productive." However, it then became apparent to the Massachusetts State Police that the targets of the investigation had been tipped off concerning the electronic surveillance.

165. Flemmi initially received information about the State Police's electronic surveillance from a Massachusetts State Police Trooper. Connolly confirmed for Bulger and Flemmi that the Lancaster Street Garage was bugged by law enforcement. Flemmi and Bulger advised some of their associates of the bugging operation. The discussion of criminal activity at the Lancaster Street Garage ceased.

XVI.    THE 98 PRINCE STREET INVESTIGATION: BULGER AND FLEMMI USE THE FBI TO GET RID OF THEIR "COMPETITORS"

166. In October 1980, Morris and Connolly gave Bulger and Flemmi the assignment to provide information that would allow for the bugging of the LCN headquarters.

167. On January 9, 1981, the government applied for and received a warrant to bug 98 Prince Street, the headquarters of the LCN.

168. Bulger and Flemmi, in violation of FBI rules and regulations, were told when the bug had been installed in January 1981 and when it was removed in April.

169. In January 1981, Flemmi, Bulger, Connolly and Morris gathered in Morris' home in Lexington, Massachusetts for a belated Christmas celebration. Bulger and Flemmi brought wine and a champagne bucket for Morris. Morris reciprocated by giving Flemmi a Korean war veteran, a painting from Korea.

170. On November 25, 1980, Special Agent Lawrence Sarhart met with Bulger as part of his efforts to determine whether the FBI had compromised the Massachusetts State Police

31

Lancaster Street Garage investigation and whether Bulger and Flemmi should be continued as informants. At this meeting, Bulger falsely claimed that he had not been given any information about the Lancaster Street Garage investigation by the FBI. In providing this false information, Bulger was protecting Connolly.

171.  In or about March 1981, defendant Fitzpatrick met with Bulger to re-evaluate whether he should continue as an informant. Fitzpatrick had concerns that Bulger and Flemmi were engaged in serious criminal conduct, including crimes of violence in collecting "tribute" from drug traffickers. There is no written record indicating that Fitzpatrick ever expressed such concerns to his supervisor.

172.  Fitzpatrick reviewed and initialed a memorandum prepared by Connolly and Morris seeking to continue Bulger and Flemmi as informants without dissent.

173.  In or about April or May 1981, Morris met with Bulger and Flemmi at the Hotel Colonnade, at which time the three drank wine, with Morris drinking so much that Bulger had to drive him home.

174.  In the fall of 1983, Connolly and Morris had dinner with Bulger and Flemmi at Flemmi's parents home in South Boston. This meeting was a celebration of the government's return of indictments against members of the LCN.

XVII.    IGNORING A PATTERN OF MURDERS, THE FBI FAILS TO INVESTIGATE

175.  Sometime in late 1981, the Randolph Police were notified that Debra Davis had disappeared.

176.  During this time defendant Sarhatt was the SAC of the FBI in Boston. The FBI did not

32

take any action to investigate or cause an investigation regarding Davis' disappearance.

177.   By the time of Davis' disappearance, agents of the FBI, including defendants Sarhatt, Morris, Connolly, and Fitzpatrick were aware that Bulger and Flemmi had a history of violence including attempted murder and murder.

178.   As alleged elsewhere in this Complaint, in November 1965, defendant Rico targeted Flemmi for development as a top echelon informant. After Flemmi became an FBI informant Flemmi engaged in the threatened and actual use of violence, including assault, attempted murder and murder.

179.   In or about January 1967 in the Commonwealth of Massachusetts, Flemmi and others murdered Edward "Wimpy" Bennett.

180.   As alleged elsewhere in this Complaint on February 8, 1967, Flemmi was designated as a top echelon informant. After Flemmi became a top echelon informant Flemmi engaged in the threatened and actual use of violence, including assault, attempted murder and murder.

181.   In or about April 1967, in the Commonwealth of Massachusetts, Flemmi and others murdered Walter Bennett.

182.   On or about December 23, 1967, in the Commonwealth of Massachusetts, Flemmi and others murdered William Bennett.

183.   On or about December 23, 1967, in the Commonwealth of Massachusetts, Flemmi and others murdered Richard Grasso.

184.   As alleged elsewhere in this Compliant, from September 1969 to May 1974, Flemmi was a fugitive for charges of murder and attempted murder. Despite these charges, defendant Rico arranged for Flemmi to return to Boston on May 6, 1974. Shortly after Flemmi's

return the pending charges against him were dismissed. Flemmi then resumed his role as informant providing information to the Boston office of the FBI.

185.   As alleged elsewhere in this Complaint, on or about September 30, 1975, Bulger became a source for Connolly and was administratively designated an FBI informant.

186.   On or about March 8, 1973 in the Commonwealth of Massachusetts defendant Bulger and others murdered Michael Milano.

187.   On or about March 8, 1973 members and associates of the Bulger Group including Bulger and others shot Dianne Sussman.

188.   On or about March 8, 1973 members and associates of the Bulger Group including Bulger and others shot Louis Lapiana.

189.   On or about March 19, 1973 in the Commonwealth of Massachusetts defendant Bulger and others murdered Al Plummer.

190.   On or about March 19, 1973 members and associates of the Bulger Group including Bulger and others shot Hugh Shields.

191.   On or about March 19, 1973 members and associates of the Bulger Group including Bulger and others shot Frank Capizzi.

192.   On or about March 24, 1973 in the Commonwealth of Massachusetts defendant Bulger and others murdered William O'Brien.

193.   On or about March 24, 1973 members and associates of the Bulger Group including Bulger and others shot Ralph DiMasi.

194.   On or about April 3, 1973 members and associates of the Bulger Group including Bulger and others murdered James Leary.

195.   On or about April 18, 1973 members and associates of the Bulger Group including

34

Bulger and others murdered Joseph Notorangeli.

196.   On or about December 1, 1973, in the vicinity of Dorchester, Massachusetts, Bulger and

others murdered James O'Toole.

197.   On or about February 21, 1974 members and associates of the Bulger Group including

Bulger and others murdered Al Notorangeli.

198.   In or about October 1974, in the vicinity of Somerville, Massachusetts, defendants

Bulger, Flemmi and others murdered James Sousa, a criminal associate who was

involved in a botched robbery with other members and associates of the Bulger Group,

after he was arrested and charged in connection with that robbery because he was

believed to be a potential witness against and liability to members of the Bulger Group.

199.   In or about November 1974, in the vicinity of South Boston, Massachusetts, defendant

Bulger and others murdered Paul McGonagle.

200.   On or about June 12, 1975, in the vicinity of Dorchester, Massachusetts, the defendants

Bulger, Flemmi and others murdered Edward Connors.

201.   On or about November 5, 1975, in the vicinity of South Boston, Massachusetts,

defendants Bulger and Flemmi and others murdered Thomas King.

202.   On or about November 6, 1975, in the vicinity of South Boston, Massachusetts,

defendant Bulger and others murdered Francis "Buddy" Leonard.

203.   In or about December 1976, members and associates of the Bulger Group learned from

defendant Connolly that Richard Castucci was providing information to agents of the

Federal Bureau of Investigation regarding the whereabouts of fugitives Joseph M.

McDonald and James L. Sims.  On or about December 30, 1976, in the vicinity of

Somerville, Massachusetts, defendants Bulger and Flemmi and others murdered Richard

35

Castucci

204. On or about May 27, 1981, defendants Bulger, Flemmi and others caused the murder of Roger Wheeler, the owner of a business known as World Jai Alai.

205. In or about late 1981, in the vicinity of South Boston, Massachusetts, defendants Bulger and Flemmi murdered Debra Davis.

206. Despite Bulger and Flemmi's threatened and actual use of violence, including assault, attempted murder and murder before and after becoming FBI informants and despite Bulger and Flemmi's threatened use of violence, including murder, against actual and potential witnesses providing information of criminal activities of the Bulger Group to the FBI and other law enforcement agencies, agents of the Boston Office of the FBI, including defendants Sarhatt, Morris, Connolly, and Fitzpatrick failed to undertake any effort to investigate Davis' disappearance.

207. In order to evade detection for the murder of Davis, Bulger, Flemmi and Weeks and other members and associates of the Bulger Group buried the remains in Dorchester, Massachusetts.

208. In October 2000, 19 years after her disappearance, but only months after the Court Order in *United States v. Salemme*, disclosing much of the facts contained in this Complaint, the remains of Debra Davis were unearthed from a shallow make-shift grave in Dorchester, Massachusetts.

XVIII.    THE COVER UP:  AFTER THE MURDERS OF DAVIS AND OTHERS, THE
FBI AGENTS, IN BREACH OF THEIR DUTIES AND IN VIOLATION OF
MANDATORY GUIDELINES AND RULES OF LAW CONTINUED TO
PROTECT FLEMMI AND BULGER, FAILED TO INVESTIGATE THE
CIRCUMSTANCES OF DAVIS' MURDER ALL TO THE DETRIMENT OF
THE ESTATE AND THE PLAINTIFF

209.    Despite Debra's sudden disappearance, and the coincidence that other individuals

associated with Flemmi and Bulger had been murdered, Debra's disappearance was met

with studied indifference.

210.    In addition to failing to protect Debra Davis from the murderous criminals they were

harboring, the defendant employees of the FBI intentionally avoided investigating

Debra's  disappearance and apparent murder after wresting the case away from the state

and local police.

211.    Debra's mother, Olga Davis, reported her missing to the Randolph Police Department

within twenty-four hours of her daughter's disappearance.  Ms. Davis believes she

initially spoke with an Officer Carvel at the Randolph Police Department.

212.    Two days later, Ms. Davis received a call from a representative of the Federal Bureau of

Investigation informing her that the FBI would be "taking over the investigation."

213.    Shortly thereafter, Ms. Davis met with approximately four agents from the Bureau at

their direction.  The agents requested that Ms. Davis meet with them in a car at a

secluded area.  Their purported reason for doing so was "in case Flemmi was around."

214.    The agents asked some preliminary questions about Debra, such as description of her

appearance.  The agents then switched gears and quickly began prodding Ms. Davis for

whatever information she knew about Stephen Flemmi, ostensibly to learn whether Ms.

Davis knew anything about Flemmi's involvement with the FBI.  They no longer

37

appeared to be concerned specifically about Debra's disappearance.

215. Ms. Davis met with agents from the FBI, at their behest, approximately once a month over the next year. The agents insisted they meet in motel rooms and parking lots. Ms. Davis recalls being asked questions regarding her knowledge of what Mr. Flemmi did for a living and whether or not she had ever overheard any of his telephone conversations. The agents continued to fish for information Ms. Davis might know about Flemmi but made no apparent progress regarding Debra's disappearance and, in fact, seemingly lost interest in the investigation.

216. Ms. Davis felt extremely intimidated by these meetings in which she was always asked to meet with several agents by herself, with the exception of one time when Michelle Davis, Debra's sister was present. Ms. Davis was never asked to meet with the agents at FBI headquarters, nor did they ever meet with her at her home. Instead, they insisted on meeting her at out of the way places, such as the parking lot of St. Bernadette's Church in Randolph.

217. The agents made statements to Ms. Davis to the effect that if James Bulger and Steven Flemmi murdered somebody, they would know how to make a body disappear because they knew people who worked at funeral parlors. These statements were highly inappropriate and upset Ms. Davis. Moreover, she felt they were intended to be veiled threats not to pursue any help from local authorities outside of the FBI.

218. Michelle Davis, Debra's sister, also recalled being asked questions about Mr. Flemmi, which she believed were designed to discover exactly how much she knew about Flemmi's involvement with the FBI. Michelle Davis resided for a time with Mr. Flemmi and Debra in Brookline. Michelle Davis was repeatedly asked by the agents what she

38

knew of Flemmi's business and what, if anything, she may have heard him discussing in telephone conversations.

219.   Olga Davis recalled being instructed by the agents not to talk to anyone else and being advised that she "has eight other kids to worry about". Again, Ms. Davis felt this was a highly inappropriate comment and interpreted this as a warning not to pursue any investigation into her daughter's disappearance. Instead of feeling reassured by the FBI's involvement, Ms. Davis recalls feeling nervous and scared by the agents' behavior. The very people who should have been helping Ms. Davis find her daughter frightened her and did nothing to locate Debra.

220.   On at least one occasion, Ms. Davis recalled that the conversation between herself and the FBI was recorded on a reel to reel recorder but, despite numerous requests, Ms. Davis has not been able to recover such recordings.

221.   As time went on, it became apparent to Ms. Davis that the FBI had no intention of investigating Debra's disappearance, and in fact, prevented local authorities from pursuing any investigation as well. Ms. Davis recalls providing local authorities with pictures of Debra, to aid the search. After the FBI became involved in the matter, Ms. Davis approached the local authorities to have the pictures returned to her, only to be told they were "missing". Ms. Davis believes that the federal authorities took custody of these pictures, but did not in fact use them to locate her.

222.   Because of these actions by the federal agents, Ms. Davis and her family did not learn what happened to their daughter and sister, Debra, until nearly nineteen years after her disappearance.

223.   The FBI's flagrant disregard for the guidelines for handling informants allowed Mr.

39

Flemmi and Bulger to remain on the streets, engaging in criminal activity, while "working" as informants.

224.    Even after the FBI became aware that Debra Davis had disappeared in 1981, they did nothing to investigate Flemmi's involvement in that crime. In fact, Ms. Davis asserts that they did the exact opposite - they turned a blind eye and squelched any attempts to investigate the matter. Flemmi and Bulger were allowed to roam free and continue on with their criminal activities for nearly thirteen more years.

225.    In the meantime, Ms. Davis and her family have lived in fear, both from Mr. Flemmi and also from the very body of law enforcement supposed to protect her. Ms. Davis has had to live with the knowledge that not only was her beloved daughter murdered, she was murdered by a man the federal government nurtured and protected.

226.    The Boston office of the FBI, through the defendants named herein and others, failed to investigate Davis' death because they did not want to disrupt their relationship with Bulger and Flemmi and the benefits that the FBI, the United States and the individual agents were receiving as a result of that relationship. Moreover, the agents of the FBI were fulfilling their part of their bargain with Flemmi and Bulger to protect them, and to avoid embarrassment to the FBI.

227.    The FBI did not investigate Flemmi or Bulger because to do so would have been to disclose them as informants or, in the alternative, would have required that they be closed as informants.

228.    Since Davis' remains were discovered, the United States has brought charges against Weeks, Bulger and Flemmi for their involvement in Davis' murder.

**Count I – MGL Ch. 229 § 2 -- Civil Conspiracy – Defendants United States, Rico, Morris, Connolly, Sarhatt, and Fitzpatrick**

229.  The plaintiff incorporates the facts alleged in paragraphs 1-228 and repeats and recite all previous allegations as if fully set forth herein.

230.  From in or about 1969 and continuing thereafter up to July 6, 2000 in the District of Massachusetts and elsewhere, defendants Rico, Morris, Connolly, Sarhatt, and Fitzpatrick, while acting within the course or scope of their office or employment with the FBI, an agency of the defendant United States, together with defendants Bulger and Flemmi combined, conspired and agreed to protect Bulger, Flemmi, and their associates from arrest and prosecution for their criminal activities including, but not limited to, murder, loan sharking, illegal gambling, extortion and bribery in exchange for defendants Bulger and Flemmi's agreement to provide information pertaining to the criminal activities of others to agents of the FBI.

231.  It was the object of the conspiracy to protect defendants Bulger and Flemmi from arrest and prosecution in order to maintain their roles as high echelon informants, providing information to the FBI.  In furtherance thereof, defendants Rico, Morris, Connolly, Sarhatt and Fitzpatrick, among other things: (a) provided Bulger and Flemmi with confidential law enforcement information regarding grand jury investigations, court authorized wire taps and other investigative efforts, including the identities of confidential informants who were providing information about Bulger and Flemmi; (b) deflected and squelched prosecutions and criminal investigations about Bulger's and Flemmi's crimes; (c) improperly preserved Bulger's and Flemmi's status as FBI

41

informants through the filing of misleading official reports and failed to report and record allegations of their crimes in official FBI documents; (d) improperly failed to supervise and review Bulger's and Flemmi's criminal activities; (e) improperly lied to others concerning the criminal activities of Bulger and Flemmi; and (f) failed to follow the Attorney General Guidelines governing high echelon informants.

232. In part, the defendants Rico, Morris, Connolly, Sarhatt and Fitzpatrick, benefitted from the conspiracy alleged herein by, among other ways: (a) increased prestige and promotions for the individual agents and the Boston field office of the FBI, in general, arising from the successful prosecution of the LCN; (b) receiving gifts of money and other things of value from Bulger and Flemmi; (c) concealing from the public and courts that the Attorney General Guidelines regulating the handling of high echelon informants had been systematically ignored; (d) concealing from the public and courts that agents of the FBI had violated the laws of the United States of America, thus saving the defendant United States from the adverse publicity and harm to reputation associated with the indictment of one or more of its agents or the public revelation of the conduct alleged within this Complaint; (e) concealing from the public, courts, and litigants the conduct alleged in this complaint in order to prevent persons from challenging the legality of their convictions; and (f) concealing from the public, courts and litigants the conduct alleged in this complaint, thus precluding persons who had been unlawfully imprisoned or harmed, including your plaintiff, from making claims against the defendant United States.

233. On or about 1981, Davis was kidnapped, tortured and murdered by Bulger, Flemmi, Weeks and others.

42

234. The defendant United States by and through defendants Morris, Connolly, Sarhatt and Fitzpatrick, and others failed to undertake any serious investigation of Davis' disappearance.

235. At the time of Davis' disappearance, Bulger and Flemmi had been involved in approximately 23 murders.

236. The defendant United States and its agency, the Federal Bureau of Investigation negligently continued to utilize Bulger and Flemmi as top echelon informants; negligently failed to control the criminal activities of Bulger and Flemmi, negligently failed to enforce the Attorney General Guidelines governing high echelon informants, including Bulger and Flemmi; negligently and in violation of the regulations and policies of the defendant United States failed to inform the appropriate law enforcement or prosecutive authorities of the criminal activities of Bulger and Flemmi; negligently failed to properly supervise federal agents, including Connolly and Morris, in their handling of Bulger and Flemmi; negligently continued to allow Connolly to remain Bulger and Flemmi's "handler" when it was known or should have been known that he should have been removed from that position;; negligently failed to warn and protect Davis; and negligently failed to investigate for the purpose of prosecution the circumstances of Davis' disappearance and death.

237. As a result of these wrongful acts by agents and employees of the defendant United States, events occurred that a reasonable, prudent person would have foreseen in light of the circumstances set forth herein, including the kidnapping, torture and wrongful death of Debra Davis. The tortious conduct of such employees was a material element and proximate cause in bringing about Davis' kidnapping, torture and death.

43

238.   By reason of the negligence of defendants Rico, Morris, Connolly, Sarhatt, Fitzpatrick, and United States, the next of kin has been deprived of compensation for the loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice and reasonable funeral and burial expenses as well as other damages pursuant to MGL Ch. 229, § 2.

### Count II -- MGL Ch. 229 § 6 – Conscious Suffering -- Defendants United States, Rico, Morris, Connolly, Sarhatt and Fitzpatrick

239.   The plaintiff incorporates the facts alleged in paragraph 1-238 and repeats and recites all previous allegations as if fully set forth herein.

240.   As a direct and proximate result of the negligence of defendant United States, by and through defendants Rico, Morris, Connolly, Sarhatt and Fitzpatrick, while acting within the scope or office of their employment by the FBI, alleged in the previous Count of this Compliant, Davis suffered great pain of body and anguish of mind in that she was kidnapped, tortured and wrongfully killed.

241.   This Count of the Compliant is for conscious suffering and is being brought for the benefit of the Estate of Debra Davis pursuant to MGL Ch 229 § 6.

### Count III -- MGL Ch. 229 § 2 and Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., 28 U.S.C. § 2401, and C.F.R. § 14.1, et seq. – Negligence – Defendants United States, Morris, Connolly, Sarhatt and Fitzpatrick

242.   The plaintiff incorporate the facts alleged in Paragraphs 1-241 and repeats and recites all previous allegations as if fully set forth herein.

243.   The defendants Morris, Connolly, Sarhatt and Fitzpatrick, while acting within the course and scope of their office or employment by the FBI, an agency of the defendant United States:

(a) knew or should have known that Bulger and Flemmi had engaged in a history of criminal

44

activity including assault, attempted murder and murder; (b) knew or should have known they had a duty to investigate the prior 23 murders caused by Bulger and Flemmi, (c) knew or should have known they had a duty to disclose Flemmi and Bulger's violent criminal activities to law enforcement agencies with jurisdiction over their crimes and/or report these activities to the Department of Justice and/or terminate Bulger and Flemmi's status as confidential informants; (d) knew or should have known that they had a duty to follow and enforce the Attorney General Guidelines regarding the handling of high echelon informants and (e) knew or should have known that their failure to comply with their duties alleged herein would place the life of Debra Davis in grave danger.

244. The United States and its agency, the Federal Bureau of Investigation, negligently continued to utilize Bulger and Flemmi as top echelon informants; negligently failed to control the criminal activities of Bulger and Flemmi, negligently failed to enforce the Attorney General Guidelines governing high echelon informants, including Bulger and Flemmi; negligently and in violation of the regulations and policies of the defendant United States failed to inform the appropriate law enforcement or prospective authorities of the criminal activities of Bulger and Flemmi; negligently failed to properly supervise federal agents, including Connolly and Morris, in their handling of Bulger and Flemmi; negligently continued to allow Connolly to remain Bulger and Flemmi's "handler" when it was known or should have been known that he should have been removed from that position.

245. As a result of these wrongful acts by agents and employees of the defendant United States, events occurred that a reasonable, prudent person would have foreseen in light of the circumstances set forth herein, including the kidnapping, torture and wrongful death of Debra Davis. The tortious conduct of such employees was a material element and proximate

45

cause in bringing about Davis' kidnapping, torture and death.

246. By reason of the negligence of defendants Morris, Connolly, Sarhatt, Fitzpatrick, and United States, the next of kin has been deprived of compensation for the loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice and reasonable funeral and burial expenses, as well as other damages pursuant to MGL Ch. 229 § 2.

247. The plaintiff has additionally duly presented a Notice of Tort Claim, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., 28 U.S.C. § 2401, and 28 C.F.R. § 14.1, et.seq. giving notice of Davis' injuries and wrongful death caused by the negligent or wrongful acts or omissions of certain employees of the United States Government while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to the plaintiffs in accordance with the laws of the Commonwealth of Massachusetts. See Exhibit A, appended hereto.

### Count IV -- MGL Ch. 229 § 6 -- Conscious Suffering -- Defendants United States, Morris, Connolly, Sarhatt, and Fitzpatrick

248. The plaintiff incorporates the facts alleged in paragraphs 1-247 and repeats and recites all previous allegations as if fully set forth herein.

249. As a direct and proximate result of the negligence of defendant United States, by and through defendants Morris, Connolly, Sarhatt and Fitzpatrick, while acting within the scope or office of their employment by the FBI, alleged in the previous Count of this Compliant, Davis suffered great pain of body and anguish of mind in that she was kidnapped, tortured and wrongfully killed.

250. This Count of the Complaint is for conscious suffering and is being brought for the benefit

of the Estate of Debra Davis pursuant to MGL Ch. 229 § 6.

## Count V – MGL Ch. 229 § 2 -- Supervisory Liability – Defendants United States, Morris and Sarhatt

251. The plaintiff incorporates the facts alleged in paragraphs 1-249 and repeats and recites all previous allegations as if fully set forth herein.

252. At the time of Davis' murder, defendants Sarhatt and Morris were the supervisors of John J. Connolly.

253. Defendants Morris and Sarhatt while acting in the course and scope of their office or employment by the FBI, an agency of the defendant United States, had a duty to ensure that their subordinate Connolly followed the laws of the United States, acted in conformity therewith, that both Connolly and the Boston Field Office of the FBI were in compliance with the Attorney General Guidelines concerning the handling of high echelon informants, including Bulger and Flemmi.

254. By the time of Davis' sudden disappearance in 1981, defendants Morris and Sarhatt: (a) knew or should have known that Bulger and Flemmi had engaged in a history of violent criminal activity, including assault, attempted murder and murder; and (b) knew or should have known they had a responsibility to inform appropriate law enforcement or prosecutive authorities of the criminal activity of Bulger and Flemmi.

255. During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a Special Agent of the FBI, received things of value from Flemmi and Bulger and with Flemmi and Bulger paid a series of things of value to former Supervisory Special Agent Morris.

256. During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a

47

Special Agent of the FBI, provided Bulger and Flemmi sensitive and confidential law enforcement information designed to protect the criminal activities of Bulger, Flemmi, and, at times, their criminal associates.

257.  During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a Special Agent of the FBI, using confidential information that he received from Supervisory Special Agent Morris and from other FBI and law enforcement sources, tipped Bulger and Flemmi to various law enforcement initiatives in order to protect their ongoing criminal activities.

258.  During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a Special Agent of the FBI, using confidential information that he received from FBI and other law enforcement sources, alerted Bulger and Flemmi to the identity of confidential law enforcement informants in order to protect Bulger's and Flemmi's ongoing criminal activities.

259.  During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a Special Agent of the FBI, knowingly omitted material information from official FBI documents regarding Bulger and Flemmi.

260.  During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a Special Agent of the FBI, in order to protect Bulger and Flemmi from prosecution and to further their criminal activities, in knowing and willful violation of his responsibilities as an FBI agent, endeavored to preserve Bulger's and Flemmi's status as confidential informants by failing to report information relating to Bulger and Flemmi which was material to the investigation of criminal activity in the Boston area.

261.  Defendants Morris and Sarhatt, while acting within the course and scope of their office or

employment by the FBI, an agency of the defendant United States, breached their duties by failing to properly supervise Connolly and others and failing to ensure that Connolly and others followed Attorney General Guidelines concerning the handling of high echelon informants thereby placing the lives of others at great risk.

262.   As a result of these wrongful acts by agents and employees of the defendant United States, events occurred that a reasonable, prudent person would have foreseen in light of the circumstances set forth herein, including the kidnapping, torture and wrongful death of Debra Davis.  The tortious conduct of such employees was a material element and proximate cause in bringing about Davis' kidnapping, torture and death.

263.   By reason of the negligence of defendants Morris, Sarhatt and United States, the next of kin has been deprived of compensation for the loss of reasonably expected net income, services, protection, care assistance, society, companionship, comfort, guidance, counsel and advice and reasonable funeral and burial expenses as well as other damages pursuant to MGL Ch. 229 § 2.

### Count VI -- MGL Ch. 229 § 6 – Conscious Suffering – Defendants United States, Morris and Sarhatt

264.   The plaintiff incorporates the facts alleged in paragraphs 1-263 of this Complaint and repeats and recites all previous allegations as if fully set forth herein.

265.   As a direct and proximate result of the negligence of defendant United States, by and through defendants Morris and Sarhatt, while acting within the scope or office of their employment by the FBI, alleged in the previous Count of this Compliant, Davis suffered great pain of body and anguish of mind in that she was kidnapped, tortured and

49

wrongfully killed.

266.    This Count of the Compliant is for conscious suffering and is being brought for the

benefit of the Estate of Debra Davis pursuant to MGL Ch. 229 § 6.


## COUNT VII -- Bivens – Fourth Amendment – Defendants Morris, Connolly, Sarhatt and Fitzpatrick

267.    The plaintiff incorporates the facts alleged in paragraph 1 - 266 and repeats and recites all

previous allegations as if fully set forth herein.

268.    Defendants Morris, Connolly, Sarhatt and Fitzpatrick, while acting under color of law of

the United States of America, knowingly, intentionally, and with actual malice, denied

Debra Davis her clearly established right to be secure in her person against unreasonable

seizures as guaranteed by the Fourth Amendment to the United States Constitution.

269.    These denials were accomplished in that defendants Morris, Connolly, Sarhatt and

Fitzpatrick, continued to utilize Bulger and Flemmi as top echelon informants; failed to

control the criminal activities of Bulger and Flemmi; failed to enforce the Attorney

General Guidelines governing high echelon informants, including Bulger and Flemmi; in

violation of the regulations and policy of the United States failed to inform the

appropriate law enforcement or prosecutive authorities of the criminal activities of

Bulger and Flemmi; continued to allow Connolly to remain Bulger and Flemmi's

"handler" when it was known or should have been known that he should have been

removed from that position; failed to warn and protect Debra Davis from individuals

known to be murderers.

270.    These actions violated Davis' clearly established right to be secure in her person from

50

unreasonable seizures, guaranteed by the Fourth Amendment to the United States Constitution, that is, force which was, considering all the facts and circumstances of the case, unreasonable in that it was not intended to achieve any lawful purpose.

271. As a direct, proximate, and foreseeable result of the actions of defendants Morris, Connolly, Sarhatt and Fitzpatrick, Davis was actually denied her constitutional rights pursuant to the Fourth Amendment as alleged above to the United States Constitution, and suffered extreme and severe fright, shock, fear, horror, emotional distress and wrongful death.

272. The actions of defendants Morris, Connolly, Sarhatt and Fitzpatrick, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken intentionally, with actual malice, and/or reckless disregard for their likely consequences.  As a result, the plaintiff is entitled to an award of punitive damages.

### COUNT VIII - Bivens – Substantive Fifth Amendment – Defendants Morris, Connolly, Sarhatt and Fitzpatrick

273. The plaintiff incorporates the facts alleged in paragraph 1-272 and repeats and recites all previous allegations as if fully set forth herein.

274. Defendants Morris, Connolly, Sarhatt and Fitzpatrick, while acting under color of law of the United States, knowingly, intentionally, and with actual malice, denied Debra Davis her clearly established substantive due process right not to be deprived of life and liberty without due process of law, guaranteed by the Fifth Amendment to the United States Constitution.

275. These denials were accomplished in that defendants Morris, Connolly, Sarhatt and Fitzpatrick continued to utilize Bulger and Flemmi as top echelon informants; failed to control the criminal activities of Bulger and Flemmi; failed to enforce the Attorney General

51

Guidelines governing high echelon informants, including Bulger and Flemmi; in violation

of the regulations and policy of the United States failed to inform the appropriate law

enforcement or prosecutive authorities of the criminal activities of Bulger and Flemmi;

continued to allow Connolly to remain Bulger and Flemmi's "handler" when it was known

or should have been known that he should have been removed from that position.

276. These actions violated Davis' clearly established substantive due process rights not to be

deprived of life or liberty without due process of law, guaranteed by the Fifth Amendment

to the United States Constitution because the force used was arbitrary and/or reckless and

highly likely to cause harm, and shocks the conscience.

277. As a direct, proximate, and foreseeable result of the actions of defendants Morris, Connolly,

Sarhatt and Fitzpatrick, Davis was actually denied her constitutional rights pursuant to the

Fifth Amendment as alleged above to the United States Constitution, and suffered extreme

and severe fright, shock, fear, horror, emotional distress and wrongful death.

278. The actions of defendants Morris, Connolly, Sarhatt and Fitzpatrick, alleged above, were an

extreme deviation from reasonable standards of conduct, undertaken intentionally, with

actual malice, and/or reckless disregard for their likely consequences. As a result, the

plaintiff is entitled to an award of punitive damages.

## COUNT IX – Bivens – Fourth and Fifth Amendments - Failure To Supervise – Defendants Morris and Sarhatt

279. The plaintiff incorporates the facts alleged in paragraphs 1-278 repeats and recites all

previous allegations as if fully set forth herein.

280. Defendants Morris and Sarhatt, while acting under color of law of the United States of

America knowingly, intentionally, and with actual malice, denied Debra Davis her clearly

52

established right to be secure in her person from unreasonable seizures as guaranteed by the Fourth Amendment to the United States Constitution, and/or her substantive due process rights not to deprived of liberty and life without due process of law, guaranteed by the Fifth Amendment to the United States Constitution, by breaching their duty to supervise John J. Connolly through their own acts or omissions causing Davis to be kidnapped, tortured and wrongfully killed by Bulger, Flemmi, Weeks and others.

281. At the time of Davis' murder, defendants Morris and Sarhatt were the supervisors of John J. Connolly.

282. Defendants Morris and Sarhatt had a duty to ensure that Connolly and other agents followed the law, acted in conformity therewith and that both Connolly and the Boston Field Office of the FBI were in Compliance with the Attorney General Guidelines concerning the handling of high echelon informants, including Bulger and Flemmi.

283. By the time of Davis' sudden disappearance in 1981, defendants Morris and Sarhatt (a) knew or should have known that Bulger and Flemmi had engaged in a history of violent criminal activity, including assault, attempted murder and murder; (b) knew or should have known that Connolly was the FBI "handler" for Bulger and Flemmi and that others within the FBI receiving reliable information about criminal activity in which Bulger and Flemmi were engaged, would consult Connolly and then not pursue any investigation of Bulger and Flemmi; (c) knew or should have known that Connolly was giving information to Bulger and Flemmi and that Bulger and Flemmi were engaged in criminal activities while serving as FBI informants; and (d) knew or should have known they had a responsibility to inform appropriate law enforcement or prosecutive authorities of the criminal activity of Bulger and Flemmi.

284.  During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a Special Agent of the FBI, both received things of value from Flemmi and Bulger and with Flemmi and Bulger paid a series of things of value to former Supervisory Special Agent Morris.

285.  During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a Special Agent of the FBI, provided Bulger and Flemmi sensitive and confidential law enforcement information designed to protect the criminal activities of Bulger, Flemmi, and, at times, their criminal associates.

286.  During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a Special Agent of the FBI, using confidential information that he received from Supervisory Special Agent Morris and from other FBI and law enforcement sources, tipped Bulger and Flemmi to various law enforcement initiatives in order to protect their ongoing criminal activities.

287.  During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a Special Agent of the FBI, using confidential information that he received from FBI and other law enforcement sources, alerted Bulger and Flemmi to the identity of confidential law enforcement informants in order to protect Bulger's and Flemmi's ongoing criminal activities.

288.  During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a Special Agent of the FBI, knowingly omitted material information from official FBI documents regarding Bulger and Flemmi.

289.  During the tenure of defendants Morris and Sarhatt, Connolly, while he served as a Special Agent of the FBI, in order to protect Bulger and Flemmi from prosecution and to further their criminal activities, in knowing and willful violation of his responsibilities as an FBI agent, endeavored to preserve Bulger's and Flemmi's status as confidential informants by

54

failing to report information relating to Bulger and Flemmi which was material to the investigation of criminal activity in the Boston area.

290. Defendants Morris and Sarhatt through their own acts or omissions encouraged, condoned, acquiesced and/or acted with gross negligence or deliberate indifference to Connolly's actions in that they ignored: that Bulger and Flemmi had engaged in a history of violent criminal activity, including assault, attempted murder and murder; that informants willing to cooperate against Bulger and Flemmi had been intimidated, tampered with or murdered in violation of 18 U.S.C. §§ 1512, 1513 and other provisions of state and federal law; the clear statutory authority to investigate those cases where witnesses and informants were tampered with or retaliated against, arising from their cooperation with law enforcement; their duty to properly supervise Connolly's personal relationship with Bulger and Flemmi; and their mandatory duty to ensure that Connolly and other agents within the Boston Field office of the FBI were in compliance with the Attorney General Guidelines concerning the handling of high echelon informants.

291. As a direct, proximate, and foreseeable result of defendants Morris and Sarhatt's actions, Davis was actually denied her clearly established constitutional rights pursuant to the Fourth and Fifth Amendments to the United States Constitution, alleged above, and suffered extreme and severe fright, shock, fear, horror, emotional distress and wrongful death.

292. The actions of defendants Morris and Sarhatt, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken intentionally, with actual malice, and/or reckless disregard for their likely consequences. As a result, the plaintiff is entitled to an award of punitive damages.

## Count X–Bivens Conspiracy - Fourth And Fifth Amendments – Defendants Rico, Morris, Connolly, Sarhatt and Fitzpatrick

293.   The plaintiff incorporates the facts alleged in paragraphs 1-292 and repeats and recites all previous allegations as if fully set forth herein.

294.   From in or about 1969 and continuing thereafter up to July 6, 2000 in the District Court of Massachusetts and elsewhere, defendants Rico, Morris, Connolly, Sarhatt and Fitzpatrick, while acting under color of the law of the United States, together with defendants Bulger, Flemmi and Weeks, combined, conspired and agreed to protect James Bulger, Stephen Flemmi, and their associates from arrest and prosecution for their criminal activities including, but not limited to, murder, loan sharking, illegal gambling, extortion and bribery, in exchange for defendants Bulger and Flemmi's agreement to provide information pertaining to the criminal activities of others to agents of the FBI.

295.   It was the object of the conspiracy to protect Bulger and Flemmi from arrest and prosecution in order to maintain their roles as high echelon informants, providing information to the FBI. In furtherance thereof, defendants Rico, Morris, Connolly, Sarhatt and Fitzpatrick, among other things, (a) provided Bulger and Flemmi with confidential law enforcement information regarding grand jury investigations, court authorized wire taps and other investigative efforts, including the identities of confidential informants who were providing information about Bulger and Flemmi; (b) deflected and squelched prosecutions and criminal investigations about Bulger's and Flemmi's crimes; (c) improperly preserved Bulger's and Flemmi's status as FBI informants through the filing of misleading official reports and failed to report and record allegations of their crimes in official FBI documents; (d) improperly failed to supervise and review Bulger's and Flemmi's criminal activities; (e) improperly lied

to others concerning the criminal activities of Bulger and Flemmi; and (f) failed to follow the Attorney General Guidelines governing high echelon informants.

296. In part, the defendants Rico, Morris, Connolly, Sarhatt and Fitzpatrick, benefitted from the conspiracy alleged herein for, among other ways: (a) increased prestige and promotions for the individual agents and the Boston field office of the FBI, in general, arising from the successful prosecution of the LCN; (b) receiving gifts of money and other things of value from Bulger and Flemmi; (c) concealing from the public and courts that the Attorney General Guidelines regulating the handling of high echelon informants had been systematically ignored; (d) concealing from the public and courts that agents of the FBI had violated the laws of the United States of America, thus saving the United States from adverse publicity and harm to reputation associated with the indictment of one or more of its agents or the public revelation of the conduct alleged within this Complaint; (e) concealing from the public, courts, and litigants the conduct alleged in this complaint in order to prevent persons from challenging the legality of their convictions; and (f) concealing from the public, courts and litigants the conduct alleged in this complaint, thus precluding persons who had been unlawfully imprisoned or harmed, including your plaintiff, from making claims against the defendant United States.

297. On or about 1981, Davis was kidnapped, tortured and murdered by Bulger, Flemmi, Weeks and others.

298. The defendants Morris, Connolly, Sarhatt, Fitzpatrick, and others failed to undertake any serious investigation of Davis' disappearance.

299. At the time of Davis' disappearance, Bulger and Flemmi had been involved in approximately 23 murders.

300.  As part of the conspiracy and in furtherance thereof the defendants acting under color of law of the United States of America, knowingly, intentionally, and with actual malice, denied Debra Davis her clearly established right to be secure in her persons against unreasonable seizures as guaranteed by the Fourth Amendment to the United States Constitution, and/or his substantive due process rights not to be deprived of liberty and life without due process of law, guaranteed by the Fifth Amendment to the United States Constitution.

301.  These denials were accomplished in that defendants Morris, Connolly, Sarhatt and Fitzpatrick, continued to utilize Bulger and Flemmi as top echelon informants; failed to control the criminal activities of Bulger and Flemmi; failed to enforce the Attorney General Guidelines governing high echelon informants, including Bulger and Flemmi; in violation of the regulations and policy of the United States, failed to inform the appropriate law enforcement or prosecutive authorities of the criminal activities of Bulger and Flemmi; continued to allow Connolly to remain Bulger and Flemmi's "handler" when it was known or should have been known that he should have been removed from that position; failed to warn and protect Debra Davis.

302.  These actions undertaken in furtherance of the conspiracy alleged herein violated Davis' clearly established right to be secure in her person from unreasonable seizures, guaranteed by the Fourth Amendment to the United States Constitution, that is, force which was, considering all the circumstances, unreasonable in that it was not intended to achieve any lawful purpose.

303.  These actions undertaken in furtherance of the conspiracy alleged herein also violated Davis' clearly established substantive due process right not be deprived of life or liberty without due process of law, guaranteed by the Fifth Amendment to the United States Constitution

58

because the force used was arbitrary and/or reckless and highly likely to cause harm, and shocks the conscience.

304. As a direct, proximate, and foreseeable result of the conspiracy alleged herein and defendants Rico, Morris, Connolly, Sarhatt and Fitzpatrick's, actions to further the conspiracy, Davis was actually denied her constitutional rights pursuant to the Fourth and Fifth Amendments to the United States Constitution, and suffered extreme and severe fright, shock, fear, horror, emotional distress and wrongful death.

305. The actions of defendants Rico, Morris, Connolly, Sarhatt and Fitzpatrick, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken intentionally, with actual malice, and/or reckless disregard for their likely consequences.  As a result, the plaintiff is entitled to an award of punitive damages.

### Count XI – Bivens Conspiracy to Deprive Estate of Rights Guaranteed by the First and Fifth Amendments – Defendants Morris, Connolly, Sarhatt and Fitzpatrick

306. The plaintiff incorporates the facts alleged in paragraphs 1-305 and repeats and recites all previous allegations as if fully set forth herein.

307. From on or about late 1981 to July 6, 2000 in the District of Massachusetts and elsewhere, defendants Morris, Connolly, Sarhatt, Fitzpatrick, and others both known and unknown, acting under color of law of the United States combined, conspired and confederated together to deny the Estate of Debra Davis its clearly established right to seek redress of grievances as guaranteed by the First Amendment to the United States Constitution and/or its right not to be deprived of property without due process of law as secured by the Fifth Amendment to the United States Constitution.

308. Pursuant to 18 U.S.C. §§ 1512, 1513, the Boston Field Office of the FBI was congressionally

authorized to investigate those cases where witnesses and informants were tampered with or retaliated against, arising from their cooperation with law enforcement.

309. By the time of Davis' sudden disappearance in 1981, the defendants Morris, Connolly, Sarhatt and Fitzpatrick, knew or should have known that there was a haunting pattern of FBI informants against Bulger and Flemmi disappearing and/or being murdered.

310. Despite their statutory mandate and knowledge of the fate of other informants who had provided information against Bulger and Flemmi, the defendants Morris, Connolly, Sarhatt and Fitzpatrick, and others acted to thwart, restrict and obstruct the investigation of Davis' disappearance and murder.

311. In part, defendants Morris, Connolly, Sarhatt and Fitzpatrick, benefitted from the conspiracy alleged herein for, among other ways: (a) increased prestige and promotions for the individual agents named in this Complaint and the Boston field office of the FBI, in general, arising from the successful prosecution of the LCN; (b) receiving gifts of money and other things of value from Bulger and Flemmi; (c) concealing from the public and courts that the Attorney General Guidelines regulating the handling of high echelon informants had been systematically ignored by the Boston Field Office of the FBI, thus saving the Boston Field Office from extreme embarrassment associated with its handling of Bulger and Flemmi; (d) concealing from the public and courts that agents of the FBI had violated the laws of the United States of America, thus saving the FBI and the United States from the adverse publicity associated with the indictment of one or more of its agents or the public revelation of the conduct alleged within this complaint; or (e) concealing from the public, courts, and litigants the conduct alleged in this complaint in order to prevent persons from challenging the legality of their convictions; and (f) concealing from the public, courts and litigants the

60

conduct alleged in this complaint, thus precluding persons who had been unlawfully imprisoned or harmed, including your plaintiff, from making claims against the defendant United States.

312.  In furtherance of the conspiracy, defendants Morris, Connolly, Sarhatt and Fitzpatrick: (a) failed to undertake a good faith effort to learn the identity of the murderers of Debra Davis and the circumstances of her death; (b) failed to interview potential witnesses who had information concerning Davis' disappearance; (c) failed to interview Bulger and Flemmi or members of the Bulger Group regarding Davis' disappearance; (d) otherwise failed to follow up on leads provided to them regarding the death and disappearance of Debra Davis.

313.  The defendants Morris, Connolly, Sarhatt and Fitzpatrick also acted to further the conspiracy by providing Bulger and Flemmi with (a) confidential law enforcement information regarding grand jury investigations, court authorized wiretaps and other investigative efforts; (b) disclosure of identities of other confidential informants; (c) deflected and squelched prosecutions and criminal investigations of Bulger and Flemmi's crimes; and (d) improperly preserved Bulger and Flemmi's status as FBI informants through the filing of misleading official reports and failing to report and record allegations of Bulger and Flemmi's crimes in official FBI documents.

314.  As a direct, proximate, foreseeable and intended result of the conspiracy alleged in this Complaint, the defendants prevented the plaintiff from learning the identities of those involved in Davis' death, precluding it from seeking civil judgment against those responsible for Davis' death, denying the plaintiff its clearly established constitutional rights to seek redress of grievances as guaranteed by the First Amendment to the United States Constitution and/or its right not to be deprived of property without due process of law as

61

secured by the Fifth Amendment to the United States Constitution in that the Estate was deprived its right to seek a civil remedy from 1981 to the date of this Complaint for the kidnapping, torture and murder of Debra Davis resulting in lost damages.

315. The actions of the defendants Morris, Connolly, Sarhatt and Fitzpatrick, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken intentionally with actual malice, and/or with a reckless disregard for their likely consequences. As a result, the plaintiff is entitled to an award of punitive damages.


**Count XII - Violation of 42 U.S.C. § 1983 v. All Individual Defendants**

316. Plaintiff repeats and realleges each and every allegation above stated as though such allegations were set forth herein.

317. By engaging in the conduct described above, the individual defendants deprived Debra Davis of clearly established and well settled constitutional rights while acting under color of law. Specifically, the defendants deprived Ms. Davis of rights secured and guaranteed to her by the United States Constitution including, but not limited to, her Fourth Amendment right to be free from unlawful seizure of her person and her Fifth and Fourteenth Amendment rights to due process of law.

318. Further, the wrongful acts were undertaken with grossly reckless disregard of Plaintiff's constitutional rights.

319. Each of the defendants together with the Federal Bureau of Investigation and the individual defendants in civil action, engaged in a conspiracy to deprive Ms.Davis and others of their rights, privileges and immunities as guaranteed and protected by the Constitution of the United States in violation of the provisions of 42 U.S.C. § 1983.

320.    The conspiracy, included but was not limited to the use and protection of James J. Bulger and Stephen Flemmi in their capacity as high echelon informants, concealment of their activities and failure to investigate their role in the disappearance and death of Debra Davis.

321.    As a result of the defendants' violations of Ms. Davis' civil rights, she suffered a loss of freedom, loss of enjoyment of life, loss of ability to earn income, extreme emotional distress and was otherwise damaged.

322.    The above constitutes violations of 42 U.S.C. § 1983 et seq.

### Count XIII - Conspiracy in Violation of 42 U.S.C. § 1983 (All Defendants)

323.    Debra Davis repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

324.    By having engaged in the conduct described above, the Defendants conspired to deprive Ms. Davis of the equal protection of the law or of the equal privileges and immunities under the law, and they acted in furtherance of the conspiracy, which resulted in the injury to Ms. Davis described above, in violation of 42 U.S.C. § 1983.


### Count XIV– Reasonable Attorney's Fees and Cost of Suit – Defendants United States, Rico, Morris, Connolly, Sarhatt and Fitzpatrick

325.    The plaintiff incorporates the facts alleged in paragraphs 1-324 of this Complaint and repeats and recites all previous allegations as if fully set forth herein.

326.    The plaintiff has been required to retain the services of counsel to prosecute the present lawsuit.

327.    The actions of the Defendants alleged above were in no instance substantially justified under the circumstances.  The Estate is therefore entitled to an award of reasonable

63

attorneys' fees and costs of suit in prosecuting the present action, under the provisions of the Equal Access to Justice Act, 28 U.S.C. § 2412; F.R.Civ.P. 54; and pursuant to other provisions of law.

WHEREFORE, the plaintiff demands judgment against defendants as follows:

A.  Damages in the amount of $30,000,000.00;

B.  Plaintiff's costs and reasonable attorneys' fees in this action; and

C.  Such other and further relief as the Court deems just and proper.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

<div style="margin-left:auto;">

RESPECTFULLY SUBMITTED

PLAINTIFF

</div>

by their attorneys:

Robert S. Sinsheimer, Esq., BBO # 464940
Susan E. Sivacek, Esq., BBO # 644771
Sinsheimer and Associates
4 Longfellow Place, Suite 3501
Boston, MA 02114
(617) 722-9954

Dated: October 17, 2002

# SINSHEIMER AND ASSOCIATES

## COUNSELLORS AT LAW

### 4 LONGFELLOW PLACE
### SUITE 3501-06
### BOSTON, MASSACHUSETTS 02114

Telephone
617-722-9954
617-227-2800
Facsimile
617-973-1562

September 14, 2001

Robert S. Sinsheimer, Esq.
robsins@aol.com

Susan E. Sivacek, Esq.
ssivacek@aol.com

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Louis J. Freeh, Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, D.C. 20535-0001

Charles Prouty
Special Agent in Charge
Federal Bureau of Investigation
One Center Plaza, Suite 600
Boston, MA 02108

Dear Gentlemen,

This office represents the Estate of Debra Davis ("Estate").  Pursuant to the provisions set forth in the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, and 28 C.F.R. 14.2(c), this letter serves as notice of the Estate's claims against the Federal Bureau of Investigation ("FBI"), its agents, servants, and/or representatives of the Federal Bureau of Investigation, including but not limited to: United States of America, H. Paul Rico, John Morris, John J. Connolly, Roderick Kennedy, Robert Fitzpatrick, Larry Potts, Bruce Ellavsky, James Ring, James Greenleaf, Edward Clarke and Edward Quinn (collectively "the defendants") for the wrongful death of Debra Davis. Pendant to the federal claims, the Estate has also brought state claims including a wrongful death action pursuant to M.G.L. c. 229.

Olga Davis (hereinafter also referred to as "Ms. Davis") has been appointed as administratrix of the Estate of Debra Davis.  See Exhibit A.  Ms. Davis is the mother of Debra Davis.  Pursuant to U.S.C. 28 § 2675, the Estate claims money damages in the amount of $30,000,000.00 for the wrongful death and conscious suffering of Debra Davis as well as other allowable damages for which the FBI and its agents, servants, and/or representatives are liable under the laws of the United States and Commonwealth of Massachusetts.

**EXHIBIT A**

Louis J. Freeh, Director
Federal Bureau of Investigation
September 14, 2001

      This claim arises out of the kidnaping, torture and execution of Debra Davis and the conspiracy of the defendants to cover up the circumstances of her death. The Estate alleges that beginning in or about 1965 and continuing up to the filing of this notice of claim, the defendants conspired to protect and shield from prosecution Stephen Flemmi, James Bulger and others, in exchange for Bulger's and Flemmi's agreement to provide information to the FBI that could and would be used by that agency in its prosecution of Bulger's and Flemmi's competitors in the Boston Organized Crime market. The Boston Office of the FBI and its agents did not want Flemmi and Bulger to be charged with crimes because, if they were, the Boston office would lose their services as informants. Prosecution of Bulger and Flemmi would also have eventually resulted in the disclosure that the FBI was engaging in conduct in violation of its rules and regulations, as well as the laws of the United States of America. In fact, once the protection afforded to Bulger and Flemmi dissolved, the disclosures associated to their relationship with the FBI led to the indictment of Bulger and Flemmi's "handler". See U.S. v. Connolly, Criminal Number 99-10428-JLT.

      It is alleged that certain of the defendants, acting in their official capacities and within the scope of their employment, allowed Flemmi and Bulger to continue to conduct their criminal activities with impunity, including murdering Debra Davis, when they knew or should have known that Debra and others were in danger. Allowing Flemmi and Bulger to continuously commit serious crimes, under the protection of the federal government amounts to nothing less than gross negligence. As a proximate cause of this gross negligence, Debra Davis' rights, as guaranteed by the Fourth and Fifth Amendments to the United States Constitution were violated. Despite Debra's sudden disappearance, and the coincidence that other individuals associated with Flemmi and Bulger had been murdered, Debra's disappearance was met with studied indifference.

      In addition to failing to protect Debra Davis from the murderous criminals they were harboring, the defendant employees of the FBI intentionally avoided investigating Debra's disappearance and apparent murder after wresting the case away from the state and local police. Debra's mother, Olga Davis, reported her missing to the Randolph Police Department within twenty-four hours of her daughter's disappearance. Ms. Davis believes she initially spoke with an Officer Carvel at the Randolph Police Department. Two days later, Ms. Davis received a call from a representative of the Federal Bureau of Investigation informing her that the FBI would be "taking over the investigation."

<div align="center">2</div>

Louis J. Freeh, Director
Federal Bureau of Investigation
September 14, 2001

Shortly thereafter, Ms. Davis met with approximately four agents from the Bureau at their direction. The agents requested that Ms. Davis meet with them in a car at a secluded area. Their purported reason for doing so was "in case Flemmi was around." The agents asked some preliminary questions about Debra, such as description of her appearance. The agents then switched gears and quickly began prodding Ms. Davis for whatever information she knew about Stephen Flemmi, ostensibly to learn whether Ms. Davis knew anything about Flemmi's involvement with the FBI. They no longer appeared to be concerned specifically about Debra's disappearance.

Ms. Davis met with agents from the FBI, at their behest, approximately once a month over the next year. The agents insisted they meet in motel rooms and parking lots. Ms. Davis recalls being asked questions regarding her knowledge of what Mr. Flemmi did for a living and whether or not she had ever overheard any of his telephone conversations. The agents continued to fish for information Ms. Davis might know about Flemmi but made no apparent progress regarding Debra's disappearance and, in fact, seemingly lost interest in the investigation.

Ms. Davis felt extremely intimidated by these meetings in which she was always asked to meet with several agents by herself, with the exception of one time when Michelle Davis, Debra's sister was present. Ms. Davis was never asked to meet with the agents at FBI headquarters, nor did they ever meet with her at her home. Instead, they insisted on meeting her at out of the way places, such as the parking lot of St. Bernadette's Church in Randolph.

The agents made statements to Ms. Davis to the effect that if James Bulger and Steven Flemmi murdered somebody, they would know how to make a body disappear because they knew people who worked at funeral parlors. These statements were highly inappropriate and upset Ms. Davis. Moreover, she felt they were intended to be veiled threats not to pursue any help from local authorities outside of the FBI.

Michelle Davis also recalls being asked questions about Mr. Flemmi, which she believed were designed to discover exactly how much she knew about Flemmi's involvement with the FBI. Michelle Davis resided for a time with Mr. Flemmi and Debra in Brookline. Michelle Davis was repeatedly asked by the agents what she knew of Flemmi's business and what, if anything, she may have heard him discussing in telephone conversations.

3

Louis J. Freeh, Director
Federal Bureau of Investigation
September 14, 2001

     Olga Davis recalls being instructed by the agents not to talk to anyone else and being advised that she "has eight other kids to worry about". Again, Ms. Davis felt this was a highly inappropriate comment and interpreted this as a warning not to pursue any investigation into her daughter's disappearance. Instead of feeling reassured by the FBI's involvement, Ms. Davis recalls feeling nervous and scared by the agents' behavior. The very people who should have been helping Ms. Davis find her daughter frightened her and did nothing to locate Debra.

     On at least one occasion, Ms. Davis recalled that the conversation between herself and the FBI was recorded on a reel to reel recorder but, despite numerous requests, Ms. Davis has not been able to recover such recordings.

     As time went on, it became apparent to Ms. Davis that the FBI had no intention of investigating Debra's disappearance, and in fact, prevented local authorities from pursuing any investigation as well. Ms. Davis recalls providing local authorities with pictures of Debra, to aid the search. After the FBI became involved in the matter, Ms. Davis approached the local authorities to have the pictures returned to her, only to be told they were "missing". Ms. Davis believes that the federal authorities took custody of these pictures, but did not in fact use them to locate her.

     Ms. Davis now knows, and has long suspected, that Debra was murdered by Stephen J. Flemmi and James J. Bulger. She now also knows that at the time of Debra's disappearance, these two men were working as informants for the FBI and operating a criminal organization under the protection of the agency.

     The allegations made herein are buttressed by the fact that a federal jurist, The Honorable Mark Wolf, has, in essence, made similar allegations. At Mr. Flemmi's sentencing hearing on August 21, 2001, Judge Wolf stated, "If Mr. Flemmi has committed any of the crimes with which he remains charged, he was able to do so largely because of the protection of the Federal Bureau of Investigation." See Exhibit B, Transcript p. 8. See also DICK LEHR & GERARD O'NEILL, BLACK MASS: THE IRISH MOB, THE FBI AND A DEVIL'S DEAL (PublicAffairs Pub.) (2000) and RALPH RANALLI, DEADLY ALLIANCE (HarperCollins Pub.) (2001). One of these crimes was the murder of Debra Davis. Clearly, not only did the FBI provide the protection with which Flemmi was able to conduct criminal activities, they actively worked to prevent any local authorities from investigating these crimes and continued to protect their informants from any

4

Louis J. Freeh, Director
Federal Bureau of Investigation
September 14, 2001

investigatory scrutiny.  Because of these actions by the federal agents, Ms. Davis and her family did not learn what happened to their daughter and sister, Debra, until nearly <u>nineteen</u> years after her disappearance.

Had it not been for the FBI's recruitment and protection of Mr. Flemmi as an informant, Ms. Davis believes that her daughter would be alive today.  As Judge Wolf further noted, "All of the murders with which Mr. Flemmi is charged in the pending cases against him occurred after he was told by [Paul] Rico in 1974 to return to Boston and, as promised, the charges against him were dismissed." Ex. B, Tr. p. 8.

The FBI's flagrant disregard for the guidelines for handling informants allowed Mr. Flemmi to remain on the streets, engaging in criminal activity, while "working" as an informant. Had the FBI not offered Mr. Flemmi such protection, he doubtless would have been unable to continue these activities and "would have been killed or in prison" as long ago as 1969 when he was tipped off and encouraged to flee by federal agent, Paul Rico.  Ex. B, Tr. p. 8.

Even after the FBI became aware that Debra Davis had disappeared in 1981, they did nothing to investigate Flemmi's involvement in that crime.  In fact, Ms. Davis asserts that they did the exact opposite - they turned a blind eye and squelched any attempts to investigate the matter.  Mr. Flemmi was allowed to roam free and continue on with his criminal activities for nearly thirteen more years.

In the meantime, Ms. Davis and her family have lived in fear, both from Mr. Flemmi and also from the very body of law enforcement supposed to protect her.  Ms. Davis has had to live with the knowledge that not only was her beloved daughter murdered, she was murdered by a man the federal government nurtured and protected.

Ms. Davis, on behalf of the Estate of Debra Davis, hereby provides notice of her intent to bring claims against the Federal Bureau of Investigation and its agents and/or representatives, including but not limited to: United States of America, H. Paul Rico, John Morris, John J. Connolly, Roderick Kennedy, Robert Fitzpatrick, Larry Potts, Bruce Ellavsky, James Ring, James Greenleaf, Edward Clarke and Edward Quinn for (a) conspiracy to protect James Bulger, Stephen Flemmi and their associates from arrest and prosecution, and that as a proximate cause thereof, Debra Davis' rights as guaranteed by the Fourth and Fifth Amendments to the United

5

Louis J. Freeh, Director
Federal Bureau of Investigation
September 14, 2001

States Constitution were violated by her kidnaping, torture and execution and the Estate's rights as guaranteed by the Fourth and Fifth Amendments to the United States Constitution to petition the government and not be deprived of property without due process of law were violated by the defendants' interference with the Estate's right to seek a civil remedy for the kidnaping, torture and murder of Debra Davis; (b) substantive <u>Bivens</u> actions against the defendants for the violations of Debra Davis' constitutional rights as protected by the Fourth and Fifth Amendments to the United States Constitution; (c) civil conspiracy to protect James Bulger, Stephen Flemmi and their associates from arrest and prosecution, and that as a proximate cause thereof, Debra Davis was kidnaped, tortured and executed resulting in damages pursuant to M.G.L.A. c. 229 §§ 2, 6; and (d) substantive claims against the defendants for the wrongful death of Debra Davis pursuant to M.G.L.A. c. 229 §§ 2, 6. The Estate further intends to seek punitive damages.

As a direct and proximate result of the negligent, willful, malicious and unlawful acts of the Federal Bureau of Investigation, its agents, servants and/or representatives, the Estate sustained damages in the amount of $30,000,000.00. Pursuant to 28 U.S.C. § 2657(b), the Estate reserves the right to amend or supplement its claimed damages if newly discovered evidence not reasonably discoverable at this time comes into existence or intervening facts relating to this claim arise.

Thank you for your prompt attention to this claim.

Sincerely yours,

Robert S. Sinsheimer, Esq.
Susan E. Sivacek, Esq.

Enclosure
cc:   Ms. Olga Davis
     Ms. Michelle Davis
     Mr. Victor Davis

c:\SSF\Davis\Presentment Letter

6